# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF NEW YORK, et al.,

       Plaintiffs,

    v.

DONALD TRUMP, IN HIS OFFICIAL CAPACITY
AS PRESIDENT OF THE UNITED STATES, et al.,

       Defendants.

C.A. No. 1:25-cv-00039

## PLAINTIFF STATES' MOTION FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

# Contents

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

   I.   Legal Background .................................................................................................... 2

      A.   The Law of Federal Funding........................................................................ 2

      B.   Federal Funds to States ................................................................................ 4

         1.   Major Mandatory Federal Funding Streams ................................................ 4

         2.   The Infrastructure Investment and Jobs Act and the Inflation Reduction Act........... 6

   II.   Factual Background ................................................................................................11

      A.   President Trump's Executive Orders .........................................................11

      B.   OMB Memorandum M-25-13................................................................... 13

      C.   OMB's "Rescission" of OMB Directive .................................................. 16

      D.   Agency Implementation of the Funding Freeze......................................... 16

         1.   Immediate and Ongoing Freeze ................................................................. 17

         2.   The Rescission Did Not Cease the Fallout ................................................ 21

      E.   Ongoing Pauses Have Caused and Continue to Cause Irreparable Harm .................. 24

      F.   The Court's TRO, And Defendants' Noncompliance ................................. 34

LEGAL STANDARD .......................................................................................................... 35

ARGUMENT ...................................................................................................................... 35

   I.   Plaintiff States Have Standing to Assert Their Claims. .................................... 35

   II.   This Case Is Ripe for Suit. ................................................................................... 37

   III.   State Plaintiffs Have Established a Likelihood of Success on the Merits. ................... 41

      A.   The Funding Freeze Violates Separation-of-Powers Principles and Multiple Overlapping Constitutional Constraints (Counts III, V)........................................ 43

         1.   The Constitution Prohibits the Executive from Declining to Spend Funding that Congress Has Duly Authorized and Appropriated........................................ 43

         2.   The Funding Freeze Contravenes These Constitutional Principles by Asserting Executive Authority to Decline to Spend Funds That Congress Has Authorized and Appropriated. .......................................................... 47

      B.   The Funding Freeze Is Ultra Vires Because It Exceeds the Executive's Statutory Authority (Count I). ................................................................. 50

C.    The Funding Freeze Violates the Spending Clause by Failing to Afford States Fair Notice of Funding Conditions (Count IV). ........................................................... 51

D.    The Funding Freeze Violates the APA (Counts I, II). ..................................... 52

    1.    The Agency Defendants Engaged in Final Agency Action Subject to Challenge. 53

    2.    The Funding Freeze Violates the APA Because It Is Contrary to Law and Ultra Vires. ...................................................................................................... 54

    3.    The Funding Freeze Is Arbitrary and Capricious .................................... 56

IV.    Plaintiff States Will Be Irreparably Harmed Absent a Preliminary Injunction. ............ 57

    A.    Withholding Federal Funding Will Frustrate Programs that Benefit Plaintiff States, Their Residents, and the Environment. .................................................................. 58

    B.    Defendants' Funding Freeze Has Caused Budgetary Confusion and Interfered with State Agencies' Ability to Plan for Provision of Essential Services for Public Health and Safety and the Environment. ..................................................................... 61

    C.    These Irreparable Injuries Are Already Occurring and Are Likely to Continue. ........... 64

V.    The Public Interest and Balance of Equities Strongly Favor Entry of a Preliminary Injunction. ........................................................................................... 65

VI.    Plaintiff States Are Entitled to Preliminary Relief in the Form Requested. ................. 69

CONCLUSION ........................................................................................... 70

## INTRODUCTION

On January 20, 2025, the Trump Administration started to implement what became known as the Federal Funding Freeze, which implicates billions of dollars in federal funding across the Plaintiff States. This freeze, which paused the majority of Federal financial assistance in order to implement a series of Executive Orders ("EOs"), was ultimately set forth in writing on January 27 in a now-rescinded Directive by the Office of Management and Budget ("OMB"). While that Directive (the "OMB Directive") was withdrawn, this Court correctly found that rescission to be "in name-only." ECF 50 at 10. The Federal Funding Freeze has not stopped, and, indeed, Defendants now affirmatively take the position that certain massive areas of funding, including billions of dollars Congress appropriated in the Infrastructure Improvement and Jobs Act ("IIJA") and Inflation Reduction Act ("IRA"), can and should remain frozen. As described below, the Funding Freeze manifested through actions, communications, and disruptions across State agencies—before and after the rescission of the OMB Directive—which interfered with myriad programs that allow the States to provide essential services to their residents.

Plaintiff States do not contend that the Executive Branch can never make alterations to grants of federal funding, but it cannot do so via unilateral action untethered to the specific statutes, regulations, and grant or contract terms that govern each funding stream. Congress has not given the Executive power or federal agencies the power to categorically "pause" all Federal financial assistance—including funds that Congress has expressly directed to specific recipients and purposes—while federal agencies try to figure out where they might have some authority to reassess funding commitments, let alone to pause all Federal financial assistance indefinitely, as this Court has already concluded. ECF 50 at 5. The Executive Branch's power here is thus at its "lowest ebb." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637–38 (1952) (Jackson, J.,

concurring). And, agencies "literally ha[ve] no power to act . . . unless and until Congress confers power upon" them. *See City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (internal citation and quotation marks omitted). For these reasons, Plaintiff States are likely to succeed on their claims that the Funding Freeze is unconstitutional, exceeds statutory authority, and violates the Administrative Procedure Act ("APA").

Plaintiff States have also more than demonstrated that they will suffer irreparable harm in the absence of preliminary injunctive relief. On a daily basis, Plaintiff States rely on federal funding to provide essential services—including childcare, health care, public safety, emergency management, workforce development, unemployment insurance, transportation and infrastructure, and so much more—to all of their residents. The Funding Freeze is already harming Plaintiff States, as described in detail below and in the numerous declarations submitted with this Motion. That same evidence demonstrates why both a balance of equities and the public interest strongly favor entry of a preliminary injunction in this case.

## **BACKGROUND**

### I.    **Legal Background**

#### A.    **The Law of Federal Funding**

"The United States Constitution exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). Specifically, the Constitution grants to Congress the authority to levy taxes, fund government operations, and set terms and conditions on that funding, U.S. Const. art. I, § 9, cl. 7; art. I, § 8, cl. 1, and vests all legislative powers in Congress, while establishing a specific procedure by which laws, including spending laws, are enacted. U.S. Const. art. I, § 1; art. I, § 7, cl. 2, 3. The President, by contrast, has a limited role in lawmaking. The President may recommend laws for Congress's

consideration, including those related to spending. U.S. Const. art. II, § 3. And upon presentment with a bill, the President may sign it into law, veto it, or take no action on it for a period of ten days, after which time it becomes law. U.S. Const. art. I, § 7, cl. 2. Once a spending law is enacted, the Constitution imposes on the President a duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

Congress authorizes federal spending not through one single piece of legislation but through many. To finance federal programs and activities, Congress grants "budget authority" to executive agencies, i.e., authorization for an agency to incur financial obligations that will result in immediate or future disbursements of federal funds from the United States Treasury. *See* 2 U.S.C. § 622(2)(A)(i). One form of budget authority is an appropriation, which creates the legal authority to "make funds available for obligation" and to make "expenditures" for the purposes, during the time periods, and in the amounts specified in the law authorizing the appropriations. *See id.* An "obligation" is a "definite commitment that creates a legal liability of the government for the payment of goods and services ordered or received, or a legal duty on the part of the United States that could mature into" such a liability; an "expenditure," also known as a "disbursement," is the actual spending of federal funds. U.S. Gov't Accountability Off., *A Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP, at 45, 48, 70 (Sept. 2005), https://www.gao.gov/assets/gao-05-734sp.pdf ("Budget Glossary"). Congress has enacted multiple overarching framework statutes that affirm congressional control over federal spending. First, the so-called "purpose statute" states that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law," 31 U.S.C. § 1301(a)—that is, funds can only be used for the purposes that Congress has designated. Second, the Antideficiency Act, 31 U.S.C. §§ 1341 *et seq*., prevents agencies from obligating or spending

3

funds absent congressional appropriation. Finally, the Congressional Budget and Impoundment Control Act of 1974, 2 U.S.C. §§ 681 *et seq.* ("ICA"), permits the Executive Branch to "impound" (or decline to spend) federal funds under a small set of highly circumscribed conditions.

In sum, the spending power is Congress's, and Congress has not delegated any power to the President to categorically pause the execution of Congress's Spending Clause legislation. Not only has Congress not given the Executive any such broad authority, but, to the contrary, when it has acted in this area, it has given the President highly circumscribed authority, which not even Defendants maintain gives them power to take their challenged actions.

### B.    Federal Funds to States

In addition to enacting framework statutes governing the Executive's power over federal funds as a general matter, Congress also establishes the terms and conditions under which federal funds are specifically made available to States and other funding recipients. Although some such statutes may permit the Executive some discretion over some aspects of federal funding, many do not, and instead *require* the Executive to obligate and expend funds consistent with Congress's priorities. The examples that follow illustrate the wide range of federal funds that Congress has authorized, appropriated, and directed be disbursed to recipients, including Plaintiff States.

#### 1.   Major Mandatory Federal Funding Streams

This case implicates a wide range of federal funding streams to Plaintiff States and their residents, many of which have been in place for decades. A large number of the most significant funding streams to the States are so-called categorical or "formula" grants, which Congress has instructed the Executive to provide to States on the basis of enumerated statutory factors, such as population or the expenditure of qualifying state funds. *See, e.g.*, *City of Los Angeles v. Barr*, 941 F.3d 931, 934–35 (9th Cir. 2019) (describing the statutory factors determining eligibility for

specific formula grant); *City of Philadelphia v. Att'y Gen. of United States*, 916 F.3d 276, 280 (3d Cir. 2019) (same). Perhaps of greatest significance to the States, Congress has directed the Secretary of Health and Human Services to "pay to each State" a fixed portion of their annual Medicaid expenditures, 42 U.S.C. § 1396b(a)—an amount totaling over $800 billion annually, U.S. Dep't of Health & Human Servs., Centers for Medicare & Medicaid Servs., *NHE Fact Sheet*, https://bit.ly/42xCy4i (last updated Dec. 18, 2024), and amounting to one of the States' most significant sources of federal funds.

Congress has likewise directed other agencies to provide States with funds according to a fixed formula. For instance, Congress has established a statutory formula by which the Secretary of Transportation is required to distribute federal highway funds to States, *see* 23 U.S.C. § 104(a)(1), (b), (c), totaling more than $500 million annually in the coming two fiscal years, *id.* § 104(a)(1). The apportionment methodologies are mandatory and do not permit the Secretary to deviate from the formula, *id.* § 104(b) ("The Secretary *shall* distribute the amount of the base apportionment . . . ."); *id.* § 104(c) ("[T]he amount for each State *shall* be determined as follows . . . .") (emphasis added), much less decline unilaterally to release funds to States for highway construction and maintenance.

Congress has also specifically instructed federal agencies to give States the funds they need to ensure that children in their jurisdictions grow up healthy and safe. The Individuals with Disabilities Education Act ("IDEA"), for instance, states that "[t]he Secretary [of Education] shall make grants to States . . . to assist them to provide special education and related services to children with disabilities" according to a statutory formula. 20 U.S.C. § 1411(a)(1); *see id.* § 1411(a), (d) (setting amounts of grants based on prior funding levels and population data). Congress did not confer any discretion on the Secretary to withhold this funding without cause or on a categorical

basis. Indeed, Congress imposed specific limits on the Secretary's ability to withhold funds, permitting it only if he determines, "for [three] or more consecutive years, that a State needs intervention . . . in implementing the [statutory] requirements," or that a "State needs substantial intervention." *Id.* § 1416(e)(2)-(3). It buttressed those limitations with specific procedural protections for the States in actually obtaining IDEA funding, barring the Secretary from denying a State payment without "reasonable notice" and "an opportunity for a hearing." *Id.* § 1412(d)(2).

Other examples abound. Congress, for instance, has directed the Secretary of HHS to provide nondiscretionary block grants to States for mental health and substance abuse treatment, and appropriates over $2 billion annually to fund those grants. The Secretary "shall make" or "shall determine the amount of" grants according to fixed statutory formulas, 42 U.S.C. §§ 300x(a), 300x-7(a), 300x-21(a), 300x-33(a), and lacks the discretion to unilaterally withhold funds absent compliance with statutory procedures that afford the States notice and an opportunity to be heard. *See, e.g.,* §§ 300x-26(b)(1), 300x-55(e). Congress also established the Low Income Home Energy Assistance Program ("LIHEAP"), likewise administered by the HHS Secretary, to support the States in their efforts to ensure low-income residents are able to obtain power and heat in the winter. 42 U.S.C. § 8621(a). Congress has appropriated billions of dollars for LIHEAP, which established a set formula by which the Secretary must provide funding to the States, *id.* §§ 8623(a), 8626(a)(1); and sharply limited the Secretary's discretion to withhold those funds (again, by requiring notice to the State and an opportunity for a hearing), *id.* § 8627.

### 2. The Infrastructure Investment and Jobs Act and the Inflation Reduction Act

This case also implicates more recent—but no less significant—funds that Congress has appropriated and specifically directed be expended on certain purposes, often under existing

statutorily authorized programs. In the first two years of the Biden Administration, Congress enacted, and President Biden signed into law, two federal statutes that made significant investments in, among other things, energy and infrastructure projects across the Nation. *See* Inflation Reduction Act of 2022, Pub. L. No. 117-169, 136 Stat. 1818 (2022) ("IRA"); Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (2021) ("IIJA"). These statutes collectively directed over $2 trillion in spending on projects ranging from federal highway aid to broadband access to pollution reduction to electric grid renewal. The following specific programs exemplify the kinds of federal funds that Congress has specifically directed be spent, but that the Executive has decided to freeze without reference to statutory commands.

For example, section 50210 of the IIJA appropriated $14.65 billion in grants for States' Clean Water revolving funds[1] for 2022 to 2026. IIJA § 50210, 135 Stat. at 1169. These funds were originally created through a separate statute, the Federal Clean Water Act, which directs that the U.S. Environmental Protection Agency ("EPA") "shall make capitalization grants to each State" to establish and support those States' water pollution control revolving funds for wastewater and sewage treatment, stormwater management and treatment, and water conservation and recycling projects using formula grants. 33 U.S.C. §§ 1381(a), (b); 1383(c); 1384(a), (c)(2). Congress did not confer discretion on the EPA Administrator to withhold this funding on a categorical basis, or because of purported policy disagreements with the statutory requirements. *See* 33 U.S.C. §§ 1381(a), (b) (use of mandatory "shall"); 1384(a), (c)(2) (mandating reallocation of any unallotted funds to State programs). Several of the Plaintiff States received Clean Water revolving fund awards under the IIJA appropriation—all of which are subject to final, binding grant

---

[1] Legislation creating a "revolving fund" establishes a "continuing appropriation which, unless restricted by the terms of the legislation, is available for obligation without further legislative action to carry out the fund's authorized purposes." GAO-16-464SP, at 2-25.

agreements. *See, e.g.*, Ex. 113 to Thomas-Jensen Aff. ¶¶ 17–20 ($9,022,000 grant to Washington); Ex. 35 to Thomas-Jensen Aff. ¶¶ 5, 7-9 ($439,012,000 in grants to California); Ex. 97 to Thomas-Jensen Aff. ¶ 4 (Oregon).

Similarly, the IIJA reauthorized and appropriated an additional $14.65 billion from 2022 to 2026 for Drinking Water State revolving funds. IIJA § 50102, 135 Stat. at 1136. Congress created these revolving funds in the Federal Safe Drinking Water Act, which provides that EPA "shall offer to enter into agreements with eligible States to make capitalization grants" via formula grants. 42 U.S.C. § 300j-12(a)(1)(A), (C), (E. Congress did not confer discretion on the EPA Administrator to withhold this funding. *See id.*; *see also id.* § 300j-12(a)(1)(E) (mandating reallocation of any unallotted funds to State programs). These funds provide loans and other financial assistance to public water systems, including for the replacement or rehabilitation of aging treatment, storage, and distribution facilities. 42 U.S.C. § 300j-12(a)(2)(B). Multiple Plaintiff States have received Safe Drinking Water revolving fund awards through final, binding grant agreements. For example, California's drinking water state revolving fund grants from 2022 to the present alone amount to more than $1 billion. Ex. 35 to Thomas-Jensen Aff. ¶¶ 5, 7; *see also, e.g.*, Ex. 122 to Thomas-Jensen Aff. ¶¶ 6-7 (estimated $215.8 million to Colorado); Ex. 23 to Thomas-Jensen Aff. ¶¶ 10-11 (seven grants to Arizona).

The IRA also appropriated $117.5 million to EPA to award grants under an existing air monitoring program established in the 1963 Clean Air Act, 42 U.S.C. §§ 7401(a)(4), 7403(a)-(c), 7405. EPA "shall," Congress instructed, "provide financial assistance to air pollution control agencies" in conducting their activities, *id.* § 7403(a)(2), including the mandatory establishment of a national air monitoring network and research program. *Id.* § 7403(c). EPA has awarded such grants to multiple Plaintiff States, all of which are subject to final, binding grant agreements with

EPA. For example, EPA awarded Arizona's Department of Environmental Quality $1.1 million to replace and repair aging air monitoring infrastructure to ensure accurate air quality data. Ex. 23 to Thomas-Jensen Aff. ¶ 7; *see also, e.g.*, Ex. 28 to Thomas-Jensen Aff. ¶¶ 5, 7(a), 12, 15, Ex. C ($1,035,400 to California); Ex. 59 to Thomas-Jensen Aff. ¶ 9(e), Ex. A ($1,170,472 to Massachusetts); Ex. 84 to Thomas-Jensen Aff. ¶ 12 ($906,000 to New Jersey); Ex. 106 to Thomas-Jensen Aff. ¶¶ 58–62 ($870,472 to Rhode Island); Ex. 97 to Thomas-Jensen Aff. ¶ 15 (Oregon); Ex. 73 to Thomas-Jensen Aff. ¶¶ 6, 8 (Michigan).

The IRA also created the Climate Pollution Reduction Grant ("CPRG") program, in which Congress appropriated $5 billion to EPA and directed that EPA "shall competitively award grants to eligible entities to implement" greenhouse gas pollution reduction plans, and "shall make funds available" to grantees. 42 U.S.C. § 7437(a)(1), (2); (b); (c)(1), (3). EPA awarded grants to multiple Plaintiff States, all obligated under final, binding grant agreements with EPA. *See, e.g.*, Ex. 42 to Thomas-Jensen Aff. ¶¶ 5, 7, Ex. A ($500 million to California subdivision); Ex. 28 to Thomas-Jensen Aff. ¶ 8, Ex. B (nearly $3 million to California Air Resources Board); Ex. 61 to Thomas-Jensen Aff. ¶¶ 2–3, 8 (nearly $3 million to Massachusetts); Ex. 84 to Thomas-Jensen Aff. ¶¶ 9-11, Exs. E, F (more than $250 million to New Jersey); Ex. 106 to Thomas-Jensen Aff. ¶¶ 32-33, Ex. G ($3 million to Rhode Island); Ex. 20 to Thomas-Jensen Aff. ¶ 7, Ex. B ($3 million to Arizona); Ex. 72 to Thomas-Jensen Aff. ¶ 3, Ex. C (nearly $3 million to Maine); Ex. 49 to Thomas-Jensen Aff. ¶ 6, Ex. A ($3 million to Hawaii); Ex. 97 to Thomas-Jensen Aff. ¶¶ 4, 14 (nearly $200 million to Oregon); Ex. 123 to Thomas-Jensen Aff. ¶ 4 ($132 million to Colorado). Through CPRG, EPA also awarded grants to a coalition of States, including more than $421 million to Maryland, South Carolina, Virginia, and North Carolina, Ex. 83 to Thomas-Jensen Aff. ¶¶ 2–6, Ex. B, as well as

$450 million to coalition including Connecticut, Massachusetts, Rhode Island, Maine, and New Hampshire, Ex. 44 to Thomas-Jensen Aff. ¶ 19, Ex. D.

The IRA also created the Solar for All program and appropriated to EPA $7 billion to make grants to States and other eligible recipients "to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies," including rooftop solar panels and storage systems. 42 U.S.C. § 7434(a)(1). Many Plaintiff States received Solar for All grants, all of which are subject to final, binding agreements with EPA. *See e.g.*, Ex. 64 to Thomas-Jensen Aff. ¶ 2 ($156 million to Massachusetts); Ex. 123 to Thomas-Jensen Aff. ¶ 4 ($156 million to Colorado); Ex. 20 to Thomas-Jensen Aff. ¶ 8 (almost $156 million to Arizona); Ex. 44 to Thomas-Jensen Aff. ¶ 11 ($62 million to Connecticut); Ex. 82 to Thomas-Jensen Aff. ¶ 21 ($62 million to Minnesota); Ex. 95 to Thomas-Jensen Aff. ¶ 6 (almost $250 million to New York); Ex. 117 to Thomas-Jensen Aff. ¶ 15 ($156 million to Washington; Ex. 108 to Thomas-Jensen Aff. ¶ 5 ($49 million to Rhode Island); Ex. 52 to Thomas-Jensen Aff. ¶ 5 ($62 million to Hawaii); Ex. 71 to Thomas-Jensen Aff. ¶ 2, Ex. B ($62 million to Maine); Ex. 73 to Thomas-Jensen Aff. ¶ 8 (Michigan).

Another section of the IRA, entitled the High-Efficiency Electric Home Rebate Act, provides that the Secretary of Energy "shall award grants to State energy offices . . . to establish a high-efficiency electric home rebate program under which rebates shall be provided" for heat pump heating and cooling and other electrification projects for low- and moderate-income households and appropriated $4.5 billion through 2031 for a home rebate program. 42 U.S.C. § 18795a(a)(1), (c), (d)(1), (d)(6); § 18795a(a)(2)(A)(i). The U.S. Department of Energy ("DOE") awarded several Plaintiff States grants under this formula grant program, all of which are subject to final, binding grant agreements. *See, e.g.*, Ex. 40 to Thomas-Jensen Aff. ¶ 8 ($290 million to

10

California); Ex. 122 to Thomas-Jensen Aff. ¶ 31 ($140 million to Colorado); Ex. 95 to Thomas-Jensen Aff. ¶¶ 15, 23 ($317.4 million to New York); Ex. 20 to Thomas-Jensen Aff. ¶ 6 ($76.4 million to Arizona); Ex. 85 to Thomas-Jensen Aff. ¶ 12 (approximately $183 million to New Jersey); Ex. 82 to Thomas-Jensen Aff. ¶¶ 16–19 ($148.5 million to Minnesota); Ex. 108 to Thomas-Jensen Aff. ¶¶ 40, 42 ($63.8 million to Rhode Island); Ex. 67 to Thomas-Jensen Aff. ¶¶ 6, 9-10 (approximately $135 million to Maryland).

## II.    Factual Background

### A.  President Trump's Executive Orders

Between January 20 and 28, 2025, the President issued multiple EOs indicating that commitments to various federal funding recipients would be reviewed and might ultimately be paused or rescinded in connection with widespread policy changes.

The clearest statement of a funding freeze came in an EO entitled *Unleashing American Energy* (the "*Unleashing* EO"), issued on January 20. Compl. ¶¶ 66, 67. In the *Unleashing* EO, the President announced a categorical, immediate, and indefinite pause on federal funds under the IIJA and IRA. Exec. Order 14154, 90 Fed. Reg. 8353 (Jan. 29, 2025), attached as Ex. 1 to Thomas-Jensen Aff. Specifically, Section 7 of the EO, entitled "Terminating the Green New Deal," orders all federal agencies to "immediately pause the disbursement of funds appropriated through the [IRA] or the [IIJA]." *Id.* at 8357. The EO directs all agencies to "review their processes, policies, and programs for issuing grants, loans, contracts, or any other financial disbursements of such appropriated funds for consistency with the law and the policy outlined in section 2 of this order" and submit a report to OMB detailing "recommendations to enhance their alignment with the policy set forth in section 2." *Id.* Section 2, in turn, details the President's energy policy priorities, including encouraging fossil fuel and minerals exploration and production, eliminating "the

11

electric vehicle (EV) mandate," and "ensur[ing] that no Federal funding be employed in a manner contrary to the principles outlined in this section, unless required by law." *Id.* at 8353. "No funds shall be disbursed," the *Unleashing* EO directs, until OMB and NEC have deemed "such disbursements consistent with any review recommendations they have chosen to adopt." *Id.* at 8357.

Other EOs likewise called on agencies to consider funding freezes. A similar call for a funding freeze, or "pause," appears in another EO entitled *Protecting the American People Against Invasion* (the "*Invasion* EO"), though without citing specific statutes. Compl. ¶¶ 60-62. The Invasion EO announces a policy "to achieve the total and efficient enforcement" of immigration laws, and to that end, calls for a "Funding Review." Exec. Order 14159, Fed. Reg. 8443, 8443-8447 (Jan. 29, 2025), attached as Ex. 3 to Thomas-Jensen Aff. The *Invasion* EO directs the Attorney General and Secretary of Homeland Security to review "all contracts, grants or other agreements providing federal funding to non-governmental organizations" that provide services to "removable or illegal aliens," to "ensure that such agreements conform to applicable law and are free of waste, fraud, and abuse, and that they do not promote or facilitate violations of our immigration laws"— and to "*[p]ause distribution of all further funds* pursuant to such agreements pending the results of*" this review. *Id.* at 8447 (emphasis added).

At least three other EOs issued between January 20 and January 28 announce a change in policy related to federal funding, making express reference to federal grants as a subject for further review and unspecified action. A January 20 EO entitled *Ending Radical and Wasteful Government DEI Programs and Preferencing* (the "*DEI* EO") declares an intention to eliminate "diversity, equity, and inclusion (DEI)" programs. Compl. ¶¶ 63, 64; Exec. Order 14151, 90 Fed. Reg. 8339, 8339 (Jan. 29, 2025), attached as Ex. 2 to Thomas-Jensen Aff. The *DEI* EO directs federal agencies

to provide the Director of OMB a list of all federal grantees who received federal funding to provide or advance DEI or "environmental justice." Ex. 2 to Thomas-Jensen Aff. at 8339-40. An EO entitled *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (the "*Gender* EO") requires similar assessments. Exec. Order 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025), attached as Ex. 5 to Thomas-Jensen Aff.; Compl. ¶¶ 68, 69. The *Gender* EO directs federal agencies to, *inter alia*, "take all necessary steps, as permitted by law, to end the federal funding of gender ideology" and to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." Ex. 5 to Thomas-Jensen Aff. at 8616. Finally, in a January 28 EO targeting certain forms of gender-affirming care (the "*Gender-Affirming Care* EO"), the President calls for "Defunding Chemical and Surgical Mutilation." Exec. Order 14187, 90 Fed. Reg. 8771, 8772 (Feb. 3, 2025), attached as Ex. 8 to Thomas-Jensen Aff. Section 4 of the *Gender-Affirming Care* EO directs agencies that provide research or education grants to medical institutions to "immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children." *Id.* at 8772.

Finally, three EOs declare changes in policies that relate to federal funding decisions, but without expressly referring to Federal grants.

## B.    OMB Memorandum M-25-13

On the evening of January 27, Plaintiff States were alerted through social media to the OMB Directive, sent by Matthew J. Vaeth, Acting Director of the OMB, to heads of executive departments and agencies. Compl. ¶ 71 & Ex. A. The OMB Directive, entitled "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs," states that all Federal agencies "must complete a comprehensive analysis of all of their Federal financial assistance programs to

identify programs, projects, and activities that may be implicated by any of the President's executive orders." Ex. A to Compl. at 2, ECF No. 1-1.[2] While this analysis is ongoing, "[i]n the interim, to the extent permissible under applicable law, Federal agencies must temporarily pause all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal." *Id.* The temporary pause was to take effect on January 28, 2025, at 5:00 PM. *Id.*

The OMB Directive appears to suspend all Federal financial assistance, with few exceptions—by its terms, it is not limited to funds that may be related to "foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal," but rather applies to "all activities related to obligation or disbursement of all Federal financial assistance." *Id.* at 2. And it expressly states that its list of "other relevant agency activities" that may be implicated by the EOs is merely illustrative and not exhaustive. *Id.*

The pause directed by OMB is unambiguously indefinite. The OMB Directive states that agencies must "submit to OMB detailed information on any programs, projects or activities subject to this pause[,]" which must happen by February 10, 2025." *Id.* But it does not specify when OMB must complete its review of the agencies' submissions or release funding pursuant to its findings. *Id.*

---

[2] The OMB Directive offers differing and contradictory definitions of "Federal financial assistance." It cites the definition of that term found in 2 CFR 200.1, but then defines the term inconsistently with that regulatory definition. For instance, the regulation defines "Federal financial assistance" to exclude reimbursement for services rendered to certain groups of individuals (see subpart (4) of the definition for "Federal financial assistance" in 2 CFR 200.1) while the term in the OMB Directive only carves out "assistance received *directly* by individuals," Ex. A to Compl. at 1 n.1 (emphasis added).

Following the transmittal of the OMB Directive to Federal agencies, OMB circulated a document labeled "Instructions for Federal Financial Assistance Program Analysis in Support of M-25-13" (the "OMB Spreadsheet"). Compl. ¶ 76 & Ex. B. This document contains a chart listing over 2,600 federal funding lines, with columns regarding whether the funding line "promote[s] gender ideology"; "provide[s] Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens"; or "relate[s] to 'environmental justice' programs or 'equity-related' grants," among other inquiries. Ex. B to Compl., ECF No. 1-2.The OMB Spreadsheet also asks whether the funding, "[i]f not covered in the preceding columns," supports "any activities that must not be supported based on executive orders issued on or after January 20, 2025 (*including executive orders released following the dissemination of this spreadsheet*)." *Id.* (emphasis added).

On January 28, the White House issued a fact sheet on the OMB Directive (the "OMB Q&A"), which made statements inconsistent with the OMB Directive and the OMB Spreadsheet. Ex. 10 to Thomas-Jensen Aff. The OMB Q&A described the OMB Directive as limited to programs "implicated by the President's Executive Orders," in conflict with the OMB Spreadsheet's broad scope of federal funding lines requiring agency review. *Id.* The OMB Q&A stated that the "freeze" did not cover Medicaid reimbursements and the Supplemental Nutrition Assistance Program ("SNAP"), while the OMB Directive made no such carve-out—and the OMB Spreadsheet listed SNAP as a program requiring review. *Compare id. with* Ex. B to Compl., ECF No. 1-2. The OMB Q&A further indicated that "Funds for small businesses, farmers, Pell grants, Head Start, rental assistance, and other similar programs" were not to be paused, while the OMB Spreadsheet listed those very programs for agency review and assessment under the OMB Directive. *Compare* Ex. 10 to Thomas-Jensen Aff. *with id.*

15

C.      OMB's "Rescission" of OMB Directive

On January 28, the U.S. District Court for the District of Columbia ordered an administrative stay of the OMB Directive pending a hearing on a motion for a temporary restraining order. Order of Administrative Stay (ECF No. 13), *National Council of Nonprofits, et al. v. Trump, et al.*, No. 1:25-cv-00239-LLA (D.D.C. filed Jan. 28, 2025). At approximately 1:00 PM Eastern Time on January 29, OMB issued M-25-14, a memorandum purportedly rescinding the OMB Directive. Ex. 12 to Thomas-Jensen Aff. It consisted of two sentences: "OMB Memorandum M-25-13 is rescinded. If you have questions about implementing the President's Executive Orders, please contact your agency General Counsel." *Id.*

Shortly after OMB purported to rescind the OMB Directive, White House Press Secretary Karoline Leavitt stated that the Funding Freeze remained in place, notwithstanding the rescission of the OMB Memorandum. Leavitt announced on social media: "This is NOT a rescission of the federal funding freeze. It is simply a rescission of the OMB memo. Why? To end any confusion created by the court's injunction. The President's EO's on federal funding remain in full force and effect, and will be rigorously implemented." Ex. 126 to Thomas-Jensen Aff. She confirmed the same at a press conference that same day, stating: "So, what does this pause mean? It means no more funding for illegal DEI programs. It means no more funding for the Green New Scam that has . . . cost American taxpayers tens of billions of dollars. It means no more funding for transgenderism and wokeness across our federal bureaucracy and agencies. No more funding for Green New Deal social engineering policies." Ex. 127 to Thomas-Jensen Aff.

D.      Agency Implementation of the Funding Freeze

In the aftermath of the EOs and OMB Directive, the Funding Freeze has manifested through chaotic actions by federal agency defendants ("Agency Defendants"), resulting in

widespread and significant disruptions of funding and related activities across State agencies—both before and after the rescission of the OMB Directive, and in many instances continuing to the present—interfering with Plaintiff States' ability to provide essential services to their residents.

### 1. Immediate and Ongoing Freeze

Following the issuance of the OMB Directive, many Plaintiff States were unable to draw down appropriated and awarded funding using federal funding portals like the Payment Management Services ("PMS") portal used by the U.S. Department of Health and Human Services ("USHHS") and the U.S. Department of Labor ("USDOL"). In some instances, this occurred before the OMB Directive was supposed to go into effect at 5 pm on January 28, 2025. Ex. 100 to Thomas-Jensen Aff. ¶ 8 (Oregon "was unable to access its Medicaid federal funding system on Tuesday, January 28, for the entirety of the day, which caused Oregon Health Authority to lose a day of work."); Ex. 86 to Thomas-Jensen Aff. ¶ 16 (New Mexico's Early Childhood Education and Care Department found the Payment Management System (PMS) not operational at approximately 8:00 am on January 28, 2025); Ex. 32 to Thomas-Jensen Aff. ¶ 13 ("For instance, on January 27, 2025, when the federal U.S. Department of Health and Human Services Payment Management Service (PMS) portal was unavailable, DHCS did not receive the almost $200 million it expected to receive overnight between January 27 and January 28, 2025."); Ex. 93 to Thomas-Jensen Aff. ¶¶ 6 (from January 27 to January 28, New York's Office of the State Comptroller was not able to draw any of over $70 million in obligated funds needed across state agencies); Ex. 94 to Thomas-Jensen Aff. ¶ 10; Ex. 54 to Thomas-Jensen Aff. ¶ 34; Ex. 19 to Thomas-Jensen Aff. ¶ 10; Ex. 22 to Thomas-Jensen Aff. ¶ 25; Ex. 24 to Thomas-Jensen Aff. ¶¶ 11-12; Ex. 26 to Thomas-Jensen Aff. ¶ 12; Ex. 80 to Thomas-Jensen Aff. ¶ 10; Ex. 116 to Thomas-Jensen Aff. ¶ 19; Ex. 55 to Thomas-Jensen Aff. ¶¶ 27-28; Ex. 29 to Thomas-Jensen Aff. ¶ 16. Even after access to the payment portals

was restored, the portals were plagued with delays. Ex. 86 to Thomas-Jensen Aff. ¶ 17; Ex. 74 to Thomas-Jensen Aff. ¶¶ 13-14; Ex. 105 to Thomas-Jensen Aff. ¶ 5; Ex. 19 to Thomas-Jensen Aff. ¶ 12; Ex. 104 to Thomas-Jensen Aff. ¶ 11; Ex. 29 to Thomas-Jensen Aff. ¶ 17-20. State agencies using other payment portals also had problems. Ex. 99 to Thomas-Jensen Aff. ¶ 9; Ex. 34 to Thomas-Jensen Aff. ¶ 16; Ex. 98 to Thomas-Jensen Aff. ¶¶ 7-8; Ex. 58 to Thomas-Jensen Aff. ¶ 4. For example, after Arizona's Department of Homeland Security submitted draw requests to Federal Emergency Management Administrations' (FEMA) Payment and Reporting System (PARS) on January 28, 2025, for "critical homeland security needs," the Deputy Director of AZDHS contacted FEMA to inquire about the OMB Directive and received an email indicating that, "FEMA is actively reviewing President Trump's memo directing agencies to pause grants and other types of federal assistance issued Monday, January 27. We are working quickly to understand the exact implications across the full range of FEMA equities. We will provide additional guidance to stakeholders as soon as possible." Ex. 18 to Thomas-Jensen Aff. ¶¶ 5, 9, 11. Rhode Island has received a Specialty Crop Block Grant to improve competitiveness of specialty crops from the U.S. Department of Agriculture ("USDA") for each of the past four years, but USDA froze those funds on January 30 and still has not released them, pending "further guidance." Ex. 106 to Thomas-Jensen Aff. ¶¶ 6-17. Salem State University in Massachusetts attempted to draw down NSF grant funding and received a notice that while NSF "perform[ed] a comprehensive review of the award portfolio to ensure compliance with recent Executive Orders, pursuant to" the OMB Directive, "all payments under active awards will be paused." Ex. 58 to Thomas-Jensen Aff. ¶ 4.

And IIJA and IRA grants were likewise frozen. Within moments of issuance of the OMB Directive—the acting Chief Financial Officer of the EPA issued a memorandum entitled "Inflation Reduction Act and Infrastructure Investment and Jobs Act Funding Action Pause." *See*

Memorandum from Gregg Treml, Acting Chief Financial Officer, to Deputy Administrators, re: Inflation Reduction Act and Infrastructure Investment and Jobs Funding Action Pause (Jan. 27, 2025) ("Jan. 27 EPA Memo"), attached as Ex. 14 to Thomas-Jensen Aff. Allegedly "based on instruction from OMB," the Jan. 27 EPA Memo explains: (i) "[i]n accordance with [*Unleashing* EO], unobligated funds (including unobligated commitments) appropriated by" the IIJA and IRA "are paused"; (ii) "all disbursements for unliquidated obligations funded by any line of accounting including funds appropriated by" the IIJA and IRA likewise "are paused"; and (iii) "[a]ll related actions, including new contract, grant, rebate, and interagency actions, to include drawdowns, for IIJA and IRA are paused." *Id.* Only this week, well after this Court's temporary restraining order, did EPA issue an "Update" on the IIJA and IRA funding pause, explaining that, "pursuant to the recent Court directive," the agency would now "enable the obligation of financial assistance" including some, but not all, "programs within the [IIJA] and [IRA]," to be specified on a forthcoming "detailed list." Memorandum from Gregg Treml, Acting Chief Financial Officer, to Deputy Administrators, re: Update on Inflation Reduction Act and Infrastructure Investment and Jobs Funding Action Pause (Feb. 4, 2025) ("Feb. 4 EPA Memo") (attached as Ex. 17 to Thomas-Jensen Aff.). And the referenced list included only twenty-eight IIJA grant programs—many of them small grant programs targeted at specific localities—and only a single IRA program. U.S. Env't Prot. Agency, List of EPA IIJA and IRA Grants Referenced in Feb. 4 EPA Memo (attached as Ex. 124 to Thomas-Jensen Aff).

The Jan. 27 EPA Memo and the Feb. 4 EPA Memo followed earlier directives and actions implementing the *Unleashing* EO's categorical, immediate, and indefinite pause on all federal funding inconsistent with the Administration's energy priorities. In fact, on January 21, just one day after President Trump issued the *Unleashing* EO, OMB issued a distinct memorandum on IIJA

and IRA funding streams, clarifying that Section 7(a) of the *Unleashing* EO only paused "Green New Deal" funding, i.e., funding "implicated by the policy established in Section 2." Memorandum from Matthew J. Vaeth, Acting Director, OMB, to the Heads of Departments and Agencies, re: Guidance Regarding Section 7 of the Executive Order *Unleashing American Energy*, OMB M-25-11 (Jan. 21, 2025) ("OMB *Unleashing* Guidance") (attached as Ex. 13 to Thomas-Jensen Aff). The guidance confirmed, as directed in the *Unleashing* EO, that agencies only "may disburse funds as they deem necessary after consulting with OMB." *Id.* The OMB *Unleashing* Guidance has not been rescinded.

Agencies implementing IIJA and IRA programs critical to State Plaintiffs acted quickly to pause federal funding. Indeed, even before the OMB Directive, State Plaintiffs faced dramatic challenges in accessing obligated IIJA and IRA funds and related funding offices. On January 20, for example, the DOE issued a memorandum ordering that, "effective immediately and until further notice," "[a]ll funding and financial assistance . . . shall not be announced, approved, finalized, modified, or provided" until reviewed "to ensure compliance with . . . Administration policy." *See* Memorandum from Ingrid C. Kolb, Acting Secretary, Agency-wide Review of Program and Administrative Activities (Jan. 20, 2025) (attached as Ex. 123 to Thomas-Jensen Aff). Shortly thereafter, on January 23, DOE informed the Colorado Energy Office that it was pausing further communication while it evaluated information from the new administration. Ex. 123 to Thomas-Jensen Aff. ¶ 36. The same day, USDA advised grantees that payments would continue to be processed under existing awards, "provided that they are not funded using IIJA and IRA funding sources." *See* Ex. 92 to Thomas-Jensen Aff. ¶ 15 & Ex. C. On January 24, the Federal Highway Administration cancelled contract negotiations with the Massachusetts Department of Transportation for an awarded Low-Carbon Transportation Materials grant, citing a funding freeze;

as of February 5, the grant remains on hold, and negotiations cannot progress. Ex. 61 to Thomas-Jensen Aff. ¶¶ 15–17. On the morning of January 27, 2025, Rhode Island's Office of Energy Resources received notification that a drawdown of $26,510.21 from Rhode Island's Solar for All grant had been rejected. Ex. 108 to Thomas-Jensen Aff. ¶ 14 & Ex. J. On both January 27 and 29, 2025, Massachusetts's Department of Environmental Protection attempted to draw down grants funded by IIJA and IRA, but no reimbursements were issued. Ex. 59 to Thomas-Jensen Aff. ¶ 8; *see also* Ex. 56 to Thomas-Jensen Aff. ¶¶ 10–13 (Illinois's available funds in EPA's payment portal, the Automatic Standard Application for Payments ("ASAP") decreased from $1 billion on January 28 to $52 million on January 29, with entire accounts, like CPRG, deleted and still inaccessible as of February 5).

### 2.    The Rescission Did Not Cease the Fallout

The "rescission" of the OMB Directive did not stop the chaos and confusion. The next day, and continuing to as recently as February 5, funds for various grants remained frozen or otherwise inaccessible. Ex. 93 to Thomas-Jensen Aff. ¶¶ 6-13. As of January 30, 2025—a full day after the circulation of OMB M-25-14—PMS still had a banner notifying visitors to the website that they could expect "delays and/or rejections of payments," "[d]ue to Executive Orders." Ex. 105 to Thomas-Jensen Aff. ¶ 5. Portals were available on reduced hours after the rescission, whereas previously they were open 24-hours a day. Ex. 34 to Thomas-Jensen Aff. ¶ 19; Ex. 29 to Thomas-Jensen Aff. ¶ 17. While some federal agencies appear to have started to process draw downs and other payments within a day of OMB M-25-14, some agencies were still not processing draw down requests as of February 4 and 5. Ex. 101 to Thomas-Jensen Aff. ¶ 7; Ex. 100 to Thomas-Jensen Aff. ¶ 8; Ex. 34 to Thomas-Jensen Aff. ¶ 29; Ex. 105 to Thomas-Jensen Aff. ¶ 8; Ex. 114 to Thomas-Jensen Aff. ¶¶ 6-8, 12; Ex. 39 to Thomas-Jensen Aff. ¶ 12. As of 3:54 pm on February 3,

2025, Minnesota's Pollution Control Agency could not access the ASAP portal for any funding streams deriving from the IRA or the IIJA. Ex. 80 to Thomas-Jensen Aff. ¶ 10; *see also, e.g.*, Ex. 28 to Thomas-Jensen Aff. ¶ 18 (five of California's IRA grants missing from ASAP website as of 7:50 am PST on February 5, 2025). As of February 3, 2025, the California Energy Commission's High-Efficiency Electric Home Rebate Act homeowner rebates still were flagged in ASAP as "holding for agency review," Ex. 40 to Thomas-Jensen Aff. ¶¶ 24–25, and the California water board's attempt to draw down against their IIJA drinking water grants on January 31 resulted in an ASAP portal error message: "ERROR 839: No accounts found matching criteria." Ex. 35 to Thomas-Jensen Aff. ¶ 17. While certain IIJA and IRA grants reappeared in ASAP, others have remained suspended and inaccessible. *See, e.g.*, Ex. 61 to Thomas-Jensen Aff. ¶¶ 8–9; Ex. 35 to Thomas-Jensen Aff. ¶¶ 17–23; Ex. 95 to Thomas-Jensen Aff. ¶ 55; Ex. 23 to Thomas-Jensen Aff. ¶¶ 11–12; Ex. 49 to Thomas-Jensen Aff. ¶ 13, 19; Ex. 60 to Thomas-Jensen Aff. ¶¶ 13–14; Ex. 51 to Thomas-Jensen Aff. ¶¶ 9–15; Ex. 48 to Thomas-Jensen Aff. ¶ 24. All told, dozens of state agencies in Plaintiff States' jurisdictions have been unable to access EPA grants funded by IIJA and IRA appropriations. *See, e.g.*, Ex. 61 to Thomas-Jensen Aff. ¶¶ 8–9; Ex. 28 to Thomas-Jensen Aff. ¶¶ 13–18; Ex. 35 to Thomas-Jensen Aff. ¶¶ 5–15; Ex. 49 to Thomas-Jensen Aff. ¶¶ 13, 19; Ex. 51 to Thomas-Jensen Aff. ¶¶ 9–15; Ex. 106 to Thomas-Jensen Aff. ¶¶ 41–43, 59, 64, 70, 76; Ex. 108 to Thomas-Jensen Aff. ¶ 19; Ex. 52 to Thomas-Jensen Aff. ¶ 12; Ex. 83 to Thomas-Jensen Aff. ¶ 17; Ex. 72 to Thomas-Jensen Aff. ¶ 6; Ex. 59 to Thomas-Jensen Aff. ¶ 8.

Indeed, as applied to many funds under the IIJA and IRA, the Funding Freeze (as directed in the *Unleashing EO*, and as implemented by the OMB *Unleashing* Guidance, the OMB Directive, and multiple Agency Defendant actions) continues to this day, despite OMB's purported rescission of the OMB Directive and despite this Court's temporary restraining order. Significant funding

under the IIJA and IRA has continued to be frozen and unavailable for drawdowns. For example, on January 30, the day after the purported rescission, several state agencies' grants were listed on ASAP as "suspended," including some "per executive order." *See, e.g.*, Ex. 42 to Thomas-Jensen Aff. ¶ 20 (four of California's South Coast Air Quality Management District IRA grants "suspended" on ASAP "per executive order"; two other IRA grants inaccessible without explanation); Ex. 23 to Thomas-Jensen Aff. ¶¶ 10–11 (14 of Arizona Department of Environmental Quality's eighteen IIJA and IRA federal grants in "suspended" status); Ex. 85 to Thomas-Jensen Aff. ¶ 10 (New Jersey Board of Public Utilities Solar for All grant suspended); Ex. 48 to Thomas-Jensen Aff. ¶¶ 12–13, 17–21 (Hawaii grant funds unavailable with ASAP notation of "BIL/IRA HOLD"); Ex. 56 to Thomas-Jensen Aff. ¶ 17 (EPA notified Illinois EPA that it should not draw down its grant supporting the groundwater treatment system because it was funded by IIJA). The same day, one EPA financial specialist reported to the Washington State Department of Ecology that the continuing freeze was a result of OMB's actions and the recent executive order(s). Ex. 113 to Thomas-Jensen Aff. ¶ 38.

Communications with federal grantor agencies have continued to reflect ongoing funding freezes and confusion about rescission of the OMB Memo and this Court's temporary restraining order. On February 3, for example, EPA staff cancelled two previously scheduled meetings with the South Coast Air District about its IRA grants; the following day, EPA staff attempted to un-cancel the same meetings. Ex. 42 to Thomas-Jensen Aff. ¶ 22. On February 4, the California Air Resources Board emailed the relevant EPA officials inquiring about its five IRA grants—and reminded EPA of this Court and the D.C. District Court's temporary restraining orders—but received no response. Ex. 28 to Thomas-Jensen Aff. ¶ 19 & Ex. H; *see also* Ex. 106 to Thomas-Jensen Aff. ¶¶ 16–17, 44 (USDA officials unable to provide specific dates or updates; radio silence

from EPA). Despite inquiry, Rhode Island's Office of Energy Resources had not received a response as of February 5, 2025, to its January 28 email inquiry regarding the status of its suspended Solar for All Account. Ex. 108 to Thomas-Jensen Aff. ¶¶ 20, 21.

     **E.    Ongoing Pauses Have Caused and Continue to Cause Irreparable Harm**

The funding freezes effectuated through Defendants' actions are already harming Plaintiff States and will continue to cause irreparable harm if unabated. Plaintiff States rely on this funding to operate programs that further their sovereign interests and provide essential services to their residents in virtually every aspect of their lives.

Federal funds are essential for the Head Start program, which provides free, high quality, year-round early childhood education and childcare. As of February 5, 2025, many Head Start providers were still having difficulties accessing federal funds. Ex. 76 to Thomas-Jensen Aff. ¶ 13; Ex. 41 to Thomas-Jensen Aff. ¶ 11. Plaintiff States understand that many Head Start providers are considering layoffs, reduction of services, and even closure, because they do not have access to federal funds. Ex. 76 to Thomas-Jensen Aff. ¶ 19. Because some Plaintiff States subsidize childcare, they would need to pay much more if federally funded Head Start childcare does not resume. Ex. 111 to Thomas-Jensen Aff. ¶ 5. Additionally, some Plaintiff States receive Child Care Development Fund Block grants that they distribute to childcare providers in their states. Ex. 76 to Thomas-Jensen Aff. ¶ 7; Ex. 36 to Thomas-Jensen Aff. ¶ 14. If federal funds are frozen again, Plaintiff States would be unable to fund this essential childcare. Ex. 76 to Thomas-Jensen Aff. ¶ 17; Ex. 41 to Thomas-Jensen Aff. ¶¶ 14-15; Ex. 36 to Thomas-Jensen Aff. ¶ 18.

Federal funds are also crucial to Plaintiff States' abilities to provide child welfare services and early childhood services. Ex. 86 to Thomas-Jensen Aff. ¶¶ 6-10; Ex. 116 to Thomas-Jensen Aff. ¶ 7; Ex. 55 to Thomas-Jensen Aff. ¶¶ 8-12; Ex. 68 to Thomas-Jensen Aff. ¶ 9; Ex. 39 to

Thomas-Jensen Aff. ¶ 8; Ex. 43 to Thomas-Jensen Aff. ¶ 15. If this funding is frozen, state agencies may not be able to provide summer food assistance to low-income children who are at risk of food insecurity and may not be able to conduct outreach to families in need of services. Ex. 86 to Thomas-Jensen Aff. ¶¶ 9-10; Ex. 43 to Thomas-Jensen Aff. ¶¶ 34, 54.

In the realm of K-12 education, Plaintiff States rely upon federal funding, especially for school districts with high percentages of low-income students. Ex. 89 to Thomas-Jensen Aff. ¶ 5; Ex. 116 to Thomas-Jensen Aff. ¶ 10; Ex. 43 to Thomas-Jensen Aff. ¶¶ 23, 43. Federal funds support professional development; academic interventions such as tutoring, after-school programs, and early childhood education; anti-bullying programming; educational technology; services for children with disabilities; and other essential services. Ex. 89 to Thomas-Jensen Aff. ¶ 5; Ex. 76 to Thomas-Jensen Aff. ¶ 5; Ex. 75 to Thomas-Jensen Aff. ¶¶ 6-8; Ex. 43 to Thomas-Jensen Aff. ¶¶ 14-33; Ex. 116 to Thomas-Jensen Aff. ¶ 10. Plaintiff States also rely upon federal funds to provide free and low-cost meals for low-income children. Ex. 75 to Thomas-Jensen Aff. ¶ 5; Ex. 43 to Thomas-Jensen Aff. ¶ 34; Ex. 116 to Thomas-Jensen Aff. ¶ 10. A freeze in federal funding for education "would catastrophically disrupt student instruction." Ex. 89 to Thomas-Jensen Aff. ¶ 8; *see also* Ex. 75 to Thomas-Jensen Aff. ¶¶ 9-17; Ex. 43 to Thomas-Jensen Aff. ¶¶ 38-54. Children with disabilities would not get the services they need (and that federal law requires that schools provide). Ex. 43 to Thomas-Jensen Aff. ¶¶ 40-41; Ex. 116 to Thomas-Jensen Aff. ¶ 16.

Additionally, many Plaintiff States' university systems receive federal funding for research, as well as student financial aid. Ex. 34 to Thomas-Jensen Aff. ¶¶ 6-7; Ex. 112 to Thomas-Jensen Aff. ¶ 4; Ex. 58 to Thomas-Jensen Aff. ¶ 5; Ex. 63 to Thomas-Jensen Aff. ¶ 7; Ex. 57 to Thomas-Jensen Aff. ¶ 5; Ex. 120 to Thomas-Jensen Aff. ¶¶ 5-6; Ex. 119 to Thomas-Jensen Aff. ¶ 3; Ex. 114 to Thomas-Jensen Aff. ¶ 3-4 (describing USAID funded research projects); Ex. 37 to Thomas-

Jensen Aff. ¶ 8; Ex. 50 to Thomas-Jensen Aff. ¶ 5. When these university systems are worried about the risk of future funding freezes, the result is that important research is chilled. Ex. 34 to Thomas-Jensen Aff. ¶¶ 27-34; Ex. 112 to Thomas-Jensen Aff. ¶ 7 ("Even a temporary pause in funding could require the University to shutter or reduce programs, including mission-critical research activities, instruction, and public service activities and to furlough and/or lay off employees."); Ex. 58 to Thomas-Jensen Aff. ¶¶ 7-10; Ex. 63 to Thomas-Jensen Aff. ¶ 9 ("The immediate chilling effect of recent presidential decisions is significant."); Ex. 120 to Thomas-Jensen Aff. ¶ 7 ("Research projects that require daily activities and meticulous record-keeping may be ruined, setting back the research enterprise and wasting the federal investment."); Ex. 119 to Thomas-Jensen Aff. ¶ 10 ("Even temporary disruptions jeopardize scientific progress, hinder faculty and student research, and create uncertainty for the thousands of individuals whose work depends on these funds."); Ex. 114 to Thomas-Jensen Aff. ¶ 11 ("These USAID-backed projects are a strategic investment in global health security, economic stability, and food sustainability."); Ex. 37 to Thomas-Jensen Aff. ¶ 20; Ex. 50 to Thomas-Jensen Aff. ¶ 11.

States also rely upon federal funds for their Medicaid programs, the Children's Health Insurance Program ("CHIP"), and other health care. Ex. 31 to Thomas-Jensen Aff. ¶¶ 6, 7; Ex. 32 to Thomas-Jensen Aff. ¶¶ 5-9; Ex. 74 to Thomas-Jensen Aff. ¶ 6; Ex. 105 to Thomas-Jensen Aff. ¶ 13; Ex. 24 to Thomas-Jensen Aff. ¶ 8. A pause in funding would interfere with the ability of State Plaintiffs to provide this lifesaving healthcare. Ex. 32 to Thomas-Jensen Aff. ¶¶ 10-15. In Plaintiff States, the loss of Medicaid funding would "significantly impede the delivery of basic health care services to . . . low-income, elderly, and pregnant individuals, as well as individuals with disabilities." Ex. 32 to Thomas-Jensen Aff. ¶ 13. This in turn, would lead to "a decline in overall health," as well as financial harm, including medical debt and bankruptcy for Plaintiff States'

26

residents. Ex. 32 to Thomas-Jensen Aff. ¶ 13. Federal funds are also essential to providing community-based health care through Federally Qualified Health Center providers. Ex. 38 to Thomas-Jensen Aff. ¶ 3. These centers provide high quality medical care, including testing for HIV and other communicable diseases. Ex. 38 to Thomas-Jensen Aff. ¶ 4. A pause in federal funds, including Centers for Disease Control grants to community health centers, means that patients will not receive care. Ex. 38 to Thomas-Jensen Aff. ¶ 12. And a pause in federal funds would impact the federal funding that lower premiums on the Affordable Care Act Marketplaces, with the end result being loss of health coverage and worsening health conditions. Ex. 46 to Thomas-Jensen Aff. ¶¶ 10-15. States also rely upon federal funding for "a safety net of immunizations to vulnerable populations at risk for vaccine-preventable diseases." Ex. 115 to Thomas-Jensen Aff. ¶ 8.

Law enforcement and public safety agencies also rely upon federal funding. Federal grant programs support state and local law enforcement agencies, community violence and crisis interruption programs, and programs addressing sexual violence, among many other crucial services. Ex. 102 to Thomas-Jensen Aff. ¶¶ 4-6; Ex. 18 to Thomas-Jensen Aff. ¶ 17. If these funds were paused, the downstream effects would be drastic and could hinder state and local governments' abilities to address violent crime and proliferation of illegal drugs. Ex. 102 to Thomas-Jensen Aff. ¶ 10.

The federal government also plays a significant role in funding emergency management and preparedness. Ex. 111 to Thomas-Jensen Aff. ¶ 10; Ex. 39 to Thomas-Jensen Aff. ¶ 13. The Director of the Oregon Department of Emergency Management explained the scale of potential harms that could flow from a freeze of emergency management funds: "If a major disaster were to occur while federal emergency management funds to Oregon are frozen. . . [p]ending preparedness training and mitigation work may come to a stop and the incapacitation of federally funded

emergency management programs and services that would result from a federal funding freeze could very well lead to increased loss of life and injury to Oregonians, slowed emergency response times, greater risks to first responders, greater property damage, and delays to community recovery and rebuilding." Ex. 99 to Thomas-Jensen Aff. ¶ 13.

Many job training programs and workforce development programs, as well as the administration of unemployment insurance, are federally funded. Ex. 94 to Thomas-Jensen Aff. 16; Ex. 54 to Thomas-Jensen Aff. ¶ 3; Ex. 70 to Thomas-Jensen Aff. ¶ 5; Ex. 104 to Thomas-Jensen Aff. ¶ 4; Ex. 29 to Thomas-Jensen Aff. ¶¶ 5-10; Ex. 39 to Thomas-Jensen Aff. ¶ 9; Ex. 30 to Thomas-Jensen Aff. ¶¶ 6, 10-12 For instance, the New Mexico Department of Workforce Solutions receives approximately 89% of its funding from the federal government, including all personnel and operations for the State's Unemployment Insurance program. Ex. 88 to Thomas-Jensen Aff. ¶¶ 5, 7. Freezing this funding would create a ripple effect—expanding out beyond direct recipients of funds to Plaintiff States' residents and economies. Ex. 88 to Thomas-Jensen Aff. ¶¶ 17, 20; Ex. 70 to Thomas-Jensen Aff. ¶ 10; Ex. 104 to Thomas-Jensen Aff. ¶¶ 14-15; *see* Ex. 29 to Thomas-Jensen Aff. ¶ 27 (harms to veterans seeking to acquire job skills and employment, and others seeking career and employment training services); Ex. 30 to Thomas-Jensen Aff. ¶ 13 (harms to workers seeking to participate in job apprenticeship programs). A funding freeze would mean that "newly unemployed workers—who may live paycheck to paycheck, with monthly bills coming due at any time—will not receive the benefits to which they are entitled." Ex. 54 to Thomas-Jensen Aff. ¶ 10; *see* Ex. 29 to Thomas-Jensen Aff. ¶ 27 (reduced level of service in processing and approving unemployment insurance claims and paying out unemployment insurance benefits).

Likewise, Plaintiff States rely upon federal funds to provide services to older Americans and adults with disabilities. Ex. 87 to Thomas-Jensen Aff. ¶¶ 3-7; Ex. 39 to Thomas-Jensen Aff. ¶ 9. These services keep older Americans living independently in their communities, rather than in nursing homes and similar facilities, and help promote healthy aging. Ex. 87 to Thomas-Jensen Aff. ¶ 8. They also fund long-term care ombudsman programs and other programs that address elder abuse. Ex. 87 to Thomas-Jensen Aff. ¶ 8. A pause in this funding would jeopardize older Americans living in their homes, who rely upon federally funded services for meal delivery, transportation to medical appointments, and caregiver services. Ex. 87 to Thomas-Jensen Aff. ¶ 10. It also might mean that elder abuse goes undetected. Ex. 87 to Thomas-Jensen Aff. ¶¶ 10, 13.

Plaintiff States rely upon federal funds for critical transportation infrastructure in their states. Ex. 77 to Thomas-Jensen Aff. ¶ 3; Ex. 31 to Thomas-Jensen Aff. ¶¶ 8, 12; Ex. 66 to Thomas-Jensen Aff. ¶ 5-6; Ex. 80 to Thomas-Jensen Aff. ¶ 6; Ex. 39 to Thomas-Jensen Aff. ¶ 10. At present the Maryland Transportation Authority is awaiting $60 million in promised reimbursement for the costs of removal and salvage of debris from the Francis Scott Key Bridge. Ex. 66 to Thomas-Jensen Aff. ¶¶ 5-7. Some Plaintiff States have entered into binding construction contracts based on federal funding that is obligated to them. Ex. 77 to Thomas-Jensen Aff. ¶ 8. If the federal government freezes obligated funds, Plaintiff States may have to suspend, delay, or cancel projects that otherwise would go ahead. Ex. 77 to Thomas-Jensen Aff. ¶ 9. And the OMB Directive left state transportation agencies "unable to adequately assess the risk of continuing to commit to federally funded contracts for transportation or otherwise continue its planning, design, or other programming activities related to federally funded projects and grants." Ex. 77 to Thomas-Jensen Aff. ¶ 11.

29

And IIJA- and IRA-funded programs are likewise critical to Plaintiff States' ability to provide essential services to protect the health, safety, and welfare of their residents. For example, IRA funding provides significant resources to State Plaintiffs to remediate contamination and pollution, including brownfields clean up and plugging orphaned oil and gas wells. *See, e.g.*, Ex. 28 to Thomas-Jensen Aff. ¶¶ 7–8, 13 (California Air Resource Board unable to access granted federal funding aimed at monitoring air toxins); Ex. 42 to Thomas-Jensen Aff. ¶¶ 7–8 (frozen funds include those awarded to South Coast Air Quality Management District for programs reducing air pollution from freight corridors and warehousing hubs); Ex. 113 to Thomas-Jensen Aff. ¶ 45 (funding freeze threatens to pause important contamination remediation efforts), ¶¶ 60–61 (contracted-for brownfield cleanup work being "held up" by funding freeze); Ex. 106 to Thomas-Jensen Aff. ¶¶ 62, 67, 74 (frozen funds designated for monitoring of air pollution); Ex. 92 to Thomas-Jensen Aff. ¶¶ 4-6 & Ex. A (New York State Department of Environmental Conservation denied funding reimbursement for plugging of orphaned oil and gas wells due to alleged inconsistency with OMB *Unleashing* Guidance). Defendants' Funding Freeze is also jeopardizing initiatives to develop clean energy resources and realize associated reliability, bill savings, job creation, and job creation benefits for Plaintiff States and their residents. Ex. 95 to Thomas-Jensen Aff. ¶¶ 8–13. It also impedes State Plaintiffs' efforts to ensure clean air and water for their residents, by interfering with projects to help States monitor air quality, improve water quality, and ensure availability of clean drinking water. Ex. 27 to Thomas-Jensen Aff. ¶¶ 7–9; Ex. 35 to Thomas-Jensen Aff. ¶¶ 11–12, 24; Ex. 23 to Thomas-Jensen Aff. ¶¶ 7, 16; Ex. 28 to Thomas-Jensen Aff. ¶¶ 20, 22; Ex. 59 to Thomas-Jensen Aff. ¶¶ 9–10; Ex. 84 to Thomas-Jensen Aff. ¶ 12; Ex. 106 to Thomas-Jensen Aff. ¶¶ 58–62. Further, the Funding Freeze thwarts Plaintiff States' plans to implement waste management, reduction, and recycling plans. Ex. 33 to Thomas-Jensen Aff. ¶¶

20, 26; Ex. 106 to Thomas-Jensen Aff. ¶ 79; Ex. 59 to Thomas-Jensen Aff. ¶ 11(f). And the freeze also causes the loss of workforce training programs, career opportunities, and community education opportunities within Plaintiff States. Ex. 42 to Thomas-Jensen Aff. ¶ 9.

Freezes on IIJA and IRA funding also have caused significant budgetary confusion, uncertainty, and risk among agencies of the Plaintiff States that administer IIJA- and IRA-funded programs and services. Dozens, if not hundreds, of State Plaintiffs' agencies have experienced confusion and budgetary uncertainty as they have been cut off from access to funds to which they are entitled. *See, e.g.*, Ex. 40 to Thomas-Jensen Aff. ¶¶ 32–33. These agencies' inability to access these funds and fear of non-reimbursement are already interfering with their ability to budget and plan, including with respect to planned hiring. *See, e.g.*, Ex. 44 to Thomas-Jensen Aff. ¶ 16 (Connecticut's DEEP "unable to recruit and hire future staff" to support Solar for All Program due to "budgetary uncertainty"); Ex. 107 to Thomas-Jensen Aff. ¶ 15 (uncertainty has led Brown University's research community to suspend orders of large research equipment, which over time will negatively impact the ability of researchers to conduct their studies); Ex. 85 to Thomas-Jensen Aff. ¶ 11 (uncertainty surrounding funding forcing New Jersey BPU to decide between delaying Solar for All program or risking no reimbursement); Ex. 117 to Thomas-Jensen Aff. ¶¶ 20, 26–-27 (uncertainty surrounding Washington's planned hiring); Ex. 27 to Thomas-Jensen Aff. ¶ 31 (uncertainty over grants has disrupted California agency's "ability to budget, plan… and carry out its mission"). The freeze has harmed their ability to work with and reimburse subgrantees, potentially risking cancellation or modification of contracts with state vendors and subgrantees, and it will continue to harm their goodwill and reputation among project partners and participants, making it more difficult to recruit project partners in the future. *See, e.g.*, Ex. 61 to Thomas-Jensen

Aff. ¶ 11; Ex. 42 to Thomas-Jensen Aff. ¶ 24; Ex. 40 to Thomas-Jensen Aff. ¶ 32; Ex. 35 to Thomas-Jensen Aff. ¶ 26; Ex. 106 to Thomas-Jensen Aff. ¶¶ 19-20, 45.

Nor have the Funding Freeze's impacts been limited to state actors. Far from it. Non-governmental organizations have been deeply impacted by the freeze, affecting their ability to provide essential services to their communities and endangering their organizational stability and staffing—with significant repercussions for State Plaintiffs and their residents. *See*, *e.g.*, Ex. 45 to Thomas-Jensen Aff. ¶ 3; Ex. 109 to Thomas-Jensen Aff. ¶ 11; Ex. 107 to Thomas-Jensen Aff. ¶¶ 9-15; Ex. 60 to Thomas-Jensen Aff. ¶¶ 11, 16; Ex. 81 to Thomas-Jensen Aff. ¶¶ 4-8. For instance, a food bank in Connecticut still, as of February 3, 2025, had not received obligated grant money. Ex. 45 to Thomas-Jensen Aff. In Rhode Island, a non-profit with an EPA grant relating to food waste had its funding frozen, which made it difficult to meet its financial obligations and plan for the future. Ex. 109 to Thomas-Jensen Aff. ¶ 11. As of January 31, an Oklahoma consortium of conservation districts can no longer access a $831,008 USDA grant to support farmers and ranchers and now lacks necessary funds to pay six employees and 26 additional contractors, nor cover future expenses for 17 conservation districts. Ex. 96 to Thomas-Jensen Aff. ¶¶ 4–8. In another example, the ASAP account of a nonprofit working with residents of Chelsea, Everett, and Malden, Massachusetts, to address the public health impacts of extreme heat and poor air quality was suspended, putting the program, the five-organization collaboration, and staff positions in jeopardy and risking strain on the healthcare system. Ex. 60 to Thomas-Jensen Aff. ¶¶ 4–15. In Minnesota, a foundation awarded a $60 million Environmental Justice Thriving Communities grant from EPA cannot access of those funds, the majority of which the foundation is obligated to regrant to small organizations engaging in rural and urban environmental and public health project activities across EPA Region V. Ex. 81 to Thomas-Jensen Aff. ¶¶ 4–5; *see also* Ex. 78 to Thomas-Jensen Aff.

(suspension of federal grant funds hampering efforts to support family farmers and ranchers); Ex. 62 to Thomas-Jensen Aff. ¶¶ 7–8 (suspension of federal grant portal threatening ability of farmer and rancher support organization to comply with grant terms); Ex. 110 to Thomas-Jensen Aff. ¶¶ 4–9 (suspension of federal funds preventing implementation of $7.7 million in grant funds to provide financial literacy and technical assistance to family farmers in 9 states and Puerto Rico).

Private colleges and universities felt immediate effects as well. Brown University "experienced near-immediate disruptions to its ongoing research projects," including the cancellation of an NIH review of Brown's renewal application for its dementia care research project and the cancellation of a grant from the U.S. State Department. Ex. 107 to Thomas-Jensen Aff. ¶¶ 9-14. Some of Brown's postdoctoral fellows have gone unpaid, and the University "advised our research community to hold off on large equipment purchases, given the uncertainty around the availability of federal funds going forward." Ex. 107 to Thomas-Jensen Aff. ¶¶ 14-15. These impacts have spillover effects across Plaintiff States' jurisdictions, harming Plaintiff States and their residents.

The uncertainty and chaos of the last week has already caused significant harm to the Plaintiff States. Ex. 31 to Thomas-Jensen Aff. ¶ 10; Ex. 41 to Thomas-Jensen Aff. ¶ 9; Ex. 119 to Thomas-Jensen Aff. ¶ 9; Ex. 26 to Thomas-Jensen Aff. ¶ 18; *see* Ex. 29 to Thomas-Jensen Aff. ¶ 18; Ex. 32 to Thomas-Jensen Aff. ¶ 13. Many state agencies attempted to contact their federal grant managers but received no response or, if they received a response, no information. Ex. 102 to Thomas-Jensen Aff. ¶ 8; Ex. 94 to Thomas-Jensen Aff. ¶ 10; Ex. 26 to Thomas-Jensen Aff. ¶ 17. Additionally, state agencies were fielding inquiries from other federal grant subrecipients and other organizations who were worried about the impact that the OMB Directive would have on them. Ex. 99 to Thomas-Jensen Aff. ¶ 10; Ex. 32 to Thomas-Jensen Aff. ¶ 17; Ex. 94 to Thomas-Jensen

Aff. ¶¶ 11-12; Ex. 70 to Thomas-Jensen Aff. ¶ 10. Some state agencies found that "grant awards simply disappeared" from the portal for managing federal grant applications. Ex. 100 to Thomas-Jensen Aff. ¶ 8. In several Plaintiff States, financial and administrative personnel had to quickly determine whether the State would be able to meet its financial obligations, including providing essential services and payroll. Ex. 100 to Thomas-Jensen Aff. ¶¶ 7-8; Ex. 89 to Thomas-Jensen Aff. ¶ 9; Ex. 119 to Thomas-Jensen Aff. ¶ 9; Ex. 37 to Thomas-Jensen Aff. ¶ 16. Some state agencies submitted draw requests outside of their normal cycle because of concerns that the funding might not be available at the regular draw time. Ex. 34 to Thomas-Jensen Aff. ¶ 25. State agencies that have previously funded subgrantees or subrecipients and then received reimbursement later may have to change their practices as reimbursement has been delayed. Ex. 91 to Thomas-Jensen Aff. ¶ 15; Ex. 31 to Thomas-Jensen Aff. ¶ 11; Ex. 32 to Thomas-Jensen Aff. ¶ 10. And state agencies worry that, if there is another freeze of federal funding, they will struggle to retain and hire staff, who may worry about the ability of state agencies to make payroll. Ex. 88 to Thomas-Jensen Aff. ¶ 25; Ex. 50 to Thomas-Jensen Aff. ¶ 13.

### F. The Court's TRO, And Defendants' Noncompliance

On January 28, 2025, Plaintiff States brought suit alleging violations of the Administrative Procedure Act ("APA") and the U.S. Constitution. Following a hearing, the Court entered a temporary restraining order to allow time for the Plaintiff States to move for a preliminary injunction. Temporary Restraining Order, *New York v. Trump* (1:25-cv-00039-JJM-PAS) (Jan. 31, 2025) (hereinafter "TRO").

Despite the clear terms of the TRO, the Government took the position in communication on February 5 that IIJA and IRA funds were excluded from the relief. This position and the ongoing

freeze of numerous important funding streams, *supra* Background Section II.D.2., leave Plaintiff States uncertain as to the security of billions of dollars of critical resources for their residents.

## LEGAL STANDARD

Under the well-worn standard for a preliminary injunction, "[t]he district court must consider 'the movant's likelihood of success on the merits; whether and to what extent the movant will suffer irreparable harm in the absence of preliminary injunctive relief; the balance of relative hardships [and equities]; and the effect, if any, that either a preliminary injunction or the absence of one will have on the public interest.'" *U.S. Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024) (quoting *Ryan v. U.S. Immigration and Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020)); *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008). The final two factors—the balance of equities and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "Likelihood of success is the main bearing wall of the four-factor framework." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996). However, a "'district court is required only to make an estimation of likelihood of success and need not predict the eventual outcome on the merits with absolute assurance.'" *Schnitzer Steel Indus., Inc.*, 639 F. Supp. 3d 222,226 (D.R.I. 2022) (quoting *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013)).

## ARGUMENT

### I. Plaintiff States Have Standing to Assert Their Claims.

Plaintiff States risk losing billions of dollars of funding obligated to them by the Federal government, and for this reason, they easily meet the standard for Article III standing.

"To ensure the proper adversarial presentation, *Lujan* holds that a litigant must demonstrate that it has suffered a concrete and particularized injury that is either actual or imminent, that the

injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury." *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "Monetary costs are of course an injury." *United States v. Texas*, 599 U.S. 670, 676 (2023). Thus, "los[ing] out on federal funds . . . is a sufficiently concrete and imminent injury to satisfy Article III." *Dep't of Commerce v. New York*, 588 U.S. 752, 767 (2019).

Because the Funding Freeze threatens immense amounts of federal funding to the Plaintiff States, the Plaintiff States meet these requirements. The injury could hardly be more severe: Plaintiff States risk losing funding for critical infrastructure and pollution reduction needed to protect public health; Plaintiff States risk losing funding that they receive from the Federal government to provide school lunches to children from low-income families, grants to help law enforcement combat violence against children, elders, and other vulnerable populations. *See supra* Background Section II.E. In short, each of the Plaintiff States faces immediate, direct pocketbook losses.

Moreover, because the Funding Freeze set forth this directive in writing on less than 24 hours' notice, and the result has been chaos that has not yet fully unwound despite the TRO, the Plaintiff States have had no time to prepare for this drastic move by the Federal government. Had States received more notice, the Plaintiff States could have at least consulted with their budgetary personnel to devise contingency plans. As it is, they had no notice and thus no ability to set aside funding for the anticipated shortfall, work with their legislatures to appropriate funds, or take other similar measures. *See supra* Background Section II.D. & E. Thus, the Funding Freeze is also causing a present harm to Plaintiff States' ability to engage in budgeting and financial planning.

36

Plaintiff States' standing to seek relief extends not only to disbursements made directly to them, but to other disbursements made to entities within their States that contribute to public health and welfare through federally funded activities. When organizations in Plaintiff States' communities are deprived of the federal funding resources necessary to implement their programs, the burden of filling those gaps or responding to resulting harms inevitably falls in some part on the Plaintiff States. *See, e.g.*, Ex. 60 to Thomas-Jensen Aff. ¶¶ 5-9 (describing how organization uses federal funds to reduce the risks of heat exposure for communities in urban settings, which in turn helps reduce burdens on the medical system). Plaintiff States accordingly have standing to seek relief that runs not only to them directly, but to entities within their States.

Finally, as for traceability and redressability, Defendants are inescapably the sole cause of this chaos and the only parties to whom these injuries trace. And preliminary injunctive relief will forestall these injuries while the case proceeds.

## II.    This Case Is Ripe for Suit.

The government suggests that, because it purportedly rescinded the OMB Directive itself, "Plaintiffs' claims are moot, and there is no need for prospective relief." ECF No. 43 at 1. But as the facts show and the government's own statements demonstrate, this case is anything but moot, including for the same reasons the Court rejected Defendants' claims of mootness when ordering temporary relief. *See* ECF No.  50 at 10–11, Ex. 126 to Thomas-Jensen Aff. The effects of the funding freeze continue to be felt today across a vast array of critical funding, and the uncertainty caused by the events since January 20 cast a long shadow of uncertainty over the resources Plaintiff States need to meet their residents' most essential needs.

Under well-established legal standards, a case is moot "when the court cannot give any 'effectual relief' to the potentially prevailing party." *Horizon Bank & Trust Co. v. Massachusetts*,

391 F.3d 48, 53 (1st Cir. 2004). Put another way, "a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *D.H.L. Assocs. v. O'Gorman*, 199 F.3d 50, 54 (1st Cir. 1999). The burden of establishing mootness lies with the party invoking its application. *See Am. Civil Liberties Union of Mass. v. U.S. Conf. of Catholic Bishops*, 705 F.3d 44, 52 (1st Cir. 2013). Here, because the issues presented in Plaintiff States' complaint are still very much "live" and a preliminary injunction will provide urgently needed relief, Defendants cannot meet their burden.

Relying on White House statements and messages from federal agencies after the purported rescission, the Court has already found that the Executive's recission of the OMB Directive "was in-name only" and "[t]he substantive effect of the directive carries on." ECF No. 50 at 10,11 (finding that the policies in the OMB Memo "are still in full force and effect."). This continues to be true. Not only are numerous sources of federal funding still frozen, the chaos and confusion resulting from the Executive's directive remain significant and continue to have detrimental impacts on Plaintiff States. Federal agencies continue to provide conflicting messages to, and block funding allocated for, recipient States. Ample evidence supports this point. For example, a full day after OMB rescinded the OMB Directive, EPA sent emails to recipients in multiple Plaintiff States, asserting that "EPA is working diligently to implement the Office of Management and Budget's memorandum," and that the "agency is temporarily pausing all activities related to the obligation or disbursement of EPA Federal financial assistance at this time." ECF No. 48-1 at 6. Additionally, despite this Court's January 31st TRO, critical funding for IIJA and IRA programs like Solar for

All[3] and CPRG[4], as well as myriad other programs critical to Plaintiff States, like funding for higher education through USAID (*see, e.g.*, Ex. 57 to Thomas-Jensen Aff. ¶ 8) and National Science Foundation,[5] have continued to be blocked well into the week of February 3, 2025.

Moreover, the Executive has not revoked or otherwise modified Section 7(a) of the *Unleashing* EO, which by its plain terms suspends all federal funding under the IIJA and IRA, or subsequent agency actions like the OMB *Unleashing* Guidance. The fact that executive agencies appear to have restored *some* funding only *after* being provided with notice of the Court's TRO is only further evidence that the Funding Freeze is very much live and that a Court order remains necessary to provide Plaintiff States with relief from that unlawful action.

Likewise, Defendants have made clear that the Executive intends to read the Court's TRO exceedingly narrowly. *See, e.g.*, ECF No. 51 at 2. For example, Defendants assert that they do not understand the Court's order as enjoining the spending freeze in Section 7(a) of the *Unleashing* EO, *see id.*, which by its own terms directs a pause in disbursement of appropriated funds, despite the TRO's clear language to the contrary, and despite conflicting statements in their own notice to federal agencies and *some* (but not all) agency actions thereafter.. *See* ECF No. 51-.1; Ex. 17 to Thomas-Jensen Aff. Similarly, Defendants have conveyed to federal agencies that they may exercise their own "discretion" to implement the precise funding pause implemented by the now-

---

[3] *See, e.g.*, Ex. 123 to Thomas-Jensen Aff. ¶¶ 10, 26; Ex. 44 to Thomas-Jensen Aff. ¶¶ 2, 14; Ex. 95 to Thomas-Jensen Aff. ¶ 55; Ex. 118 to Thomas-Jensen Aff. ¶ 18 & Ex. F; Ex. 85 to Thomas-Jensen Aff. ¶ 10; Ex. 108 to Thomas-Jensen Aff. ¶ 19; Ex. 73 to Thomas-Jensen Aff. ¶ 8; Ex. 52 to Thomas-Jensen Aff. ¶ 12.

[4] *See, e.g.*, Ex. 123 to Thomas-Jensen Aff. ¶¶ 4, 10; Ex. 20 to Thomas-Jensen Aff. ¶¶ 7, 23; Ex. 44 to Thomas-Jensen Aff. ¶¶ 23-25; Ex. 118 to Thomas-Jensen Aff. ¶ 25 & Ex. H; Ex. 84 to Thomas-Jensen Aff. ¶ 15 & Ex. K; Ex. 106 to Thomas-Jensen Aff. ¶¶ 41-44 & Ex. I; Ex. 73 to Thomas-Jensen Aff. ¶ 8; Ex. 83 to Thomas-Jensen Aff. ¶ 25.

[5] *See, e.g.*, Ex. 58 to Thomas-Jensen Aff. ¶ 13; Ex. 34 to Thomas-Jensen Aff. ¶ 17; Ex. 37 to Thomas-Jensen Aff. ¶ 17.

withdrawn OMB Directive. *See* ECF No. 51-1 at 1 (advising agencies that they "may exercise their own authority to pause awards or obligations, provided agencies do so purely based on their own discretion—not as a result of the OMB Memo or the President's Executive Orders"). Thus, Plaintiff States continue to face a very real risk of imminent, irreparable harm from an arbitrary, undifferentiated Funding Freeze irrespective of any specific underlying statutory or regulatory authorization. For that reason, the Court can provide real relief from both the funding freeze itself and the chaos attendant to the Executive's vague and confusing guidance to agencies. Accordingly, Plaintiff States' requests for declaratory, preliminary, and permanent injunctive relief are not moot.

Even if this case did not present a live controversy, the voluntary cessation doctrine would preclude application of the mootness doctrine. "The voluntary cessation exception 'traces to the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior.'" *Am. Civil Liberties Union of Mass.*, 705 F.3d at 54 (quoting *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001)). Without this rule, "a defendant could immunize itself from suit by altering its behavior so as to secure a dismissal, and then immediately reinstate the challenged conduct afterwards." *Brown v. Colegio de Abogados de Puerto Rico*, 613 F.3d 44, 49 (1st Cir. 2010). To determine whether voluntary cessation provides an exception to mootness, courts look to the conduct of the defendant to determine, among other things, whether circumstances "justify a fear of repetition" *Id.*

Here, it is abundantly clear that Defendants attempted to immunize themselves from suit through nongenuine changes to their short-term behavior. *See* ECF No. 50 at 10 (noting that recission of OMB Directive "may have been issued simply to defeat the jurisdiction of the courts."). After the OMB Directive was withdrawn, the White House Press Secretary published a statement on X that read, in pertinent part, that "[t]his is NOT a recission of the federal funding

freeze." Ex. 126 to Thomas-Jensen Aff. Instead, she explained, the Executive rescinded the OMB

Directive to "end any confusion created by" an administrative stay of the Directive entered by the

federal district court in the District of Columbia. *Id.* In other words, the Executive's designated

spokesperson unambiguously explained that (1) recission of the OMB Directive was intended only

to avoid the consequences of litigation and (2) that the actual policy of freezing spending set forth

in the OMB Directive would carry on unabated. And in fact, that policy did continue through

certain agencies even after this Court entered its TRO Order. As Plaintiff States' declarations attest,

the States received numerous agency communications indicated that funding was still disrupted

after the TRO was issued. Where Plaintiffs "'remain under a constant threat' that government

officials will use their power to reinstate the challenged restrictions," the voluntary cessation

doctrine applies to preclude application of the mootness rules. *Tandon v. Newsom*, 593 U.S. 61, 63

(2021) (quoting *Roman Catholic Diocese v. Cuomo*, 592 U.S. 14, 20 (2020)). That is exactly the

case here.

### III.    State Plaintiffs Have Established a Likelihood of Success on the Merits.

Immediately upon taking office, the President initiated an across-the-board Funding Freeze

intended to halt the disbursement of all federal financial assistance—funds appropriated by

Congress for purposes spanning public education, highway construction, disaster relief,

infrastructure investment, pollution reduction, and more—to "align Federal spending and action

with the will of the American people as expressed through Presidential priorities." OMB Directive

at 1. The OMB Directive then implemented that Funding Freeze, as did the Agency Defendants in

carrying out the OMB Directive and continuing to freeze funds even after the Directive's purported

rescission. Each of these actions suffer from several, independent legal defects. The OMB

Directive itself, as well as its chaotic and ongoing implementation by Agency Defendants, violate

several provisions of the U.S. Constitution relating to the separation of powers between the Executive and Legislative branches. The OMB Directive and the Agency Defendants' implementation also violate many statutes governing the Executive branch's authority (or lack thereof) to modify open awards under specific grant schemes. These violations are also independently actionable under the APA, as they are contrary to law, ultra vires, and were executed arbitrarily and capriciously. As explained above, Defendants now seek to defeat this Court's jurisdiction by claiming that with the "recission" of the OMB Directive, the Agency Defendants are acting pursuant to executive orders rather than the OMB Directive. But even if that argument were factually correct—and it is not—the actions of the Agency Defendants *still* would violate all of the same constitutional and statutory provisions, including the APA.

As this Court held in granting Plaintiff States' motion for a temporary restraining order, TRO at 6, neither the President nor federal agencies have any sweeping authority to freeze funds that Congress has duly authorized and appropriated, without regard to any of the statutory provisions or specific grant terms that govern such funding. As the Court explained in its order, "[f]ederal law specifies how the Executive should act if it believes that appropriations are inconsistent with the President's priorities—it must ask Congress, not act unilaterally." *Id.* Plaintiff States are thus highly likely to succeed on their claims, and the Court should enter a preliminary injunction barring Defendants from continuing to implement their Funding Freeze—a freeze that, Defendants' conduct makes patently clear, will immediately resume, including for the purpose of implementing the President's executive orders, if an injunction is not granted.

A.  **The Funding Freeze Violates Separation-of-Powers Principles and Multiple Overlapping Constitutional Constraints (Counts III, V).**

"[S]ettled, bedrock principles of constitutional law" require the Executive to expend funds that Congress has duly authorized and appropriated. *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.); *accord City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020); *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). The Funding Freeze cannot be squared with these fundamental constitutional limitations on executive authority.

1.  **The Constitution Prohibits the Executive from Declining to Spend Funding that Congress Has Duly Authorized and Appropriated.**

Neither the President nor the Agency Defendants can unilaterally decline to spend federal funds that have been authorized and appropriated by Congress. Both bedrock separation-of-powers principles and multiple specific constitutional provisions prohibit that sweeping assertion of authority.

"[U]nder the principle of Separation of Powers, . . . the Executive Branch may not refuse to disperse" federal funds "without congressional authorization." *San Francisco*, 897 F.3d at 1231. That conclusion follows from a straightforward application of the three-part framework set out in Justice Jackson's concurring opinion in *Youngstown*. Under that rubric, to determine whether the President has authority to act, courts consider whether that authority derives from the Constitution, the will of Congress, or both. As the Supreme Court has explained, "[n]o matter the context, the President's authority to act necessarily 'stem[s] either from an act of Congress or from the Constitution itself.'" *Trump v. United States*, 603 U.S. 593, 607 (2024) (quoting *Youngstown*, 343 U.S. at 585). Here, no constitutional or statutory provision authorizes the Executive to initiate a

sweeping, all-purpose funding freeze of the kind at issue here, and multiple constitutional and statutory authorities refute the existence of any such power.

The Constitution makes clear that the Executive lacks authority to unilaterally decline to spend funds that Congress has authorized and appropriated. The Constitution "grants the power of the purse to Congress, not the President." *San Francisco*, 897 F.3d at 1231; *see* U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause). Congress also possesses exclusive power to legislate. "[T]he Constitution is neither silent nor equivocal about who shall make laws which the President is to execute." *Youngstown*, 343 U.S. at 587–88. "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). Instead, the President's role in lawmaking is sharply circumscribed: "[H]e may initiate and influence legislative proposals," and may veto a bill. *Id.* As the Supreme Court explained in *Youngstown*, "[i]n the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." 343 U.S. at 587–88. Once a law is enacted—including a law appropriating funds—the President has a duty to "take care that [it] be faithfully executed." U.S. Const. art. II, § 3. As then-Judge Kavanaugh has explained, these fundamental structural principles require "the President [to] follow statutory mandates so long as there is appropriated money available." *In re Aiken Cnty.*, 725 F.3d at 259 (emphasis omitted). "[T]he President may not," by contrast, "decline to follow a statutory mandate . . . simply because of policy objections." *Id.*; *see Clinton*, 524 U.S. at 451 (Kennedy, J., concurring) (if "the decision to spend [is] determined by the Executive alone, without adequate control by the citizen's Representatives in Congress, liberty is threatened").

Indeed, Congress has established a comprehensive statutory regime that governs when and how the President and Agency Defendants can decline to spend duly appropriated funds. As

described *supra* Background Section I.A., the ICA permits the Executive to decline to spend such funds only under highly circumscribed conditions. The ICA does not give federal agencies any authority to decline to spend. It provides that the President cannot unilaterally rescind federal funds made available by Congress; instead, he must "propose[]" a rescission to Congress, a proposal deemed rejected if Congress declines to pass a rescission bill within 45 days. *Id.* § 683; *see In re Aiken Cnty.*, 725 F.3d at 261 n.1 (describing this process). Likewise, the ICA permits the President to "defer" (i.e., delay) the expenditure of federal funds only under equally circumscribed conditions, including by limiting the grounds on which such deferrals may occur, *see id.* § 684(b), and by requiring the President to send an explanation for the proposed deferral (including the "legal authority" on which it rests) to Congress, *id.* § 684(a). The ICA, in other words, specifically prohibits the President or any executive agency from unilaterally and indefinitely halting the expenditure of federal funds. Nor does the ICA allow federal agencies to unilaterally and indefinitely halt federal funds, whether they purport to do so at the direction of the President or on their own.

These constitutional and statutory provisions make clear that when the President attempts to unilaterally decline to spend appropriate funds, "his power is at its lowest ebb." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). The Constitution reserves to Congress the power to make laws, including appropriations laws, and assigns the President the duty to execute those laws rather than countermand them. And Congress has buttressed its power to appropriate and control federal spending by prescribing a specific statutory regime pursuant to which the Executive can rescind or defer funding obligations—a regime with which the President here plainly has not complied. In such a circumstance, because the President's actions are not authorized by the Constitution itself or an act of Congress, he lacks the power to "redistribute or withhold properly appropriated funds

in order to effectuate" his own "policy goals." *San Francisco*, 897 F.3d at 1238. At bottom, "[t]he President . . . may not ignore statutory mandates or prohibitions merely because of policy disagreements with Congress." *In re Aiken Cnty.*, 725 F.3d at 260. That "bedrock" separation-of-powers principle, *id.* at 259, resolves this case.

Specific constitutional provisions buttress this general principle and independently establish that the Executive lacks authority to unilaterally decline to spend duly appropriated federal funds.

First, neither the President nor federal agencies can unilaterally decline to spend duly appropriated funds without violating the Appropriations Clause. The Constitution grants to Congress the "power of the purse," authorizing it "to lay and collect Taxes, Duties, Imposts and Excises" and providing that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. Unilateral executive action to decline to expend appropriate funds infringes on Congress's appropriations power, and thus likewise violates the Constitution for that independent reason.

Second, the Executive cannot decline to spend duly appropriated funds without violating the Presentment Clauses. The Constitution prescribes a "single, finely wrought and exhaustively considered[] procedure" for enacting legislation: passage of a bill by both houses of Congress and presentment to the President for his signature or veto. *Immigration Naturalization Serv. v. Chadha*, 462 U.S. 919, 951 (1983); *see* U.S. Const. art. I, § 7, cls. 2, 3. As the Supreme Court explained in *Clinton v. City of New York*, this procedure is an exclusive one: The President cannot unilaterally "amend" legislation sitting on his desk before he signs it, nor can he unilaterally "repeal[] . . . parts of duly enacted statutes." 524 U.S. at 438–39. Indeed, the Court in *Clinton* held unconstitutional a federal statute purporting to grant the President exactly that authority, explaining that, "[i]n both

46

legal and practical effect," the statute allowed the President to amend an enacted law, which violated the Presentment Clauses. *Id.* at 436. The same is true of the authority the President and Agency Defendants have asserted here to unilaterally decline to expend funds; that, too, violates the Presentment Clauses by attempting to repeal federal laws that the President dislikes without following the "finely wrought" procedures for doing so. *Chadha*, 462 U.S. at 951; *see id.* at 954 ("[R]epeal of statutes, no less than enactment, must conform with Art. I.").

Finally, and independently, the Executive cannot decline to spend duly appropriated funds without violating the Take Care Clause. The Constitution provides that the Executive must "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3, cl. 3; *Utility Air Reg. Grp. v. Env't Prot. Agency*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes the laws and the President . . . faithfully executes them."). But when the Executive refuses to spend funds that Congress has duly authorized and appropriated, in furtherance of the President's own policy goals, it is refusing to "faithfully execute" congressional commands, and any action taken pursuant to such a policy thus violates the Constitution for that reason, too. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("the President is without authority to set aside congressional legislation by executive order.").

>2.    **The Funding Freeze Contravenes These Constitutional Principles by Asserting Executive Authority to Decline to Spend Funds That Congress Has Authorized and Appropriated.**

The Court correctly held that Plaintiff States are likely to show that "the Executive's actions violate the separation of powers." TRO at 5. The President initiated, the OMB Directive implemented, and a wide range of federal agencies continue to implement (or would implement absent the TRO and a preliminary injunction) a categorical, sweeping funding freeze spanning all

47

but a handful of federal funding streams, affecting funds supporting public education, highway construction, disaster relief, and more. The OMB Directive and Agency Defendants did so in blatant disregard of the statutes, regulations, and grant conditions that set out circumstances under which funding can be terminated or withheld, and for the stated purpose of "align[ing] Federal spending and action with the will of the American people as expressed through Presidential priorities." OMB Directive at 1. But neither the President nor federal agencies can "ignore statutory mandates or prohibitions merely because of policy disagreements with Congress." *In re Aiken Cnty.*, 725 F.3d at 260. The Funding Freeze thus violates bedrock separation-of-powers principles and the Appropriations, Presentment, and Take Care Clauses.

Indeed, the statutory and regulatory regimes governing the wide range of funding streams affected by the Funding Freeze transparently do not confer the sweeping authority on the Executive that it has asserted. Defendants have not identified a single statutory or regulatory provision authorizing the Freeze, and even a cursory examination of the statutes and regulations that govern these funding streams shows that they require the expenditure of funds and do not grant the Executive the unchecked power it has claimed for itself. As discussed, *supra* Background Sections I.A.–I.B., a wide range of federal statutes, some longstanding and some contemporary, explicitly direct specific federal agencies to provide funds to recipients, and either afford no discretion to halt those payments or set out specific mechanisms by which any suspension of funding must be accomplished—mechanisms plainly not complied with here.

Here are just a handful of examples:

- Congress has directed funding be provided to the States for their use in supporting critical and longstanding state priorities, including the provision of healthcare to the States' most vulnerable residents (via the Medicaid program) and the construction of roads and

highways. *See* 42 U.S.C. § 1396b(a) (Medicaid funds shall be "pa[id] to each State"); 23 U.S.C. § 104(a)(1), (b), (c) (similar for federal highway funds). These federal funds total billions of dollars and are allocated to States based on a statutorily prescribed formula, a methodology that does not permit executive deviation (much less unilateral termination).

- Congress has elsewhere allocated mandatory funds to the States to fund programs for their residents ranging from special education to mental health and substance abuse treatment to power and heat for low-income individuals, and imposed specific limits on the relevant agencies' power to withhold such funds (generally requiring notice and a hearing). *See* 20 U.S.C. §§ 1411, 1412, 1416 (IDEA); 42 U.S.C. §§ 300x(a), 300x-7(a), 300x-21(a), 300x-33(a) (mental health and substance abuse treatment); 42 U.S.C. §§ 8621, 8623, 8626, 8627 (LIHEAP).

- More recently, in the IIJA and IRA, Congress appropriated billions of dollars to federal programs that support critical energy and infrastructure projects, among other legislative priorities—and used mandatory language to describe many of the most significant funding decisions that it made. For instance, the IIJA appropriated almost $30 billion for use in constructing and rehabilitating state water, wastewater, and sewage facilities, and the relevant provisions make clear that these funds must be provided to the States. *See* 33 U.S.C. §§ 1381(a), 1384(a), (c)(2) (EPA "*shall* make capitalization grants to each State" for water pollution control pursuant to a statutory formula); 42 U.S.C. § 300j-12(a)(1)(A), (C) (similar for drinking water grant). And the IRA established a program to subsidize low- and moderate-income households' purchase of heat pump systems—and directed the Secretary of Energy to "reserve funds . . . for each State energy office" based on an

49

allotment formula, 42 U.S.C. § 18795a(a)(2)(A)(i), that does not give the Secretary the power to decline to expend funds.

Congress has, through these statutes and others, determined that federal funds be spent and sharply limited the Executive's authority to withhold them. But Defendants have—via the President's executive orders (including Section 7(a) of the *Unleashing* EO), the OMB Directive, the *Unleashing* Guidance, and their actions implementing those orders and directives—asserted the sweeping authority to decline to spend funds based solely on the purposes to which those funds will be used. The Constitution affords the Executive no such power. Plaintiff States are thus highly likely to succeed on their separation-of-powers, Appropriations Clause, Presentment Clause, and Take Care Clause claims.

**B.      The Funding Freeze Is Ultra Vires Because It Exceeds the Executive's Statutory Authority (Count I).**

The Funding Freeze is also unlawful because it is ultra vires—that is, outside the scope of the statutory authority conferred on the Executive by Congress. Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949). Courts have extended that rule to permit injunctive relief in such circumstances against the President. *See, e.g.*, *Am. Forest Rsch. Council v. United States*, 77 F.4th 787, 796 (D.C. Cir. 2023) ("[A] claim alleging that the President acted in excess of his statutory authority is judicially reviewable even absent an applicable statutory review provision."), *cert. denied*, 144 S. Ct. 1110

50

(2024); *Murphy Co. v. Biden*, 65 F.4th 1122, 1131 (9th Cir. 2023) (similar), *cert. denied*, 144 S. Ct. 1111 (2024).

Here, the Plaintiff States are likely to succeed on an equitable ultra vires claim against all Defendants, including the President, because their actions were flatly contrary to law. As discussed, *supra* Background Sections I.A.–I.B. & Argument Section III.A.2. multiple federal statutes limit the Executive's authority to decline to spend funds authorized and appropriated by Congress. The ICA prohibits the rescission and deferral of appropriated funds except under narrow circumstances not present here, and a wide range of federal statutes (including, but not limited to, the IIJA and IRA) not only tell the Executive to spend funds but substantially limit its discretion to withhold those funds. Because the record establishes that Defendants—including the President—have acted outside their authority in implementing the Funding Freeze, warranting injunctive relief, Plaintiff States are likely to succeed on their ultra vires claim.

### C. The Funding Freeze Violates the Spending Clause by Failing to Afford States Fair Notice of Funding Conditions (Count IV).

Even if the Executive had authority to condition the disbursement of federal funds on new criteria, the freeze would still violate the Spending Clause. The Constitution grants Congress the power "to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. But "[t]he spending power is . . . not unlimited." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). If the Federal government "desires to condition the States' receipt of federal funds, it 'must do so unambiguously.'" *Id.* (quoting *Pennhurst State Sch.* & *Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). States "cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst*, 451 U.S. at 17). Similarly, "[t]hough

Congress' power to legislate under the spending power is broad, it does not include surprising participating States with post acceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25; *accord Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 584 (2012). "[O]nce a State has accepted funds pursuant to a federal spending program," that is, the government "cannot alter the conditions attached to those funds so significantly as to 'accomplish[] a shift in kind, not merely degree.'" *New York v. HHS*, 414 F. Supp. 3d 475, 567 (S.D.N.Y. 2019).

Here, to the extent the Freeze attempts to change the conditions of grant funding already obligated to the States, that change would violate the Spending Clause. The States have relied on the existing network of statutory, regulatory, and contractual terms governing the funds they use to support basic services within their jurisdictions. Those terms, as discussed, *supra* Background Sections I.A.–I.B. & Argument Section III.A.2., do not permit the Executive to unilaterally suspend or terminate payment on a whim. If the Executive believes that it has the statutory or regulatory authority to enact such a policy, it can propose it to the States (and to other recipients of federal funds) when the relevant grants are renewed in accordance with applicable procedures. Until that time, however, the Executive lacks the power to "alter the conditions attached to" the States' funds, *New York*, 414 F. Supp. 3d at 567, on a retroactive and permanent basis. The Plaintiff States are thus likely to succeed on their Spending Clause claim, too.

### D.    The Funding Freeze Violates the APA (Counts I, II).

The actions of the Agency Defendants to implement the Funding Freeze without regard to the relevant statutes and regulations—indeed in contravention of them—violate the APA because they are contrary to law and arbitrary and capricious. 5 U.S.C. § 706(2)(A) (courts must "hold unlawful and set aside agency action, findings, and conclusions" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). *See also F.C.C. v. NextWave*

*Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (contrary to law "means, of course, any law, and not merely those laws that the agency itself is charged with administering") (internal citation and quotation marks omitted). Starting January 20, 2025, and continuing beyond the rescission of the OMB Directive, the federal government implemented an across-the-board Funding Freeze that caused chaos in Plaintiff States and disrupted essential services for their residents in violation of the APA.

## 1.    The Agency Defendants Engaged in Final Agency Action Subject to Challenge.

The APA permits judicial review of "final agency action." 5 U.S.C. § 704. The OMB Directive itself is final agency action, despite its rescission. Extensive evidence demonstrates that the rescission was in name only, and that agencies continued to carry out the Funding Freeze after the rescission. *See supra* Background Section II.D. At most, the rescission of the OMB Directive could qualify as a voluntary cessation, but a defendant's voluntary change in conduct moots a case only if it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Calvary Chapel of Bangor v. Mills*. 52 F.4th 40, 47 (1st Cir. 2022) (quotation marks omitted). Here, it is not just that the wrongful behavior could recur—it simply never stopped, and some has continued to this day even after the Court's TRO.

The Agency Defendants also undertook final agency actions to implement the Funding Freeze by unilaterally suspending funding while purporting to review whether they have any statutory authority to suspend funding. For example, Agency Defendants' actions implementing Section 7(a) of the *Unleashing* EO constitute final agency action because they effect an immediate and blanket freeze of all disbursements pursuant to the IRA and the IIJA. OMB and agencies charged with implementing the IIJA and IRA are still implementing the *Unleashing* EO's Funding

Freeze through confusing and inconsistent agency actions that pause or otherwise interrupt disbursement of obligated funds. *See, e.g.*, Ex. 1 to Thomas-Jensen Aff. (OMB *Unleashing* Guidance); Ex. 17 to Thomas-Jensen Aff. (Jan. 27 EPA Memo). Indeed, the Government has now taken the position that those funds should be exempt from this Court's TRO. *See* ECF No. 51, ¶ 2.

Each of these actions has marked "the consummation" of agency decision making and determined "rights or obligations . . . from which legal consequences" flowed. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted). Indeed, the Funding Freeze announced in the OMB Directive and ordered by Section 7(a) of the *Unleashing* EO, along with the agency actions implementing it, have affected both the Plaintiff States' rights and the federal government's obligations, resulting in significant legal and practical consequences. *Supra* Background Section II.D.–II.E.

### 2.    The Funding Freeze Violates the APA Because It Is Contrary to Law and *Ultra Vires*.

As described extensively above, a complex network of statutes governs federal appropriations, and the Funding Freeze thus violates not one but many federal statutes. First, federal law requires that appropriated funds be applied "*only* to the objects for which the appropriations were made." 31 U.S.C. § 1301(a) (emphasis added). Second, when the President wants "to spend less that the full amount appropriated by Congress" he must comply with the ICA's specific parameters, 2 U.S.C. §§ 681 *et seq*.; *see supra* Background Section I.A. & Argument Section III.A.2.; *see also Aiken Cnty.*, 725 F.3d at 261 n.1 (citing 2 U.S.C. § 683). The Funding Freeze is based on the administration's policy disagreement with Congressional priorities, an impermissible purpose under the ICA. *See* 2 U.S.C. § 684(b) (deferrals permitted only "to provide for contingencies," "to achieve savings made possible by or through changes in requirements or

greater efficiency of operations," or "as specifically provided by law"); Mem. of Gen. Accountability Off., *Office of Management and Budget—Withholding of Ukraine Security Assistance*, B-331564, at 6 (Jan. 16, 2020), https://perma.cc/6TMT-3CH2 ("The ICA does not permit deferrals for policy reasons."). Moreover, the administration failed to send a detailed "special message" to Congress explaining the numerous proposed deferrals, as required by the ICA. *See* 2 U.S.C. § 684(a). For at least these two reasons, the Funding Freeze clearly violates the ICA.

Finally, even beyond those general funding statutes, the Funding Freeze violates the specific statutes in which Congress mandated that funding be used in a specific manner according to specific terms. In the appropriations context, it is fundamental that "the President must follow statutory mandates so long as there is appropriated money available." *In re Aiken Cnty.*, 725 F.3d at 259; *accord, e.g.*, *City & Cnty. of San Francisco*, 897 F.3d at 1232 ("[T]he President is without authority to thwart congressional will by canceling appropriations passed by Congress."); *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) ("[A]n agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes").

As described above, *see supra* Background Section I.A. & Argument Section III.A.2., many federal funding streams take the form of categorical or "formula" grants, which Congress has instructed the Executive to provide to the States on the basis of enumerated statutory factors, such as population or the expenditure of qualifying State funds. *See, e.g.*, *City of Los Angeles v. Barr*, 941 F.3d 931, 934-35 (9th Cir. 2019) (describing the statutory factors determining eligibility for specific formula grant); *City of Philadelphia v. Att'y Gen. of U.S.*, 916 F.3d 276, 280 (3d Cir.

2019) (same). And the Freeze of IIJA and IRA is likewise wholly inconsistent with Congress's specific dictates in those statutes.

An agency action that runs roughshod over all of these specific statutes by halting funding *en masse*—as the Funding Freeze did here—is "not in accordance with law" and is ultra vires, and thus violates the APA. 5 U.S.C. § 706(2)(A).

### 3.    The Funding Freeze Is Arbitrary and Capricious

The Funding Freeze is also arbitrary and capricious because it is not "reasonable and reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). A court may not "substitute its own policy judgment for that of the agency." *Id.* It must, however, ensure that the agency has "examine[d] the relevant data and articulate[d] 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency cannot simply ignore "an important aspect of the problem." *Id.*

First, the Agency Defendants have failed to articulate any satisfactory explanation for the Funding Freeze. Indeed, the only explanation provided is that the Funding Freeze is intended to help the Executive achieve his policy priorities. *See supra* Background Section II.A., II.B., & II.D. But achieving those priorities cannot come in the form of an across-the-board directive that contravenes numerous statutory provisions without explanation of how that action comports with applicable statutory or regulatory commands or factors relevant under those authorities. Agency Defendants identify no statute that grants them such authority, nor could they. Nor have Agency Defendants attempted to explain their utter disregard for the harms wrought by the Funding Freeze—the very harms Congress sought to address in the laws the Agency Defendants violated here. And as described extensively above, the Funding Freeze endangers critical services that

millions of Americans rely on—funds for food, healthcare, public safety, law enforcement, a healthy environment, education, critical infrastructure, and more, which the Agency Defendants appear to ignore entirely. *See supra* Background Sections II.D.–II.E.

Second, freezing all funds under the IRA and the IIJA is also substantively unreasonable because it lacks any support in law, and indeed, contravenes statutory text, as discussed *supra* Argument Section III.A. Agency action is "substantive[ly] unreasonable[]" when "the agency exercised its discretion unreasonably." *Multicultural Media, Telecom & Internet Council v. Fed. Commc'ns Comm'n*, 873 F.3d 932, 936 (D.C. Cir. 2017) (Kavanaugh, J.). Where, as here, an agency exercises its discretion to act counter to the authorizing statute's directives, its action is plainly unreasonable.

In short, the Agency Defendants' repeated and ongoing attempts to evade statutory funding commands with no rational explanation, no consideration of relevant factors, and in violation of applicable appropriations and substantive laws was arbitrary and capricious in every sense.

## IV.    Plaintiff States Will Be Irreparably Harmed Absent a Preliminary Injunction.

The Court should enter an injunction because without one, Plaintiff States will "suffer[] a substantial injury that is not accurately measurable or adequately compensable by money damages." *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996). "District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009) (quoting *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir.1989) (internal quotations omitted)).

Here, Defendants' actions to freeze federal funds that Congress has appropriated will irreparably harm the Plaintiff States in at least two ways. First, deprivation of this funding threatens

Plaintiff States' sovereign interests by interrupting essential services they provide to their residents and hindering their ability to carry out programs aimed at protecting human health, safety, and the environment. Second, the Defendants' actions have caused significant budgetary uncertainty and confusion, which is irreparably harming Plaintiff States by interfering with their agencies' ability to budget, plan, and serve their residents, including through frustrating the aims of the funding provided by statutes like the IIJA and IRA. These harms already have occurred, and absent entry of an injunction will almost certainly continue. Where, as here, irreparable injury to the Plaintiff States is both "real and immediate," the Court should enter an injunction to preserve the status quo. *See Winter*, 555 U.S. at22 (emphasis in original); *Biogen Idec MA Inc. v. Trs. of Columbia Univ.*, 332 F. Supp. 2d 286, 296 (D. Mass. 2004) (quotation omitted).

### A.  Withholding Federal Funding Will Frustrate Programs that Benefit Plaintiff States, Their Residents, and the Environment.

Absent injunctive relief, Defendants' actions will cause significant and irreparable harm by hobbling programs meant to further Plaintiff States' sovereign interests. These programs provide critical financial assistance and other services to individuals, businesses, local governments, and other interested parties across a variety of subject-matter areas—areas that Congress specifically contemplated and authorized such funds to support, such as critical infrastructure, air and water pollution, climate change mitigation and adaptation, grid resiliency and reliability, and waste management and reduction. Denial of these funds threatens significant and concrete harm—a type of harm that, "by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987); *accord Idaho Sporting Cong. Inc. v. Alexander*, 222 F.3d 562, 569 (9th Cir.

2000); *Maine People's All. v. HoltraChem Mfg. Co., LLC*, No. 1:00-CV-00069-JAW, 2015 WL 5155573, at *28 (D. Me. Sept. 2, 2015).

The freezing of funds appropriated under the IIJA and IRA further illustrates the point. This freeze will harm the Plaintiff States by frustrating the very goals Congress designed the programs to achieve and by requiring additional State efforts to attempt to fill the gaps—sovereign harms that cannot be adequately compensated with money damages. *See Kansas v. United States*, 249 F.3d 1213, 1227-28 (10th Cir. 2001) (threats to State's public policy and sovereign interests constitute irreparable harm). As already described, *supra* Background Sections I.B.2. & II.E., EPA has awarded Plaintiff States hundreds of millions of dollars under different IIJA and IRA grant programs, some of which were awarded jointly to multiple States following significant interstate coordination and planning. These grants support Plaintiff States' efforts to protect their residents' health and safety, by removing contaminating substances from drinking water and harmful pollutants from the air, by cleaning up hazardous waste, and by increasing energy efficiency and lowering greenhouse gas emissions. *See supra* Background Sections I.B.2. & II.E. (describing examples of IIJA and IRA appropriations, including High-Efficiency Electric Home Rebate Act grant awards, CPRG awards, Solar for All awards, air pollution quality monitoring awards). Freezing these grants will hinder Plaintiff States' ability to achieve those aims and adequately protect their residents. *See, e.g.*, Ex. 117 to Thomas-Jensen Aff. ¶ 30 (pause in funding streams would have "massive impact," require resource shifts, and interfere with mission); Ex. 59 to Thomas-Jensen Aff. ¶ 11 (without grant funding, "small public water systems … will continue to rely on drinking water polluted by PFAs and/or other emerging contaminants," cleanup of oil and hazardous materials contamination in post-industrial communities would likely be abandoned, and state efforts to monitor and mitigate air pollution would be hampered); Ex. 83 to Thomas-Jensen

Aff. ¶ 27 ("North Carolina will lose the benefits of over $117 million in conservation projects" if the freeze is not lifted, leaving its residents "more vulnerable to flooding and wildfires.").

Even a temporary delay in IIJA and IRA funding disbursement will cause Plaintiff States to sustain significant and irreparable injuries. Freezing reimbursements under these statutes' various home efficiency and electrification rebates programs are increasing consumer electricity bills and disrupting the processing of funds for low- and moderate-income homeowners who have begun home retrofits under the program (e.g., removing existing water heaters or HVAC systems), creating costly disputes between those homeowners and private contractors expecting to be paid. *See* Ex. 40 to Thomas-Jensen Aff. ¶¶ 26–30 (state would have to regain trust of contractors and homeowners after reimbursement delays); Ex. 122 to Thomas-Jensen Aff. ¶ 5(e) (funding freeze causes uncertainty, harming Colorado's ability to provide services to Coloradans relying on federal funds for installation of energy-saving appliances), ¶ 29 (continued delay will cause homeowners to forfeit improvements to homes that would cut energy bills). Any further pause in CPRG funding threatens postponement or possible derailment of major projects necessary to attain mandatory Federal air standards. Ex. 42 to Thomas-Jensen Aff. ¶¶ 22-24.

Similarly, pauses to programs for critical infrastructure buildout—like lead water service line replacements, wastewater treatment facility improvements, and electric grid resilience improvements—threaten the postponement or possible termination of major projects necessary to protect public health and welfare within Plaintiff States. *Supra* Background Section II.E.; *see also, e.g.*, Ex. 95 to Thomas-Jensen Aff. ¶ 45 (freezing of IIJA GRIP funding in New York will delay electric grid resilience improvements, "potentially increasing the risk of damage to the grid in a severe weather event and causing additional harm to small municipal electric utilities."); Ex. 59 to Thomas-Jensen Aff. ¶ 11.b (pause in Long Island Sound Program Grant would impede remediation

of nitrogen and other pollution); Ex. 79 to Thomas-Jensen Aff. ¶¶ 10–14 (frozen $25 million grant funds for replacing lead service lines to residential homes "put[s] the safety of Minnesotans' drinking water at risk"); Ex. 31 to Thomas-Jensen Aff. ¶¶ 10, 12 (health care, emergency relief, highway safety, and billions of dollars in water infrastructure, transportation, and broadband infrastructure projects); Ex. 30 to Thomas-Jensen Aff. ¶ 13 (federal funding pause could render California government entities unable to deliver numerous services to increase workplace health and safety); Ex. 35 to Thomas-Jensen Aff. ¶ 11 (interruption in funding threatens California water board's ability to come into compliance with federal safe drinking water standards, including ongoing work to remove lead from water service lines).

**B.    Defendants' Funding Freeze Has Caused Budgetary Confusion and Interfered with State Agencies' Ability to Plan for Provision of Essential Services for Public Health and Safety and the Environment.**

Defendants' funding freeze has unleashed budgetary chaos in Plaintiff States and interfered with state agencies' operations, which constitutes further irreparable harm. Courts have recognized that the financial and operational harms caused by interruptions to federal funding may constitute irreparable harm. *See, e.g.*, *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017), *reconsideration denied*, No. 17-CV-00485-WHO, 267 F. Supp. 3d 1201, 2017 WL 3086064 (N.D. Cal. July 20, 2017) (uncertainty prompted by executive order withholding funds from so-called "sanctuary jurisdictions" caused irreparable harm by "interfer[ing] with the Counties' ability to budget, plan for the future, and properly serve their residents" and by requiring Counties to take "mitigating steps," including placing funds in reserve or making cuts to other services); *see also Mich. v. DeVos*, 481 F. Supp. 3d 984, 988–89 (N.D. Cal. 2020) (plaintiffs demonstrated likelihood of irreparable harm by detailing, "often on a district and school-level basis, the financial and

61

operational harms" that enforcement of a rule imposing conditions on federal funding would cause, by requiring State agencies to divert millions of dollars in federal funding from programs earmarked to support public schools to other programs).

Plaintiff States have suffered similar financial and operational harms here. As described above, since the Defendants announced the "pause" on federal funding, numerous state agencies have experienced confusion and budgetary uncertainty as they have been cut off from access to funds to which they are legally entitled. *See, e.g.*, Ex. 40 to Thomas-Jensen Aff. ¶¶ 32–33; Ex. 20 to Thomas-Jensen Aff. ¶¶ 18–23, 25–26; Ex. 122 to Thomas-Jensen Aff. ¶¶ 6–8; Ex. 37 to Thomas-Jensen Aff. ¶ 17. That budgetary uncertainty is forcing state agencies to take steps to mitigate the risk of losing "millions of dollars" in grant funding, including "cuts to program services." Ex. 40 to Thomas-Jensen Aff. ¶ 33; *see also* Ex. 118 to Thomas-Jensen Aff. ¶ 30 (Washington directed state agencies to identify spending reductions of 6%); Ex. 23 to Thomas-Jensen Aff. ¶ 16 (further disruption to funding would require Arizona agency to "divert[] funding away from other necessary activities" and "delay[] or halt[] operations in critical programs"). And, as described *supra* Background Section II.E., the uncertainty is interfering with Plaintiff States' ability to budget, plan for the future, and properly serve their residents. *See Cnty. of Santa Clara*, 250 F. Supp. 3d at 537; *see also United States v. North Carolina*, 192 F.Supp.3d 620, 629 (M.D.N.C. 2016) (finding irreparable harm where unavailability of funds was "likely to have an immediate impact on [the state's] ability to provide critical resources to the public, causing damage that would persist regardless of whether funding [was] subsequently reinstated").

Moreover, state agencies face the risk that federal agencies will refuse to reimburse them or their subgrantees for any costs already incurred under awarded grants, which will leave states to cover those costs and may require states to cancel or amend vendor contracts. *See e.g.*, Ex. 20

to Thomas-Jensen Aff. ¶ 6(d) (Arizona has incurred obligations over $16 million in reliance on HEAR award, of which over $15 million has yet to be reimbursed); Ex. 49 to Thomas-Jensen Aff. ¶¶ 11–15 (University of Hawaii has been paying five employees out of pocket, without reimbursement to which they are entitled); Ex. 106 to Thomas-Jensen Aff. ¶ 45 (elimination of $3 million CPRG would make statutory compliance more costly); Ex. 61 to Thomas-Jensen Aff. ¶ 11 (if not reimbursed through CPRG, Massachusetts may be forced to cancel contract with vendor); Ex. 42 to Thomas-Jensen Aff. ¶ 24 (California's South Coast Air Quality Management District and its subgrantees face risks that EPA would refuse to reimburse incurred work and costs).

Nor is the harm limited to the specific grants affected today: suspensions without notice cause reputational harm to State agencies, which makes it more difficult for them to attract grant partners for future applications. Ex. 39 to Thomas-Jensen Aff. ¶ 17. That prospect, in turn, causes a chilling effect on grant activity overall, because there is no longer certainty that the federal government will make good on its legal obligations, and accordingly many state agencies are faced with deciding whether to forego valuable federal programs, including those described above, and how to address the shortfall. *See e.g.*, Ex. 42 to Thomas-Jensen Aff. ¶ 24; Ex. 40 to Thomas-Jensen Aff. ¶ 32; Ex. 23 to Thomas-Jensen Aff. ¶ 15. These financial and operational impacts, and the resulting loss of goodwill and reputational harm with respect to these agencies' project partners and program participants, unquestionably constitute irreparable harm to the Plaintiff States. *See Warwick*, 102 F.3d at 20 ("By its very nature injury to goodwill and reputation is not easily measured or fully compensable in damages. Accordingly, this kind of harm is often held to be irreparable.").

C.     **These Irreparable Injuries Are Already Occurring and Are Likely to Continue.**

As described above, Plaintiff States are already suffering irreparable injuries due to Defendants' actions to "pause" obligated federal funding to which Plaintiff States are entitled. Absent injunctive relief, this harm is certain to continue—and to worsen. *See Biogen*, 332 F. Supp. 2d at 296 (harm sufficient to justify preliminary injunctive relief must be real and immediate). The OMB Directive required all Federal agencies to pause "all activities related to obligation or disbursement of all Federal financial assistance, and any other relevant agency activities that may be implicated by the executive orders . . ." and "pause . . . disbursement of Federal funds under all open awards." Compl. ¶ 71 & Ex. A. While OMB characterized its pause as "temporary," the Directive does not state when it would expire, and contemplates that funding must remain paused while Federal agencies and OMB conduct a "comprehensive" analysis of thousands of funding streams to assess their consistency with the Executive Branch's preferred policies. *See id.* Though OMB has rescinded the OMB Directive, subsequent statements by the Administration make clear that the policy underlying the OMB Directive is still in effect—pursuant to EOs, including the *Unleashing* EO that categorically, immediately, and indefinitely paused IIJA and IRA funds. ECF No. 50 at 10.

And remarkably, even with the Court's order in place, ECF No. 50, state agencies continue to experience interruptions to access and inconsistent ability to draw down funds from grants funded by IIJA and IRA appropriations. Some have reappeared in federal funding portals, but others have disappeared completely. *See, e.g.*, Ex. 28 to Thomas-Jensen Aff. ¶¶ 13–18; Ex. 36 to Thomas-Jensen Aff. ¶¶ 5–15; Ex. 33 to Thomas-Jensen Aff. ¶¶15–19, Ex. B; Ex. 59 to Thomas-Jensen Aff. ¶ 12. Moreover, communication with federal agencies remains unclear and

inconsistent. *See, e.g.*, Ex. 28 to Thomas-Jensen Aff. ¶ 19 (receiving no response from EPA officials to inquiry about grants missing from ASAP); Ex. 33 to Thomas-Jensen Aff. ¶ 28 (same).

Accordingly, absent preliminary injunctive relief, it is likely that the irreparable harm stemming from Defendant's Funding Freeze will continue.

## V.    The Public Interest and Balance of Equities Strongly Favor Entry of a Preliminary Injunction.

Where the government is a party, as it is here, the Court's inquiry into the balance of the equities and the public interest merges. *See Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021); *see also Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 496 F. Supp. 3d 600, 611 (D. Mass. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). As Plaintiff States explained in their request for a TRO, both of these factors strongly favor preliminary injunctive relief in this case.

First, as the Court has already observed, the record "substantiates the likelihood of a successful claim that the Executive's actions violate the Constitution and statutes of the United States." TRO at 7. Indeed, Plaintiff States have—through the contemporaneously filed evidentiary declarations—established a high likelihood of prevailing on the merits of their challenge to the Funding Freeze. "The fact that the States have shown a likelihood of success on the merits strongly suggests that [preliminary relief] would serve the public interest." *Id.* at 9; *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("extremely high likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest."); *Saget v. Trump*, 375 F. Supp. 3d 280, 377 (E.D.N.Y. 2019) ("Because Plaintiffs have shown both a likelihood of success on the merits and irreparable harm, it is also likely the public

interest supports preliminary relief." (citing *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 143 (3d Cir. 2017)).

Moreover, "the public has an important interest in making sure government agencies follow the law." *Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d 323, 343 (D. Mass. 2005); *see also League of Women Voters*, 838 F.3d at 12 ("there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations.") (internal quotation marks omitted)). Likewise, courts in this Circuit have observed that "[i]t is hard to conceive of a situation where the public interest would be served by enforcement of an unconstitutional law or regulation." *Maine Forest Prods. Council v. Cormier*, 586 F. Supp. 3d 22, 64 (D. Me.), *aff'd*, 51 F.4th 1 (1st Cir. 2022) (citation omitted). Here, as Plaintiff States have shown, the arbitrary, across-the-board Funding Freeze announced by the OMB Directive and other actions transgresses both the APA and several constitutional limitations. Thus, there is a strong public interest in stopping the Executive's unlawful conduct and requiring the Executive Branch to comply with basic procedural and constitutional rules. *See, e.g.*, *Maine Forest Prods.*, 586 F. Supp. 3d at 64.

Plaintiff States specifically and the public generally also suffer significant harm when the Executive threatens to revoke wide swaths of federal funding with no notice or opportunity for state and local governments to account for the loss. Plaintiff States receive billions of dollars in federal grants for critical public services that ensure access to education, promote clean air and water, protect public safety, provide for public transportation, support the health of infants, the sick, and the elderly—to name just a few of the examples set forth in Plaintiff States' declarations. Defendants' arbitrary, unilateral revocation of that funding seriously risks impairing all of these substantial interests. *See, e.g., Plyler v. Doe*, 457 U.S. 202, 222 (1982) ("education is perhaps the

most important function of state and local governments."); *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 631 (2022) ("the State has a strong sovereign interest in ensuring public safety and criminal justice within its territory"); *Pac. Merch. Shipping Ass'n v. Goldstene*, 639 F.3d 1154, 1180 (9th Cir. 2011) ("the state of California clearly has an especially powerful interest in controlling the harmful effects of air pollution"); *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 61 (D.D.C. 2020) ("There is clearly a robust public interest in safeguarding prompt access to health care."). And, in the face of such threats, Plaintiff States are thrown into chaos and uncertainty, juggling funding priorities and working to ensure that critical services flow uninterrupted.

Specifically as to the IIJA and IRA—appropriated funding that remains explicitly suspended by Section 7(a) of the *Unleashing* EO and subsequent agency actions, none of which have been rescinded by Defendants—Plaintiff States as well as their subgrantees and contractors face substantial uncertainty as to whether expenditures to carry out contractual obligations under IIJA and IRA programs will be reimbursed, and indeed as of this week Plaintiff States remained unable to draw down obligated grant awards. Sections II(B(2) and II(E). As detailed above, this uncertainty disrupts state and local budgets, has a chilling effect on public programs, and threatens to kneecap private businesses and organizations—and their employees—who have been awarded grants or who serve as vendors or contractors under state-administered IIJA and IRA programs. *Id*. Meanwhile, the vast array of public benefits for which Congress specifically appropriated funds in the IIJA and IRA remains in limbo so long as funding under those statutes stays frozen—including economic development and job creation, transportation and other public infrastructure, water quality protection, energy development, energy efficiency and building weatherization, climate change adaptation and mitigation, and broadband access. *See* Section I(B)(2).

67

On the other hand, Defendants suffer no cognizable harm in disbursing grant funds that Congress has already appropriated, much of which the agencies themselves have already made plans to disburse. Indeed, the Funding Freeze announced in the OMB Directive is noteworthy for its failure to reflect any compelling public interest. To the extent that Defendants assert that existing federal grants entail a "waste of taxpayer dollars" attributable to "Marxist equity, transgenderism, and green new deal social engineering policies," which is contrary to Congressional direction when appropriating funds, "those harms are insufficiently grave to overcome the much more substantial countervailing harms" to Plaintiff States. *Newby*, 838 F.3d at 13. Likewise, insofar as the *Unleashing* EO directs federal agencies to subordinate IIJA and IRA funding to the policies stated in Section 2 of the EO—such as encouraging fossil fuel exploration and production and eliminating a so-called electric vehicle "mandate"—the Executive's policy preferences are irrelevant to its duty to spend congressionally appropriated funds, nor would Defendants' ability to pursue the EO's stated policy objectives through lawful means be prejudiced by a preliminary injunction in this matter. And contrary to "support[ing] hardworking American families," as the OMB Directive purported to do, revoking federal funding across the board will devastate Americans who benefit from programs funded by federal grants. In short, the public interest and the equities weigh unambiguously in Plaintiff States' favor.

Finally, the government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). In their TRO Opposition, Defendants relied on a single legal authority to support their arguments with respect to the balance of the harms: *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). *See* ECF No. 49 at 6. But *King* does not purport to balance harms, nor does it go further

than saying that a *state* suffers "a form of irreparable injury" when a court enjoins "statutes enacted by representatives of its people." *King*, 567 U.S. at 1303. By Defendants' own admission, the OMB Directive reflected presidential policy choices; that is not the same as enjoining a state law enacted by a state legislature. But more to the point, because the funding freeze announced by the OMB Directive is unlawful, Defendants have no cognizable interest in its enforcement. *Maine Forest Prods.*, 586 F. Supp. 3d at 64.

## VI.    Plaintiff States Are Entitled to Preliminary Relief in the Form Requested.

Given the tremendous harm threatened by the Funding Freeze, Plaintiff States' respectfully request the following relief. First, that Defendants be enjoined from reissuing, adopting, implementing, giving effect to, or reinstating under a different name the directives in OMB Memorandum M-25-13 (the "OMB Directive") with respect to the disbursement and transmission of appropriated federal funds to Plaintiff States and recipients therein under awarded grants, executed contracts, or other executed financial obligations. Second, that Defendants be enjoined from pausing, freezing, blocking, cancelling, suspending, terminating, or otherwise impeding the disbursement of appropriated federal funds to Plaintiff States and recipients therein under awarded grants, executed contracts, or other executed financial obligations based on the OMB Directive, including funding freezes dictated, described, or implied by executive orders issued by the President prior to rescission of the OMB Directive or any other materially similar order, memorandum, directive, policy, or practice under which the federal government imposes or applies a categorical pause or freeze of funding appropriated by Congress. For added clarity, this includes but is by no means not limited to, Section 7(a) of Executive Order 14154, Unleashing American Energy. Third, that Defendants must provide written notice of this Order to all Federal agencies to which the OMB Directive was addressed. The written notice shall instruct those agencies that they

69

may not take any steps to implement, give effect to, or reinstate under a different name or through other means the directives in the OMB Directive with respect to the disbursement or transmission of appropriated federal funds to Plaintiff States and recipients therein under awarded grants, executed contracts, or other executed financial obligations. Fourth, that the written notice shall also instruct those agencies to release and transmit any disbursements to Plaintiff States and recipients therein on awarded grants, executed contracts, or other executed financial obligations that were paused on the grounds of the OMB Directive and Executive Orders included by reference therein or issued prior to the rescission of the OMB Directive.

## **CONCLUSION**

For the foregoing reasons, Plaintiff States respectfully request that the Court grant their motion.

**PETER F. NERONHA**
Attorney General for the State of Rhode Island

By: */s/ Kathryn M. Sabatini*
Kathryn M. Sabatini (RI Bar No. 8486)
Civil Division Chief
Special Assistant Attorney General
Sarah W. Rice (RI Bar No. 10465)
Deputy Chief, Public Protection Bureau
Assistant Attorney General
Leonard Giarrano IV (RI Bar No. 10731)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2054
ksabatini@riag.ri.gov
srice@riag.ri.gov
lgiarrano@riag.ri.gov

**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Rabia Muqaddam*
Rabia Muqaddam*
Special Counsel for Federal Initiatives
Michael J. Myers*
Senior Counsel
Molly Thomas-Jensen*
Special Counsel
Colleen Faherty*
Special Trial Counsel
Zoe Levine*
Special Counsel for Immigrant Justice
28 Liberty St.
New York, NY 10005
(929) 638-0447
Rabia.Muqaddam@ag.ny.gov
Michael.Myers@ag.ny.gov
Molly.Thomas-Jensen@ag.ny.gov
Colleen.Faherty@ag.ny.gov
Zoe.Levine@ag.ny.gov

**ROB BONTA**
Attorney General for the State of California

By: */s/ Laura L. Faer*
Laura L. Faer*
Supervising Deputy Attorney General
Christine Chuang*
Supervising Deputy Attorneys General
Nicholas Green*
Carly Munson*
Kenneth Sugarman*
Christopher J. Kissel*
Lara Haddad*
Theodore McCombs*
Deputy Attorneys General
California Attorney General's Office
1515 Clay St.
Oakland, CA 94612
(510) 879-3304
Laura.Faer@doj.ca.gov
Christine.Chuang@doj.ca.gov
Nicholas.Green@doj.ca.gov
Carly.Munson@doj.ca.gov
Christopher.Kissel@doj.ca.gov
Lara.Haddad@doj.ca.gov
Theodore.McCombs@doj.ca.gov
Kenneth.Sugarman@doj.ca.gov

**KWAME RAOUL**
Attorney General for the State of Illinois

By: */s/ Alex Hemmer*
Alex Hemmer*
Deputy Solicitor General
115 S. LaSalle St.
Chicago, Illinois 60603
(312) 814-5526
Alex.Hemmer@ilag.gov

**ANDREA JOY CAMPBELL**
Attorney General for the Commonwealth of
Massachusetts

By: */s/ Katherine B. Dirks*
Katherine B. Dirks*
Deputy Chief, Government Bureau
Turner Smith*
Deputy Chief, Energy and Environment
Bureau
Anna Lumelsky*
Deputy State Solicitor
1 Ashburton Pl.
Boston, MA  02108
(617.963.2277)
katherine.dirks@mass.gov
turner.smith@mass.gov

**MATTHEW J. PLATKIN**
Attorney General for the State of New Jersey

By: */s/ Angela Cai*
Angela Cai*
Executive Assistant Attorney General
Jeremy M. Feigenbaum*
Solicitor General
Shankar Duraiswamy*
Deputy Solicitor General
25 Market St.
Trenton, NJ 08625
(609) 376-3377
Angela.Cai@njoag.gov
Jeremy.Feigenbaum@njoag.gov
Shankar.Duraiswamy@njoag.gov

anna.lumelsky@mass.gov

**KRISTEN K. MAYES**
Attorney General for the State of Arizona

By: */s/ Joshua D. Bendor*
Joshua D. Bendor*
Solicitor General
Nathan Arrowsmith*
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Joshua.Bendor@azag.gov
Nathan.Arroswmith@azag.gov

**PHILIP J. WEISER**
Attorney General for the State of Colorado

By: */s/ Shannon Stevenson*
Shannon Stevenson*
Solicitor General
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, Colorado 80203
(720) 508-6000
shannon.stevenson@coag.gov

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

By: */s/ Andrew Mendrala*
Andrew Mendrala*
Assistant Attorney General
Public Advocacy Division
Office of the Attorney General for the District
of Columbia
400 Sixth Street, NW
Washington, DC 20001
(202) 724-9726

**WILLIAM TONG**
Attorney General for the State of Connecticut

By: */s/ Michael K. Skold*
Michael K. Skold*
Solicitor General
Jill Lacedonia
165 Capitol Ave
Hartford, CT 06106
(860) 808 5020
Michael.skold@ct.gov
Jill.Lacedonia@ct.gov

**KATHLEEN JENNINGS**
Attorney General of Delaware

By: */s/ Vanessa L. Kassab*
Vanessa L. Kassab*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 577-8413
vanessa.kassab@delaware.gov

**ANNE E. LOPEZ**
Attorney General for the State of Hawai'i

By: */s/ Kaliko'onālani D. Fernandes*
David D. Day*
Special Assistant to the Attorney General
Kaliko'onālani D. Fernandes*
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov

72

Andrew.Mendrala@dc.gov

**AARON M. FREY**
Attorney General for the State of Maine

By: */s/ Jason Anton*
Jason Anton*
Assistant Attorney General
Maine Office of the Attorney General
6 State House Station
Augusta, ME 04333
207-626-8800
jason.anton@maine.gov

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Linus Banghart-Linn*
Linus Banghart-Linn*
Chief Legal Counsel
Neil Giovanatti*
Assistant Attorney General
Michigan Department of Attorney General
525 W. Ottawa St.
Lansing, MI 48933
(517) 281-6677
Banghart-LinnL@michigan.gov
GiovanattiN@michigan.gov

**AARON D. FORD**
Attorney General of Nevada

*/s/ Heidi Parry Stern*
Heidi Parry Stern*
Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-5708
HStern@ag.nv.gov

kaliko.d.fernandes@hawaii.gov

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ Adam D. Kirschner*
Adam D. Kirschner*
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6424
AKirschner@oag.state.md.us

**KEITH ELLISON**
Attorney General for the State of Minnesota

By: */s/ Liz Kramer*
Liz Kramer*
Solicitor General
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 757-1010
Liz.Kramer@ag.state.mn.us

**RAÚL TORREZ**
Attorney General for the State of New Mexico

By: */s/ Anjana Samant*
Anjana Samant*
Deputy Counsel
NM Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
505-270-4332
asamant@nmdoj.gov

73

**JEFF JACKSON**
Attorney General for the State of North Carolina

By: */s/ Daniel P. Mosteller*
Daniel P. Mosteller*
Associate Deputy Attorney General
PO Box 629
Raleigh, NC 27602
919-716-6026
Dmosteller@ncdoj.gov

**DAN RAYFIELD**
Attorney General for the State of Oregon

By: */s/ Christina Beatty-Walters*
Christina Beatty-Walters*
Senior Assistant Attorney General
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Tina.BeattyWalters@doj.oregon.gov

**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Jonathan T. Rose*
Jonathan T. Rose*
Solicitor General
109 State Street
Montpelier, VT 05609
(802) 793-1646
Jonathan.rose@vermont.gov

**NICHOLAS W. BROWN**
Attorney General for the State of Washington

By: */s Andrew Hughes*
Andrew Hughes*
Assistant Attorney General
Leah Brown*
Assistant Attorney General
Office of the Washington State Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
andrew.hughes@atg.wa.gov
leah.brown@atg.wa.gov

**JOSHUA L. KAUL**
Attorney General for the State of Wisconsin

By: */s Aaron J. Bibb*
Aaron J. Bibb*
Assistant Attorney General
Wisconsin Department of Justice
17 West Main Street

Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0810
BibbAJ@doj.state.wi.us

*Admitted *Pro Hac Vice*

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that I filed the within via the ECF filing system and that a copy is available for viewing and downloading.  I have also caused a copy to be sent via the ECF System to counsel of record on this 7th day of February, 2025.

*/s/ Molly Thomas-Jensen*