UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF NEW YORK, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, *et al.*,<br><br>Defendants. | Civil Action No. 1:25-cv-39 (JJM) |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## Table of Contents

INTRODUCTION .................................................................................................... 1

BACKGROUND ..................................................................................................... 4

I.   Executive Actions Regarding Funding ..................................................... 4

II.  Procedural History ...................................................................................... 7

STANDARD OF REVIEW .................................................................................. 10

ARGUMENT ......................................................................................................... 11

I.   The Court Lacks Jurisdiction to Enter Preliminary Relief .................. 11

   A.  Rescission of the OMB Memo Has Mooted Plaintiffs' Claims, Or At Least Mooted Their Demand for Preliminary Relief ................................. 11

   B.  Plaintiffs Have Not Established Their Standing to Challenge the OMB Memo ....................................................................................................... 18

II.  Plaintiffs' Claims Fail at the Outset for Additional Reasons .............. 22

   A.  Plaintiffs Cannot Seek Relief Against the President ...................... 23

   B.  Plaintiffs' Claims Seek to Litigate an Abstract Question That Is Not Ripe for Adjudication .............................................................................. 24

   C.  Plaintiffs Are Not Challenging Discrete, Final Agency Action ....... 27

III. Plaintiffs' Challenges Are Meritless ...................................................... 32

   A.  All of Plaintiffs' Claims Rest on an Incorrect Reading of the OMB Memo ....................................................................................................... 32

   B.  Plaintiffs' Statutory Claim is Essentially a Facial Challenge that All Temporary Pauses in Funding Are Unlawful, Which Is Legally Incorrect .................................................................................................. 38

      1.  Numerous Grant Programs Allow Funding Pauses .................... 39

      2.  The Impoundment Control Act Does Not Assist Plaintiffs ........ 43

   C.  The Constitutional Challenges Are Largely Just Recycled Statutory Claims, But Also Fail On Their Own Terms ........................................ 47

      1.  Separation of Powers .................................................................... 49

2.  Appropriations Clause ................................................................. 50

3.  Take Care Clause ....................................................................... 51

4.  Presentment Clause .................................................................... 53

5.  Spending Clause ......................................................................... 53

D.  A Temporary Pause in Funding Is Not Arbitrary and Capricious ................ 56

IV. The Balance of the Equities Independently Forecloses Relief ............................ 59

A.  Plaintiffs Have Not Proven Irreparable Injury in the Absence of a Preliminary Injunction ...................................................................... 59

B.  The Public Interest Weighs Squarely Against Relief ...................................... 63

V.  Any Injunctive Relief Should be Narrowly Tailored to Permit Lawful Agency Activity, and Should Be Stayed Pending Appeal ..................................... 65

A.  Injunctive Relief Should Be Limited to the Present Plaintiffs and the Object of Their Challenge: The OMB Memo .................................................... 67

B.  Relief Should Be Limited to Preserve the Executive Branch's Discretionary Authority ....................................................................... 68

CONCLUSION ................................................................................. 71

## INTRODUCTION

Plaintiffs here seek to portray the Executive Branch's actions in extreme terms, as imposing an indefinite pause on all federal funding, occurring "via unilateral action untethered to the specific statutes, regulations, and grant or contract terms that govern each funding stream." Mot. for Prelim. Inj. (ECF No. 67) at 1 ("PI Mot."). In reality, this case is about something far more modest—the Executive's ability to instruct agencies to temporarily pause discrete categories of funding, to the extent doing so is consistent with their underlying statutory authorities, to ensure that such funding aligns with a new Administration's priorities. That authority is well-settled, and even Plaintiffs do not appear to dispute the legality of such an action. They instead portray the Executive's actions here in the broadest possible terms, thereby justifying their request for the broadest possible relief.

This Court need not address the outer bounds of the Executive's authority to pause funding, because the only action at issue here—an instruction to temporarily pause funding, to the extent permissible by law—is plainly lawful and essentially unchallenged. Nor should the Court accept Plaintiffs' invitation to become an ongoing superintendent over the funding decisions of almost a dozen federal agencies. Plaintiffs' claims do not warrant such intrusive relief, particularly in this preliminary posture when the only action challenged in this case has already been withdrawn. For numerous reasons, this Court should deny Plaintiffs' motion.

First, Plaintiffs' claims are moot. Their Complaint seeks relief against only one action—OMB Memorandum M-25-13, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs* (Jan. 27, 2025) ("OMB Memo")—which has

now been withdrawn.  They cannot demonstrate a need for continued relief, and certainly not emergency preliminary relief, in light of that rescission.  Nor can they seek to litigate the legality of temporary pauses in funding through broad claims, untethered to any of the underlying statutory authorities, appropriations measures, or other grant agreement terms; such claims are not ripe for review.

Even if this Court allowed Plaintiffs to expand this suit beyond solely a challenge to the now-rescinded OMB Memo, Plaintiffs' claims would still fail.  They cannot seek relief directly against the President or his Executive Orders, as the Supreme Court confirmed over 150 years ago that courts have "no jurisdiction . . . to enjoin the President in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867).  And their attempt to challenge a broader "Funding Freeze" beyond just the OMB Memo is an impermissible programmatic challenge that is inconsistent with the Administrative Procedure Act (APA) and the separation of powers; there is no lawful basis for this Court to superintend every funding decision of a dozen federal agencies.

Plaintiffs' claims also all fail on the merits.  They portray this case as being about whether the Executive can unilaterally ignore all validly enacted appropriations laws, but that is not what the OMB Memo required—as is apparent from the text of the Memo, as well as guidance issued the following day, agencies were instructed to temporarily pause funding only to the extent doing so was consistent with their underlying statutory authorities.  The President's recent Executive Orders contain the same instructions.  Far from being a case where the

Executive has "decline[d] to follow a statutory mandate or prohibition simply because of policy objections," *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013), this case involves the Executive Branch's unquestioned authority to exercise discretion and make funding decisions as permitted under legal authorities governing federal grant programs. As this Court has already acknowledged, *see* ECF No. 50 at 4, there are undoubtedly some programs where temporary pauses are allowed, which is by itself sufficient to defeat the facial attack that Plaintiffs launch on the Executive's actions here—*i.e.*, that temporary pauses can never lawfully be applied. Plaintiffs' efforts to recast these questions as constitutional claims also fails, and they cannot demonstrate a likelihood of success on any of their claims.

Beyond the merits, the balance of the equities also weighs squarely against entering the intrusive relief Plaintiffs request. Plaintiffs cannot identify any threat of immediate, irreparable harm given that the OMB Memo has now been rescinded (and many of the funds for which they claim harm were not within the scope of that Memo's pause anyway). In contrast, Plaintiffs' requested relief would constitute an extraordinary intrusion into the Executive's lawful prerogatives, effectively turning this Court into an overseer of almost a dozen federal agencies' funding programs. Even assuming this Court preserves agencies' authority to act on the basis of their authorizing statutes, regulations, and grant terms, that does not solve the separation of powers harms caused by enjoining subordinate Executive Branch agencies from implementing the President's policies as expressed through Executive Orders.

At an absolute minimum, any relief entered here should be significantly

limited and immediately stayed pending any appeal that is authorized.  The proper course, however, is to deny Plaintiffs' motion for a preliminary injunction, and to the extent they suffer funding deprivations in the future that they believe are unlawful, allow them to challenge such deprivations through the ordinary course of grant- and program-specific challenges.

## BACKGROUND

### I.    Executive Actions Regarding Funding

On January 20, 2025, the President issued various Executive Orders, some of which directed temporary pauses in certain funding.  For example, in the *Unleashing American Energy* Executive Order, the President directed that "[a]ll agencies shall immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58) . . . and shall review their processes, policies, and programs for issuing grants, loans, contracts, or any other financial disbursements of such appropriated funds for consistency with the law and the policy outlined in section 2 of this order."  Exec. Order No. 14,154, *Unleashing American Energy*, 90 Fed. Reg. 8353, § 7 (Jan. 20, 2025).  The Order further directed that it must be "implemented in a manner consistent with applicable law[.]"  *Id.* § 10(b).  The following day, the Office of Management and Budget (OMB) issued a Memorandum confirming that the Order's pause on funding "only applies to funds supporting programs, projects, or activities that may be implicated by the policy established in Section 2 of the order."  OMB Memorandum M-25-11, *Guidance Regarding Section 7 of the Executive Order Unleashing American Energy* (Jan. 21, 2025),

https://www.whitehouse.gov/briefings-statements/2025/01/omb-memo-m-25-11/.

Six days later, on January 27, 2025, OMB issued the Memorandum that is challenged in this case. *See* OMB Mem. M-25-13, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs* (Jan. 27, 2025). That Memorandum "require[d] Federal agencies to identify and review all Federal financial assistance programs and supporting activities consistent with the President's policies and requirements." OMB Memo at 1. In particular, "[t]o implement" the President's recent Executive Orders, "each agency must complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders." *Id.* at 2. The OMB Memo further directed that "[i]n the interim, to the extent permissible under applicable law, Federal agencies must temporarily pause all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders[.]" *Id.* at 2. In multiple places, the OMB Memo specified that agencies should take such action "to the extent permissible by law." *Id.* Although the OMB Memo's "temporary pause will become effective on January 28, 2025, at 5:00 PM," the OMB Memo also instructed agencies that, even before completing their review of programs, they "must immediately identify any legally mandated actions or deadlines for assistance programs arising while the pause remains in effect." *Id.*

Following reports of agencies broadly pausing Federal financial assistance, the very next day OMB issued a guidance document emphasizing the narrow scope of the

temporary pause.  *See* OMB Guidance (ECF No. 49-1) (Jan. 28, 2025).  In particular, the guidance stated in bold text that "[a]ny program not implicated by the President's Executive Orders is not subject to the pause."  OMB Guidance at 1.  The OMB Guidance also reiterated that agencies should pause funding only when doing so is consistent with underlying law.  *See id.* ("In implementing President Trump's Executive Orders, OMB issued guidance requesting that agencies temporarily pause, *to the extent permitted by law*, grant, loan or federal financial assistance programs that are implicated by the President's Executive Orders." (emphasis added)); *id.* ("Any payment required by law to be paid will be paid without interruption or delay."); *id.* at 2 ("It is a temporary pause to give agencies time to ensure that financial assistance conforms to the policies set out in the President's Executive Orders, to the extent permitted by law.").  Additionally, the OMB Guidance emphasized that, consistent with the OMB Memo's exclusion for assistance received by individuals, *see* OMB Memo at 1 n.1, numerous government programs were not subject to the pause:

> [A]ny program that provides direct benefits to Americans is explicitly excluded from the pause and exempted from this review process. In addition to Social Security and Medicare, already explicitly excluded in the guidance, mandatory programs like Medicaid and SNAP will continue without pause.

> Funds for small businesses, farmers, Pell grants, Head Start, rental assistance, and other similar programs will not be paused. If agencies are concerned that these programs may implicate the President's Executive Orders, they should consult OMB to begin to unwind these objectionable policies without a pause in the payments.

OMB Guidance at 1-2.

Before OMB and agencies were able to fully implement the OMB Memo and its accompanying guidance, courts began entering relief.  Specifically, in a separate

case filed in the United States District Court for the District of Columbia, the Court entered a partial administrative stay of the OMB Memo on January 28, 2025. *See Nat'l Council of Nonprofits v. OMB*, No. 1:25-cv-239 (D.D.C.), ECF No. 13 (Jan. 28, 2025). Following that administrative stay, OMB elected to rescind the challenged Memo. *See* OMB Mem. M-25-14, *Rescission of M-25-13* (Jan. 29, 2025) ("OMB Memorandum M-25-13 is rescinded. If you have questions about implementing the President's Executive Orders, please contact your agency General Counsel.") (ECF No. 43-1).

## II.  Procedural History

Plaintiffs in this case are twenty-two States and the District of Columbia, who filed this action on January 28, 2025, specifically challenging OMB Memo M-25-13. *See* Compl. (ECF No. 1) ¶ 1. Although Plaintiffs acknowledged that OMB had issued Guidance about the Memo earlier that day, *id.* ¶ 3, Plaintiffs' Complaint portrayed OMB Memo M-25-13 as "requir[ing] the temporary suspension of disbursement and obligation of all Federal financial assistance with few exceptions[.]" *Id.* ¶ 72. Plaintiffs alleged that this "sudden, across-the-board, indefinite freeze of already allocated funds," *id.* ¶ 75, was unlawful because it was contrary to statute, *id.* ¶¶ 98-108; arbitrary and capricious, *id.* ¶¶ 110-16; violated the separation of powers, *id.* ¶¶ 118-23; violated the Spending Clause, *id.* ¶¶ 125-29; and violated the Constitution's Presentment, Appropriations, and Take Care Clauses, *id.* ¶¶ 131-136. Based on those claims, Plaintiffs' Complaint sought various forms of relief, all directed at OMB Memo M-25-13. *See id.* at 35-36, Prayer for Relief.

Later that same day, Plaintiffs also filed a motion for a temporary restraining

order, again requesting an injunction against implementation of the OMB Memo. *See* TRO Mot. (ECF No. 3) at 2 ("Plaintiff States move for issuance of an order temporarily restraining Defendants from enforcing the directive given to all Federal agencies in the Office of Management and Budget's January 27, 2025 Directive[.]"). They claimed irreparable harm from the loss of numerous sources of Federal funds, such as Medicaid disbursements and Head Start, *id.* at 19, despite those funds being excluded from the pause pursuant to the OMB Guidance.

This Court scheduled a hearing on Plaintiffs' motion for January 29, 2025. Prior to the hearing, Defendants filed a Notice alerting the Court to the rescission of the challenged OMB Memo. *See* ECF No. 43. At the hearing, Plaintiffs argued that they continued to feel the effects of the OMB Memo's pause on federal funding, and thus they still needed relief. *See* TRO Hrg. Tr. at 4-5.

On February 3, 2025, this Court granted Plaintiffs' motion and entered a temporary restraining order. The Court concluded that the case was not moot because "[t]he substantive effect of the [OMB Memo] carries on." ECF No. 50 at 10. The Court also concluded that Plaintiffs were likely to succeed on the merits of their claims, construing the OMB Memo as "unilaterally suspend[ing] the payment of federal funds to the States and others simply by choosing to do so, no matter the authorizing or appropriating statute, the regulatory regime, or the terms of the grant itself," which the Court concluded the Executive lacked legal authority to do. *Id.* at 5. The Court noted that there may be "some aspects of the pause that might be legal and appropriate constitutionally for the Executive to take," but "many instances"

would not be legal, and "[t]he Court must act in these early stages of the litigation under the 'worst case scenario' because the breadth and ambiguity of the Executive's action makes it impossible to do otherwise." *Id.* at 4. Finally, the Court found that the States would be harmed by a broad pause of federal funds, such as funds for "highway planning and construction, childcare, veteran nursing care funding, special education grants, and state health departments." *Id.* at 8.

Accordingly, the Court enjoined Defendants from pausing Plaintiffs' federal financial assistance, "except on the basis of the applicable authorizing statutes, regulations, and terms." *Id.* at 11. The Court also prohibited Defendants from "reissuing, adopting, implementing, or otherwise giving effect to the OMB Directive under any other name or title[.]" *Id.* at 12. The Court subsequently imposed additional terms on Defendants in ruling on Plaintiffs' motion to enforce the TRO. *See* ECF No. 96; *see also* ECF No. 107 (reaffirming the Court's Orders).

On February 7, 2025, Plaintiffs filed their motion for a preliminary injunction, ECF No. 67 ("PI Mot."), attaching 127 exhibits, *see* ECF No. 68. Plaintiffs' PI motion now purports to challenge a "Funding Freeze" beyond simply OMB Memo M-25-13. *See* PI Mot. at 1 ("On January 20, 2025, the Trump Administration started to implement what became known as the Federal Funding Freeze[.]"); *id.* at 43-57 (arguing that the "Funding Freeze" is unlawful for several reasons). Plaintiffs' use of the phrase "Funding Freeze" is not limited to OMB Memo M-25-13, and instead describes multiple different actions—some by the President, some by OMB, and some by individual agencies. *See, e.g., id.* at 22 ("[T]he Funding Freeze (as directed in the

*Unleashing EO*, and as implemented by the OMB *Unleashing* Guidance, the OMB Directive, and multiple Agency Defendant actions) continues to this day[.]").  Because Plaintiffs contend that this "Funding Freeze" is unlawful, they seek broad relief prohibiting implementation not only of OMB Memo M-25-13 but also the President's Executive Orders as well as "any other materially similar order, memorandum, directive, policy, or practice under which the federal government imposes or applies a categorical pause or freeze of funding appropriated by Congress." *Id.* at 69.  They also request that the Court require Defendants to affirmatively direct that all federal agencies must "release and transmit any disbursements to Plaintiff States and recipients therein on awarded grants, executed contracts, or other executed financial obligations that were paused on the grounds of the OMB Directive and Executive Orders." *Id.* at 70.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (cleaned up).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor." *Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006).

## ARGUMENT

## I.    The Court Lacks Jurisdiction to Enter Preliminary Relief

### A.    Rescission of the OMB Memo Has Mooted Plaintiffs' Claims, Or At Least Mooted Their Demand for Preliminary Relief

Plaintiffs' Complaint challenges one action—the OMB Memo—which has now been rescinded.  Plaintiffs' claims are therefore moot, despite their efforts to broaden their claims to challenge other actions not properly within this suit.

**1.** There is no doubt that Plaintiffs' claims in this case are directed solely against the OMB Memo, as is the relief they seek in their Complaint.  *See, e.g.*, Compl. ¶ 1 ("This action seeks declaratory and injunctive relief and vacatur under the Administrative Procedure Act ('APA') with respect to the Office of Management and Budget's January 27, 2025, Directive for Heads of Executive Departments and Agencies (M-25-13), with the subject, "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs[.]'"); *id.* ¶¶ 101, 110 (identifying the "OMB Directive" as the alleged agency action for purposes of Plaintiffs' APA claims); *id.* ¶¶ 121, 127, 134 (alleging that the "OMB Directive" allegedly violates various constitutional provisions); *id.* at 35-36 (prayer for relief seeking relief solely against the "OMB Directive").

Now that the OMB Memo has been rescinded, Plaintiffs' claims are therefore moot.  *See Harris v. Univ. of Massachusetts Lowell,* 43 F.4th 187, 192 (1st Cir. 2022) ("claims for injunctive relief are inescapably moot" when a "polic[y] no longer appl[ies]"); *Fund for Animals, Inc. v. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006) ("Because the memo has expired, this claim is moot."); *Christian Knights*

*of Ku Klux Klan Invisible Empire, Inc. v. Dist. of Colum.*, 972 F.2d 365, 369 (D.C. Cir. 1992) (holding that case was moot because the challenger "received the full measure of relief it sought through its complaint"). While Plaintiffs may wish to bring challenges against other actions, that would be the subject of separate litigation. Plaintiffs cannot use a Complaint directed against a rescinded OMB Memorandum as a vehicle for obtaining relief against actions not challenged in the Complaint, let alone against Defendants' federal funding decisions writ large. *See, e.g.*, *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015) ("A court's equitable power lies only over the merits of the case or controversy before it. When a plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not have the authority to issue an injunction."); *Beers v. N.H. State Prison Warden*, No. 20-968, 2024 WL 4264252, at *3 (D.N.H. Sept. 23, 2024) ("If the request for injunctive relief is not related to the claims asserted in the action in which the request is filed, the court does not have the authority to issue the injunctive relief requested"); *Kosilek v. Misi*, 630 F. Supp. 3d 328, 334 (D. Mass. 2022) (denying motion for preliminary relief, because the requested injunction "would not be related to the claims in [plaintiff's] complaint" which were "limited" to specific conduct); *see also Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 762 (1994) (an injunction regulates conduct "in the context of a specific dispute between real parties" and "the court hearing the action is charged with fashioning a remedy for a specific deprivation, not with the drafting of a statute addressed to the general public"); *De Beers Consol. Mines v. United States*, 325 U.S. 212, 217 (1945) (reversing grant of

preliminary injunction that related to matters "wholly outside the issues in the suit").

Plaintiffs primarily argue that this case is not moot because "numerous sources of federal funding [are] still frozen." PI Mot. at 38. But Plaintiffs incorrectly assume that any paused funding must necessarily be paused as a result of the now-rescinded OMB Memo. Even assuming that certain funding is currently frozen, Plaintiffs' claims are moot if any such ongoing freeze stems from other actions (not challenged in this case) besides the OMB Memo.

While courts have ruled that claims are not moot where there are continuing adverse effects on the parties, it is axiomatic that those continuing effects must arise *from the challenged action*. *See Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (explaining that, in order for a case to be mooted by voluntary action, "interim relief or events" must have "eradicated the effects *of the alleged violation*" (emphasis added)); *S.W. Bell Tel. Co. v. FCC*, 168 F.3d 1344, 1350 (D.C. Cir. 1999) ("Where *an action* has no continuing adverse impact and there is no relief that a court may grant, *any request for judicial review of the action* is moot." (emphasis added)); *Miccosukee Tribe of Indians of Fla. v. United States*, 259 F. Supp. 2d 1237, 1245 (S.D. Fla. Feb. 28, 2003) ("A request for declaratory relief should be dismissed as moot if *the challenged conduct* has no continuing adverse effects on the parties." (emphasis added) (citing *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 122 (1974)).

Plaintiffs' own assertions of ongoing harm make clear that they do not stem from the challenged OMB Memo, but rather are the result of action that is not challenged in the Complaint, such as their broader conception of an ongoing "Funding

Freeze."  For instance, Plaintiffs argue that they face an imminent risk of harm, because Defendants have advised agencies that they may "exercise their own authority to pause awards or obligations" as long as they do so "purely based on their own discretion" rather than as a result of the OMB Memo.  PI Mot. at 39–40.  But any such harms would plainly flow from independent agency decisions, not the challenged OMB Memo.  Indeed, Plaintiffs have now confirmed that they are not asking the Court to prohibit such actions by agencies implementing their own authorities.  *See, e.g.*, Pls.' Opp'n to Admin. Stay, No. 25-1138 (1st Cir. filed Feb. 11, 2025), at 8 (responding to concern that Court's Orders prohibited agencies from exercising their own discretion, by saying "that interpretation . . . would make no sense" because "Plaintiff States have never sought to have defendants *disregard* federal funding law; to the contrary, we have consistently sought to ensure that defendants abide by federal funding law"); Pls.' Opp'n to Mot. to Stay (ECF No. 105) at 4-5 ("Plaintiff States encourage this Court to issue a further order emphasizing that its February 10 order does not preclude defendants from imposing limitations to federal funds 'on the basis of the[ir] applicable authorizing statutes, regulations, and terms'").  Thus, any harms from those independent agency actions do not allow Plaintiffs to continue challenging the now-rescinded OMB Memo.

Similarly, Plaintiffs argue that certain funding appropriated under the Infrastructure Improvement and Jobs Act and the Inflation Reduction Act remains paused.  PI Mot. at 38-39.  Six days prior to OMB's issuance of Memorandum M-25-13, however, OMB issued Memorandum M-25-11, which directs agencies to

"immediately pause disbursement" of certain "funds appropriated under the Inflation Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58)." OMB Memorandum M-25-11. Nothing in Plaintiffs' Complaint challenges OMB Memorandum M-25-11, and therefore actions taken in accordance with that memorandum are not properly subject to this lawsuit (regardless of whether the Court understood its initial TRO to extend to such actions, *cf.* ECF No. 96 at 4). Nor do Plaintiffs connect other alleged pauses in funding, *see* PI Mot. at 38-39 & nn.4-5, specifically to the now-rescinded OMB Memo, rather than being a result of independent action taken by the relevant government agencies.

In sum, Plaintiffs cannot escape mootness by pointing to alleged ongoing or prospective harms resulting from action that is not properly a part of this lawsuit. *See City of Houston, Tex. v. Dep't of Housing & Urban Dev.*, 24 F.3d 1421, 1429 (D.C. Cir. 1994) ("[I]f a plaintiff has made no challenge to some underlying policy, but merely attacks an isolated agency action, then the mooting of the specific claim moots any claim for a declaratory judgment that the specific action was unlawful."); *Miccosukee Tribe of Indians of Florida v. United States*, 259 F. Supp. at 1242-43 (holding that a claim challenging an old policy was moot in light of superseding policy, notwithstanding alleged continuing adverse effects caused by both policies, because the old policy was "of no further legal force and effect" and any grant of relief "would have no effect on the [policy] now in place").[1]

_____

[1] Plaintiffs also point to the fact that, after the OMB Memo was rescinded, EPA sent emails to recipients, informing them that it was working to implement the OMB

**2.** Plaintiffs cannot escape mootness by invoking the voluntary cessation doctrine. Plaintiffs suggest that, in rescinding the OMB Memo, Defendants "attempted to immunize themselves from suit." PI Mot. at 40. However, the only evidence Plaintiffs point to is a statement that demonstrates the opposite, *i.e.*, a goal of ending confusion. *See id.* at 16 (citing ECF No. 68-126). This statement did not suggest that rescission was litigation posturing, as opposed to focusing agencies on the legal effect of the President's recent Executive Orders.

Plaintiffs further argue that the "policy did continue through certain agencies even after this Court entered its TRO Order." *Id.* at 41. But again, the voluntary cessation doctrine is not concerned with the continued existence of conduct other than the subject of the litigation. *See Brown v. Colegio de Abogados de Puerto Rico*, 613 F.3d 44, 49 (1st Cir. 2010) (case cited by Plaintiffs, providing that voluntary cessation doctrine is concerned with whether defendants will "reinstate the *challenged* conduct" and that defendants must show that it is "absolutely clear that the *allegedly wrongful behavior* could not reasonably be expected to recur" (emphasis added)). As to any allegation that Plaintiffs are "under a constant threat" that the government will "reinstate" the challenged OMB Memo, PI Mot. at 41 (citation omitted), Plaintiffs' asserted fear is wholly speculative particularly given the existence of the President's Executive Orders which separately address the President's priorities.

_____

Memo. *See* PI Mot. at 38 (citing ECF No. 48-1 at 6). That was an error, and upon being made aware of this information, counsel for Defendants promptly acted to rectify the situation, and understands that the EPA is no longer sending any such emails purporting to implement the OMB Memo.

**3.** Even if the Court concludes that voluntary cessation *does* apply and Plaintiffs' lawsuit as a whole is therefore not moot, at a minimum Plaintiffs' request for preliminary relief is moot. Courts recognize that there is a "distinction between mootness as to a preliminary-injunction . . . and mootness as to the case as a whole." *Ohio v. Envtl. Prot. Agency*, 969 F.3d 306, 309 (6th Cir. 2020) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 394–95 (1981)). Whether a request for preliminary relief is moot therefore "depends on whether there remains a reasonable possibility that [the challenged conduct will recur] while this case remains pending in the district court." *Id.* at 309. Thus, even in cases in which courts rule that plaintiffs' claims as a whole are not moot due to the voluntary cessation doctrine, courts rule that "*preliminary* relief . . . is moot because defendants have [voluntarily] provided or promised to provide all the relief that plaintiffs sought." *Brooks v. Gant*, No. 12-5003, 2012 WL 871262, at *2 (D.S.D. Mar. 14, 2012); *see also Int'l Gemmological Inst., Inc. v. Indep. Gemological Labs, Inc.*, No. 00-4897, 2000 WL 1278179, at *1 (S.D.N.Y. Sept. 7, 2000) ("While voluntary cessation of challenged conduct does not of itself moot an action for injunctive relief, and thus does not require dismissal of a complaint, such a cessation surely is relevant to a claim for a preliminary injunction."). By rescinding the OMB Memo, the government has voluntarily provided the prospective injunctive relief that Plaintiffs sought in their Complaint. *See* Compl. at 35-36 (seeking injunctive relief as to the "OMB Directive"). To the extent Plaintiffs claim to suffer from a revived version of the OMB Memo during the pendency of this action, they can file another motion for preliminary relief. At present, however, it is wholly

-17-

speculative to claim that emergency relief is necessary to avert harms associated with an agency action that has already been rescinded. Thus, even if the voluntary rescission of the challenged OMB Memo does not moot the entire case, it surely moots Plaintiffs' request for expansive preliminary relief in this motion.

**B.    Plaintiffs Have Not Established Their Standing to Challenge the OMB Memo**

Notwithstanding the additional information submitted in Plaintiffs' PI motion, they still have failed to establish "injury in fact" that was "fairly . . . traceable to the challenged action" and "redress[able] by a favorable decision" even before the OMB Memo was rescinded. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). To create Article III jurisdiction, "'a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought.'" *Wilkins v. Genzyme Corp.*, 93 F.4th 33, 40 (1st Cir. 2024) (quoting *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017)). Here, Plaintiffs bring five different claims against thousands of various agency funding streams. *See generally*, Pls.' Compl., ECF No. 1; Corr. Compl., ECF No. 27. They must demonstrate standing for each of these claims as they pertain to each of these funding streams. This is because "standing is not dispensed in gross. If the right to complain of *one* administrative deficiency automatically conferred the right to complain of *all* administrative deficiencies, any citizen aggrieved in one respect could bring the whole structure of state administration before the courts for review. That is of course not the law." *Lewis v. Casey*, 518 U.S. 343, 358, n. 6 (1996).

Plaintiffs clearly do not have standing to pursue claims against funding

streams that (1) are not within the scope of the OMB Memo; (2) are not managed by any of the Defendant agencies; or (3) benefit other States or third parties that are not plaintiffs in this case. Any one of those circumstances would be sufficient to defeat these particular Plaintiffs' standing to seek relief as to that particular funding stream. And enforcing these limitations on Plaintiffs' suit is necessary to bring it closer to a manageable case or controversy fit for judicial review. *Cf. Alberta Gas Chemicals Ltd. v. E.I. Du Pont De nemours & Co.*, 826 F.2d 1235, 1240 (3d Cir. 1987) (the standing requirement supports "the court's ability to keep trial of the claim within the judicially manageable limits").

Plaintiffs cannot seek preliminary injunctive relief against existing or future funding pauses that do not result from the now-rescinded OMB Memo, which as discussed above is the only action properly challenged here. Most funds that Plaintiffs discuss were never paused. Plaintiffs' declarations do little more than demonstrate speculation that certain funding—such as Federal Highway Funds, Law Enforcement Grants, Elementary and Secondary Education Act funds, Individuals with Disabilities in Education Act funds, and other assistance—might become paused "at some indefinite future time." *Lujan v. Defs. of Wildlife*, 504 U.S. at 556. For example, one declarant claims injury from a pause in Highway Funds that would occur "*if* all federal transportation funding is paused," ECF No. 68-77 ¶ 9 (emphasis added), and another that "[a]ny pause in our federal funding *would* catastrophically disrupt student instruction." ECF No. 68-89 ¶ 8 (emphasis added). This "theory of *future* injury is too speculative to satisfy the well-established requirement that

-19-

threatened injury must be 'certainly impending.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013) (quoting *Whitmore v. Arkansas,* 495 U.S. 149, 158 (1990)).  And no threat can reasonably be considered certainly impending given that the OMB Memo has been rescinded.

Indeed, Plaintiffs' discussion of their harms essentially ignores the OMB Guidance emphasizing that the OMB Memo's pause was not intended to include most of the funding streams Plaintiffs discuss.  The Guidance stated in relevant parts: "any program that provides direct benefits to Americans is explicitly excluded from the pause and exempted from this review process . . . mandatory programs like Medicaid and SNAP will continue without pause. Funds for small businesses, farmers, Pell grants, Head Start, rental assistance, and other similar programs will not be paused." OMB Guidance at 1-2.  Accordingly, Plaintiffs cannot rely on any of these funds to confer standing (let alone irreparable harm).

Even assuming Plaintiffs have established a valid injury-in-fact based on the pause of certain funds that do fall within the scope of the OMB Memo, Plaintiffs cannot satisfy traceability or redressability if there are other reasons why those funds may remain paused regardless of what happens in this suit.  For example, Plaintiffs acknowledge that several sources of funding (in particular Inflation Reduction Act and Infrastructure Act funding) began being paused even before issuance of the challenged OMB Memo in this case.  *See* PI Mot. at 20 (acknowledging a Department of Energy agency review of funding announced on January 20 and a subsequent pause of funding on January 23, as well as a January 24 pause on certain

Transportation funding).  Such pauses occurring before January 27 cannot possibly be fairly attributable to the only action properly challenged in this case (OMB Memo M-25-13) which postdates those earlier pauses, nor would relief against the OMB Memo redress any injuries pertaining to those pauses (or any other independent, unchallenged agency pause).  Thus, Plaintiffs lack standing as to them.

Despite the significant amount of factual declarations they now put forth before the Court, Plaintiffs still do not clearly articulate that specific funds (1)  are within the scope of the OMB Memo's pause, (2) remain at risk of being paused because of that Memo as opposed to some other independent agency action not challenged in this case, and (3) would necessarily be unpaused if this Court entered preliminary relief directed at the OMB Memo.  In the absence of that clear articulation, they have not carried their burden of establishing standing.[2]

Finally, Plaintiffs do not have standing to seek relief on behalf of grantees other than the Plaintiff States.  *See* PI Mot. at 32-33.  That is essentially a *parens patriae* injury, but the Supreme Court has made clear that "'[a] State does not have standing as *parens patriae* to bring an action against the Federal Government,'" *Haaland*, 599 U.S. at 295 (quoting *Alfred L. Snapp & Son, Inc., Alfred L. Snapp &*

---

[2] Plaintiffs' claims about assistance managed by agencies that are not party to this action, such as the Department of Agriculture, *see* PI Mot. at 18, the State Department, and USAID, *see id.* at 25-26, 39, are not fairly traceable to any Defendant in this suit.  Additionally, the court does not have jurisdiction over any of these agencies such that it could issue relief providing adequate redress; they "are nonparties who would not be bound by the judgment." *Haaland v. Brackeen*, 599 U.S. 255, 293 (2023).  Thus, Plaintiffs lack standing to seek relief against non-defendant agencies.

*Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 610 n.16 (1982)); *see also Commonwealth of Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923) ("it is no part of [a State's] duty or power to enforce [its citizens'] rights in respect of their relations with the federal government. In that field it is the United States, and not the state, which represents them as *parens patriae*"). Therefore, Plaintiffs do not have standing to seek injunctive relief regarding assistance that is disbursed directly to entities or citizens other than the Plaintiff States in this suit. *See* PI Mot. at 32-33 (discussing assistance directed at private organizations and universities); *id.* at 24 (discussing private entities who receive Head Start funds directly).

In sum, Plaintiffs lack Article III standing to assert claims regarding Federal financial assistance that is not affected by the OMB Memo, subject to independent agency actions not challenged in this case, not managed by any Defendants, and not directed toward the present Plaintiff States. Accordingly, they cannot obtain preliminary relief regarding any of these funds.

## II.    Plaintiffs' Claims Fail at the Outset for Additional Reasons

Even if the Court concludes it possesses jurisdiction over Plaintiffs' broad challenge to the "Funding Freeze," such claims cannot continue for several more reasons. First, Plaintiffs cannot seek relief against the President or directly against his Executive Orders. Second, Plaintiffs' claims are not ripe because they seek to litigate abstract questions, divorced from the necessary grant- and program-specific analysis. And third, Plaintiffs cannot obtain APA review over agencies' broad, ongoing implementation of Executive Orders or other agency funding programs.

### A.    Plaintiffs Cannot Seek Relief Against the President

Plaintiffs' attempt to challenge a broader "Funding Freeze" includes a request for relief directly against the President and his Executive Orders. Their Complaint names the President as a defendant, *see* Compl. ¶ 31, and their PI motion expressly argues for injunctive relief against the President. *See* PI Mot. at 50-51 (arguing that claims against the President are reviewable); *id.* at 69 (requesting an injunction prohibiting Defendants from implementing "funding freezes dictated, described, or implied by executive orders issued by the President prior to rescission of the OMB Directive," including the *Unleashing American Energy* Executive Order). But Plaintiffs cannot seek relief directly against the President or his Executive Orders.

Plaintiffs do not have an APA claim against the President because he is not an "agency." *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992). They claim to bring non-statutory *ultra vires* claims, *see* PI Mot. at 50, but they are not bringing any claims properly considered constitutional in nature (as discussed below, *see* Part III.C), and thus cannot fit within that exception. *Franklin*, 505 U.S. at 801; *see also Dalton v. Specter*, 511 U.S. 462, 473-74 (1994) ("[C]laims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review under the exception recognized in *Franklin*."). And it would be inappropriate to infer non-statutory *ultra vires* review directly challenging the President's actions, given the principle that courts have "no jurisdiction . . . to enjoin the President in the performance of his official duties." *Mississippi*, 71 U.S. at 501; *see also Franklin*, 505 U.S. at 827 (Scalia, J., concurring in part).

Entering relief directly against the President would be particularly

inappropriate here, given that Plaintiffs remain free to pursue "the regular order of normal APA review" for individual agency funding decisions.  Tr. of TRO Hrg. at 11. Courts thus routinely decline to entertain suit or judicial relief against the President. *See, e.g.*, *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 605 (4th Cir. 2017) ("In light of the Supreme Court's clear warning that such relief should be ordered only in the rarest of circumstances we find that the district court erred in issuing an injunction against the President himself."), *vacated and remanded*, 138 S. Ct. 353 (2017); *Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir. 2017) ("the extraordinary remedy of enjoining the President is not appropriate here"), *vacated as moot*, 138 S. Ct. 377 (2017); *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him, and have never submitted the President to declaratory relief." (citation omitted)); *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d at 34-35 (dismissing the President as a defendant); *Doe 2 v. Trump*, 319 F. Supp. 3d 539, 541 (D.D.C. 2018) (dismissing "the President himself as a party to this case").

Consistent with these precedents, Plaintiffs cannot seek relief directly against the President or his recently issued Executive Orders.  The most they can seek is review of agencies' actions.

### B.    Plaintiffs' Claims Seek to Litigate an Abstract Question That Is Not Ripe for Adjudication

Regardless of whether Plaintiffs are challenging the OMB Memo or a broader "Funding Freeze," their fundamental theory is that "neither the President nor federal agencies can unilaterally decline to spend duly appropriated funds without violating

-24-

the Appropriations Clause." PI Mot. at 46. As Plaintiffs elsewhere acknowledge, however, specific grant programs may well allow the United States to temporarily pause disbursement of funds. *See id.* at 1 ("Plaintiff States do not contend that the Executive Branch can never make alterations to grants of federal funding[.]"); *see also* Pls.' Mot. to Enforce (ECF No. 66) at 16 ("Of course, as set forth in the Order, there could be an instance where a specific applicable statute, regulation or term of the grant allowed a pause[.]"). Indeed, this Court previously noted that there are likely "some aspects of the pause that might be legal and appropriate constitutionally for the Executive to take[.]" ECF No. 50 at 4; *see also id.* at 12 (allowing pauses in assistance "on the basis of the applicable authorizing statutes, regulations, and terms"). The critical question for evaluating the legality of a "pause" in funding, therefore, is whether that particular pause contravenes congressional intent—as Plaintiffs acknowledge. *See* PI Mot. at 43 (arguing that "'the Executive Branch may not refuse to disperse' federal funds '*without congressional authorization*'" (quoting *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018))).

Determining congressional intent as to grant disbursements (and whether any "pause" in those disbursements is permissible) necessarily requires examining the underlying statutes governing a program, the appropriations measures providing funding for the program, and potentially the specific terms and conditions included in the grant agreement for that program. Plaintiffs' motion proves the point—they list a "handful of examples" of statutory programs that, in their view, "do[] not permit executive deviation" or "impose[] specific limits on the relevant agencies' power to

withhold funds." PI Mot. at 48-49. And for each of those examples, Plaintiffs identify the specific statutory provisions that, in their view, make disbursements to the Plaintiff States mandatory. *See id.* But even assuming *arguendo* Plaintiffs are correct as to those programs, Plaintiffs admit that not all grant programs involve statutory "formulas" requiring specific disbursements to the States. *See, e.g.*, TRO Hrg. Tr. at 8 (discussing how "there are a number of different kinds of money streams," only some of which are "formula funding where an appropriation is allocated among the States"); Pls.' Opp'n to Stay Mot. (ECF No. 105) at 1 (acknowledging that Defendants may still "exercis[e] their discretion to halt the disbursement of federal funds based on specific applicable statutes, regulations, and grant terms"). And as discussed further below, *see* Part III.B.1, several identified grant programs plainly do *not* require disbursement to specific entities on specific timelines, and thus afford the Executive the discretion to temporarily pause funding. The legal analysis necessary to distinguish between the two—*i.e.*, whether a particular grant program's statutes require mandatory disbursements, or instead preserve discretion to temporarily pause funding—is inherently fact- and program-specific, and cannot be done in the abstract.

In similar circumstances where Plaintiffs have sought broad relief that cannot be evaluated without reference to more specific and concrete factual and legal contexts, courts have concluded that Plaintiffs' claims are not ripe. *See, e.g.*, *Reddy v. Foster*, 845 F.3d 493, 505 (1st Cir. 2017) ("Until the dispute ripens, and more facts come to light, we cannot perform the requisite claim-specific analysis as to any claim

-26-

that may be brought, as we have before us only hypothetical claims, the details of which are not known." (cleaned up)); *Lab. Rels. Div. of Constr. Indus. of Massachusetts, Inc. v. Healey*, 844 F.3d 318, 330 (1st Cir. 2016) (rejecting claims that are "too contingent on as-yet-unknown features of as-yet-unspecified claims to be fit for adjudication at this time"). Equally here, Plaintiffs' claim—that the Executive cannot lawfully pause funding—is abstract and cannot be decided without reference to more specific factual and legal contexts. And particularly now that the OMB Memo has been withdrawn, Plaintiffs cannot claim any hardship associated with declining review over their abstract claim in favor of channeling review to more concrete contexts, which Plaintiffs agree is "the regular order of normal APA review." TRO Hrg. Tr. at 11. In short, Plaintiffs' claim challenging the legality of a "pause" in funding in the abstract—without reference to any of the underlying legal frameworks, appropriations measures, or grant conditions—is too amorphous for resolution and does not warrant preliminary relief.

## C.  Plaintiffs Are Not Challenging Discrete, Final Agency Action

Even if their claims were ripe, Plaintiffs still must satisfy the normal requirements for obtaining judicial review. Here, Plaintiffs cannot use the APA to challenge agencies' ongoing funding decisions or implementation of the President's Executive Orders—the high-level, ongoing operation of an overall funding program is not the type of discrete, final agency action subject to challenge under the APA.

The APA permits review only over "final agency action," 5 U.S.C. § 704, which means that the action "must mark the consummation of the agency's decisionmaking process," and "the action must be one by which rights or obligations have been

determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted). Additionally, these final agency actions must be "circumscribed [and] discrete." *Norton v. Southern Utah Wilderness Alliance (SUWA)*, 542 U.S. 55, 62 (2004). The APA does not provide for "general judicial review of [an agency's] day-to-day-operations," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1999), like "constructing a building, operating a program, or performing a contract," *Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013).

**1.** With respect to Plaintiffs' claims against the OMB Memo (and any other over-arching guidance about how to implement the President's priorities), those claims fail because they are not challenging final agency action. As discussed further below, the OMB Memo did not itself determine which funds or grants should be paused; instead, it required agencies to make that determination, consistent with their own authorities. *See* Part III.A, *infra*. Those agencies' subsequent decisions to pause funding for particular grants or awards might be final agency action. But that would permit only a grant- or program-specific lawsuit, not a facial attack directly against the OMB Memo itself, as Plaintiffs seek to bring here.

The OMB Memo's instruction that agencies pause funding, to the extent permissible within the agency's own authorities, is conditional unless and until the grant-administering agency determines it has such discretion. This type of conditional instruction is not, on its own, a final agency action. *See Berkshire Env't Action Team, Inc. v. Tennessee Gas Pipeline Co., LLC*, 851 F.3d 105, 112 (1st Cir.

2017) (holding that "an initial letter granting a water quality certification *subject to Condition 15* . . . is not a final agency action" (emphasis added)); *cf. Louisiana v. Biden*, 64 F.4th 674, 684 (5th Cir. 2023) ("Plaintiffs contemplate harms that are several steps removed from—and are not guaranteed by—the challenged Executive Order or the Interim Estimates. The states cannot do away with their alleged parade of horribles in a single swipe at the duly elected executive.").

**2.** Plaintiffs' claims also fail because they are not challenging discrete agency action; instead, they are bringing a broad, programmatic challenge to agency functioning as a whole.

"Under the terms of the APA, respondent must direct its attack against some particular 'agency action' that causes it harm." *Nat'l Wildlife Fed'n*, 497 U.S. at 891. Again, the APA might allow Plaintiffs to challenge specific withholdings of funds under a particular grant. But here, Plaintiffs have made expressly clear that they are not seeking to bring those types of claims. *See, e.g.*, TRO Hrg. Tr. at 11 ("[W]e cannot proceed in the regular order of normal APA review of an agency decision because . . . we can't go program by program, bring to you the statute, bring to you the regulation, bring to you the grant agreement, bring to you all the things that courts would normally look at[.]"); *id.* at 12 (asserting that it is "simply impossible" to "present to you what I think courts normally like to see, which is a more agency-by-agency, grant-by-grant"). Indeed, Plaintiffs describe their claims here as seeking relief as to "thousands and thousands of programs across multiple States." *Id.* at 8.

Plaintiffs' PI motion, and their attempt to recharacterize their claims away

from challenging the OMB Memo and instead challenging a broader "Funding Freeze" policy, underscores the programmatic nature of their claims. As their motion makes clear, the "Funding Freeze" is no single policy—it is simply the name they use to describe countless other Executive Branch decisions regarding funding. *See, e.g.*, PI Mot. at 16 ("the Funding Freeze has manifested through chaotic actions by federal agency defendants"); *id.* at 22 (describing the "Funding Freeze" as being "directed in the *Unleashing EO*, and as implemented by the OMB *Unleashing* Guidance, the OMB Directive, and multiple Agency Defendant actions"); *id.* at 41 (stating that "[i]mmediately upon taking office, the President initiated an across-the-board Funding Freeze," and "[t]he OMB Directive then implemented that Funding Freeze, as did the Agency Defendants in carrying out the OMB Directive and continuing to freeze funds even after the Directive's purported rescission").

This amorphous, generalized claim—challenging a purported "Funding Freeze," untethered to any specific decisions in the context of individual grant programs—is the type of broad, programmatic challenge that is not cognizable under the APA. *See Nat'l Wildlife Fed'n*, 497 U.S. at 893 ("[T]he flaws in the entire 'program'—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA[.]"). Just as in *National Wildlife Federation* the challengers could not escape that result by characterizing their challenge as being to a "land withdrawal review program," because that was "simply the name by which petitioners have occasionally referred to the continuing (and thus

constantly changing) operations of the BLM," *id.* at 890, the same is true for the "Funding Freeze" here. There is no singular "Funding Freeze," but rather that is the name Plaintiffs attribute to the thousands of individual decisions made by agencies about whether particular grants or other funding should be paused.

It is no answer that requiring Plaintiffs to proceed on a program-by-program, grant-by-grant basis would make it more difficult for them to obtain comprehensive relief. *Cf.* TRO Hrg. Tr. at 11-12. "The case-by-case approach that this requires is understandably frustrating to an organization such as respondent, which has as its objective across-the-board protection of our Nation's wildlife and the streams and forests that support it. But this is the traditional, and remains the normal, mode of operation of the courts." *Nat'l Wildlife Fed'n*, 497 U.S. at 894. Indeed, one of the reasons for requiring Plaintiffs to proceed in this case-by-case manner is to avoid injecting courts into the day-to-day oversight and supervision of agencies' compliance:

> If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved—which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management.

*SUWA*, 542 U.S. at 66-67. That concern is particularly apt here. Given the broad-ranging nature of Plaintiffs' claims, it is impossible for this Court to grant relief without becoming an overseer of a wide swath of the Executive Branch's ongoing funding activities, contrary to what the APA and the separation of powers contemplate.

## III.    Plaintiffs' Challenges Are Meritless

Even if the Court were willing to review Plaintiffs' claims on the merits, none of the Executive Branch's actions was unlawful.  It is well established that, to effectuate his discretion and policy objectives, the President may direct agencies to take actions to pause or freeze funding pursuant to the authority those agencies possess under their organic statutes and regulations.  Plaintiffs do not take issue with that legal proposition, and this Court has recognized that Defendants may "limit access to federal funds on the basis of the applicable authorizing statutes, regulations, and terms."  ECF No. 107 at 3 (quotation marks omitted).  That should end the matter, for that is all the OMB Memo sought to accomplish.

Plaintiffs' claims all rest on a serious misreading of the OMB Memo.  Their constitutional claims are essentially recycled versions of their statutory claims, which fail for all these same reasons.  And the OMB Memo amply satisfies the minimal standard for arbitrary and capricious review under the APA.  Thus, none of Plaintiffs' claims warrants the extraordinary relief of a preliminary injunction.

### A.    All of Plaintiffs' Claims Rest on an Incorrect Reading of the OMB Memo

Plaintiffs' claims in this case all rest on a single flawed premise—that the OMB Memo and the President's Executive Orders direct an immediate pause in funding without regard to the underlying legal framework governing that funding.  Contrary to Plaintiffs' characterization, however, each Executive action expressly instructs agencies to implement a pause only to the extent permissible by law, which is critical language that cannot simply be ignored.

From the outset, Plaintiffs have framed this case as being about whether the Executive Branch can categorically pause all funding without consideration of whether a pause is consistent with the underlying legal framework governing that funding. *See, e.g.*, TRO Mot. at 8 ("Congress has not delegated any unilateral authority to Defendants to indefinitely pause all Federal financial assistance under any circumstance, irrespective of the specific Federal statutes and contractual terms governing particular grants, and without even considering those statutory and contractual terms."). Plaintiffs continue to cast the issues in those overly broad terms. *See, e.g.*, PI Mot. at 1 ("Plaintiff States do not contend that the Executive Branch can never make alterations to grants of federal funding, but it cannot do so via unilateral action untethered to the specific statutes, regulations, and grant or contract terms that govern each funding stream."); *id.* at 42 ("[N]either the President nor federal agencies have any sweeping authority to freeze funds that Congress has duly authorized and appropriated, without regard to any of the statutory provisions or specific grant terms that govern such funding.").

Their interpretation of the OMB Memo is incorrect, and contrary to the Memo's plain text. The OMB Memo is explicit that the temporary pause must only be implemented "to the extent permissible under applicable law." OMB Memo at 2. And the Memo repeatedly acknowledges and embraces legal constraints on federal funding. It states that the purpose of the pause is to "provide the Administration time to review agency programs and determine the best uses of the funding for those programs *consistent with the law* and the President's priorities." *Id.* (emphasis

added).  And even before completing this review, "Federal agencies must immediately identify any legally mandated actions or deadlines for assistance programs arising while the pause remains in effect."  *Id.*; *see also id.* ("To the extent required by law, Federal agencies may continue taking certain administrative actions, such as closeout of Federal awards . . . or recording obligations expressly required by law.").

Consistent with the OMB Memo, the OMB Guidance—issued the very next day and before Plaintiffs filed this suit—further emphasizes that the pause applies only to the extent permissible by law.  *See, e.g.*, OMB Guidance at 1 ("OMB issued guidance requesting that agencies temporarily pause, to the extent permitted by law, grant, loan or federal financial assistance programs that are implicated by the President's Executive Orders."); *id.* ("Any payment required by law to be paid will be paid without interruption or delay."); *id.* at 2 ("It is a temporary pause to give agencies time to ensure that financial assistance conforms to the policies set out in the President's Executive Orders, to the extent permitted by law.").  And to the extent Plaintiffs' claims are broadened to encompass any of the President's Executive Orders, those Orders likewise make clear that pauses must be implemented consistent with law.  *See, e.g.*, Exec. Order No. 14,154, *Unleashing American Energy*, § 10(b) ("This order shall be implemented in a manner consistent with applicable law[.]").

Plaintiffs' claims ignore all of these provisions, instead accusing the Executive of pursuing "unilateral action untethered to the specific statutes, regulations, and grant or contract terms that govern each funding stream."  PI Mot. at 1.  But there is

no valid basis for simply reading the "to the extent permissible under applicable law" language out of the OMB Memo, OMB Guidance, or applicable Executive Orders.  To the contrary, courts have previously recognized that such provisions have meaningful effect.  *See Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002) (upholding Executive Order as proper "exercise of the President's supervisory authority over the Executive Branch" including because "the President directs his subordinates how to proceed in administering federally funded projects, but only '[t]o the extent permitted by law,'" and thus "if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law"); *Common Cause v. Trump*, 506 F. Supp. 3d 39, 47 (D.D.C. 2020) (Katsas, J.) ("We cannot ignore these repeated and unambiguous qualifiers imposing lawfulness and feasibility constraints on implementing the memorandum.").

Plaintiffs' lengthy PI motion never explains why this language should simply be ignored.  In their TRO motion, Plaintiffs asserted that "[t]he OMB Directive provides no time for Federal agencies either to make supported requests for case-by-case exceptions to the memo's directives or to assess adequately whether halting particular grants would or would not be permissible under law." ECF No. 3 at 9.  But the OMB Memo implicated only those funds related to the President's Executive Orders, most of which had been issued a week prior to the OMB Memo on January 20, 2025.  And Plaintiffs cite no authority for the proposition that courts get to decide how much time the President must afford agencies before directing them to act.

Indeed, it would be a fundamental intrusion on Article II for courts to require the President to wait a particular amount of time before directing agencies to implement his agenda to the extent permissible by law.

As discussed below, there is no meaningful dispute about the settled legal proposition that the President has authority to direct subordinate agencies to implement his agenda as permitted by law, which is all that the rescinded OMB Memo sought to accomplish. In the very early stages on this case, this Court appeared to embrace that the OMB Memo went further. *See* ECF No. 50 at 5 (characterizing the OMB Memo as "unilaterally suspend[ing] the payment of federal funds to the States and others simply by choosing to do so, no matter the authorizing or appropriating statute, the regulatory regime, or the terms of the grant itself"); ECF No. 96 at 3 ("Defendants issued a broad, categorical, all-encompassing directive freezing federal funding."). Even if there were any doubt, the challenged actions in this case are capable of being construed as directing only those funding pauses that agencies have concluded are lawful. And this Court should construe the challenged policies to preserve their legality, just as it would for any other type of action. *Cf. Arizona v. United States*, 567 U.S. 387, 415 (2012) ("inappropriate to assume" that state enactment will be construed in an impermissible manner); *Blodgett v. Holden*, 275 U.S. 142, 148 (1927) (per curiam) (presumption that statutes should be construed to be lawful); Restatement (Second) of Contracts § 203(a) (same for contracts).

In any event, the dispute over whether the OMB Memo provided sufficient time for agencies to determine the legality of particular funding pauses is largely academic

at this stage. The OMB Memo has now been withdrawn, and none of the President's Executive Orders imposes a specific deadline for implementing a pause. At this point, the sole question before this Court is whether it should enter emergency, preliminary relief prohibiting the Executive from implementing funding pauses to the extent permissible by law. The answer to that question is plainly no, based on *Allbaugh* and other longstanding decisions recognizing the President's legitimate authority to direct subordinate agencies' activities, as consistent with law. *See Allbaugh*, 295 F.3d at 32 ("[T]he President's power necessarily encompasses 'general administrative control of those executing the laws,' throughout the Executive Branch of government, of which he is the head." (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926), citation omitted)); *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) ("[A]s an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law."); *Sierra Club v. Costle*, 657 F.2d 298, 406 n.524 (D.C.Cir.1981) ("The ordinary duties of officers prescribed by statute come under the general administrative control of the President by virtue of the general grant to him of the executive power, and he may properly supervise and guide their construction of the statutes under which they act[.]").

    Interpreting the OMB Memo and Executive Orders as extending only to pauses that agencies determine are lawful would give meaning to their express language and avoid endorsing the type of "unilateral action" the Court expressed concerns about in its temporary restraining order, ECF No. 50 at 5, while still remaining faithful to the separation of powers principles articulated in *Allbaugh* and other cases. Either way,

the Court's duty to give effect to the "permissible by law" language in the OMB Memo
and the President's Executive Orders precludes the type of broad relief requested by
Plaintiffs, *see* PI Mot. at 69-70. At an absolute minimum, as discussed below, any
injunctive relief should be tailored to the alleged illegality of Plaintiffs' reading of the
OMB Memo, and make clear that such relief does not extend to the permissible
exercise of Executive Branch authority that the OMB Memo plainly comprehends.

### B. Plaintiffs' Statutory Claim is Essentially a Facial Challenge that All Temporary Pauses in Funding Are Unlawful, Which Is Legally Incorrect

Even if the "to the extent permissible by law" language does not itself defeat
Plaintiffs' claims, Plaintiffs still cannot demonstrate they are entitled to relief.
Plaintiffs' statutory claims are essentially a facial challenge to the OMB Memo,
contending that it can *never* lawfully be applied. *See, e.g.*, PI Mot. at 43 ("Neither the
President nor the Agency Defendants can unilaterally decline to spend federal funds
that have been authorized and appropriated by Congress."). But Plaintiffs appear to
concede that there are at least some circumstances where Defendants may
permissibly "exercis[e] their discretion to halt the disbursement of federal funds
based on specific applicable statutes, regulations, and grant terms," ECF No. 105
at 1, which is on its own sufficient to defeat their request for an injunction against all
applications of the OMB Memo and the President's Executive Orders. *See* PI Mot.
at 69-70. To justify such broad relief, they must prevail on a facial challenge.

"[A] plaintiff can only succeed in a facial challenge by establishing that no set
of circumstances exists under which the [action] would be valid," or by showing that
the action lacks "a plainly legitimate sweep." *Washington State Grange v.*

*Washington State Republican Party*, 552 U.S. 442, 449 (2008) (cleaned up).  Here,
Plaintiffs cannot make that showing because temporary pauses in funding are
frequently legally permissible.

### 1.    Numerous Grant Programs Allow Funding Pauses

At the outset, Plaintiffs err in suggesting that this case is about the Executive
"declin[ing] to spend federal funds that have been authorized and appropriated by
Congress."  PI Mot. at 43.  By temporarily pausing funding, the Executive has not
"declined to spend" anything.  The Executive might later determine to "lift" the pause
and continue funding the original recipient for the same amount.  Or the Executive
might decide that its priorities are better served by directing the remaining funding
to a different recipient.  In either scenario, however, the Executive would still be
funding the full amount appropriated by Congress and signed into law through
bicameralism and presentment.  Thus, the temporary pause does not inherently
result in a reduction in expenditures, contrary to Plaintiffs' assertions.  *See* PI Mot.
at 43-47; *cf.* ECF No. 50 at 6 n.3 (discussing proposed rescissions of budget authority).

Of course, the decisions to pause funding and/or select a different recipient for
funding must still be consistent with the underlying legal authorities governing a
particular grant program.  Plaintiffs' motion identifies a "handful of examples" of
funding programs that they contend forbid the Executive from pausing funding or
choosing different recipients, primarily because the programs involve formula grants
to the States.  *See* PI Mot. at 48-50.  But many of those funds are outside the scope of
the OMB Memo.  *Compare, e.g.*, *id.* at 48-49 (discussing Medicaid and other funding

provided to low-income individuals), *with* OMB Guidance at 1-2 (expressly excluding "mandatory programs like Medicaid" and other "program[s] that provide[] direct benefits to Americans"). And in any event, Plaintiffs have acknowledged that formula grants to the States are only one type of grant. *See* TRO Hrg. Tr. at 8.

There can be no serious question that many other grants are *not* formula grants, and that the Executive has significant discretion over selecting recipients and deciding whether to continue funding them. Indeed, the Supreme Court has previously held that allocations from a lump-sum appropriation provide such significant discretion to the Executive that such decisions are not susceptible to judicial review. *See Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) ("The allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion."). In that case, the Executive "discontinued the direct clinical services to Indian children in the Southwest," *id.* at 188, and because "the appropriations Acts for the relevant period do not so much as mention the Program," and the organic statutes "speak about Indian health only in general terms" there was no "legally binding obligation[]" to continue the program; thus, "[t]he decision to terminate the Program was committed to the Service's discretion." *Id.* at 193-94. Although it is certainly possible that, for any particular grant program, Congress may have "circumscribe[d] agency discretion to allocate resources by putting restrictions in the operative statutes," *id.* at 193, Plaintiffs have not carried their burden of demonstrating that *every* funding source is a mandatory one to which they are legally entitled—which is what they would have to show to

-40-

prevail on a facial challenge.

Indeed, even a brief review of some of the non-formula grant programs mentioned in Plaintiffs' PI motion highlights that they cannot prevail on their facial challenge. For example, Plaintiffs mention two awards through which Salem State University receives funding from the National Science Foundation (NSF). *See* PI Mot. at 18; ECF No. 68-58 ¶ 5. The first award (2200918, titled *Collaborative Research: Designing Computational Modeling Curricula across Science Subjects to Study How Repeated Engagement Impacts Student Learning throughout High School*) is funded pursuant to 42 U.S.C. § 1862q, which directs NSF to award grants for STEM education but does not require that any specific project or grantee receive funding, and the relevant appropriations for this grant are lump-sum appropriations.[3] And the relevant grant agreement states that "[t]he grant may be suspended or terminated in whole or in part . . . [b]y NSF, to the greatest extent authorized by law, if a grant [no] longer effectuates the program goals or agency priorities," including without any advance notice when NSF "believes such action is reasonable to protect the interests of the Government." NSF, *Research Terms & Conditions, Agency Specific Requirements* (Jan. 30, 2023), https://perma.cc/438V-

---

[3] Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. B, tit. III, National Science Foundation, Education and Human Resources, 136 Stat. 49, 139 (Mar. 15, 2022) (appropriating $1,006,000,000 "[f]or necessary expenses in carrying out science, mathematics, and engineering education and human resources programs and activities"); Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. C, tit. III, National Science Foundation, STEM Education, 138 Stat. 25, 162 (Mar. 9, 2024) (similar).

6H7N, § 41(b)-(c).    In light of this particular grant's governing statute, appropriations, and underlying agreement, there can be little dispute that the Executive has authority to temporarily pause funding to determine whether the grant continues to "effectuate[] . . . agency priorities."    A similar analysis applies with respect to the second NSF award.[4]

Plaintiffs also invoke certain highway grants administered by the Federal Highway Administration (FHWA), a subcomponent of the Department of Transportation.    *See* PI Mot. at 20-21; ECF No. 68-61 ¶¶ 12-18 (discussing grant negotiations for Low-Carbon Transportation Materials Grants Program).    That particular program is governed by 23 U.S.C. § 179, which again appropriates an overall amount and defines the intended purpose, but does not mandate that any eligible recipient receive an award.    *Cf.* FHWA, *Low-Carbon Transportation Materials Grants Program*, https://perma.cc/UU7K-43SD.    The FHWA grant conditions likewise embrace authority to "terminate[] or suspend[] in whole or in part . . . in accordance with 2 CFR 200.340," FHWA, *Contractors & Recipients General Terms and Conditions for Assistance Awards*, § 17 (Aug. 7, 2023), https://perma.cc/M7LK-D9SU, with that citation being to a uniform grant regulation that includes authority to terminate when "an award no longer effectuates the

---

[4]    That award (2314916, titled *Collaborative Research: Advancing Collaborations for Equity in Marine and Climate Sciences*) is operated pursuant to 42 U.S.C. § 1862(a)(1), and is also funded through a lump-sum appropriation.    *See* Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. B, tit. III, National Science Foundation, STEM Education, 138 Stat. 4459, 4550 (Dec. 29, 2022).    The award also has the same agency-specific grant terms regarding suspension and termination.

program goals or agency priorities." 2 C.F.R. § 200.340(a)(4).  Again, there is nothing in this particular grant's legal framework precluding the Executive from implementing a short-term, temporary pause to review the program.

If Plaintiffs were challenging isolated grant decisions, the parties could go through each one and litigate the full amount of discretion that each agency retains to temporarily pause funding.  But Plaintiffs are not bringing those claims, and are instead seeking broad, facial relief prohibiting implementation of the OMB Memo and the President's Executive Orders in all of their applications.  The above discussion is sufficient to show that, for at least some grant programs, agencies would have discretion to temporarily pause funding.  Thus, the above is sufficient to underscore that Plaintiffs have not carried their burden of proving that temporary pauses in funding are inherently unlawful.

## 2.    The Impoundment Control Act Does Not Assist Plaintiffs

Plaintiffs also contend that the Impoundment Control Act "specifically prohibits the President or any executive agency from unilaterally and indefinitely halting the expenditure of federal funds."  PI Mot. at 45.  But there are numerous problems with this argument.

To start, Plaintiffs' Complaint does not plead a claim under the Impoundment Control Act (or even mention the Act).  *See* Compl. ¶¶ 98-136.  As discussed above, Plaintiffs cannot obtain emergency, preliminary relief for a claim that is not properly part of this case.  *See supra* Part I.A.

Even if Plaintiffs had pled such a claim, moreover, the Impoundment Control

Act is a statute designed to enforce Congress's power over the purse in relation to the Executive. *See Dabney v. Reagan*, 542 F. Supp. 756, 760 (S.D.N.Y. 1982) ("The Impoundment Control Act was enacted by the Congress . . . in an effort to resolve disagreement between the Executive and Legislative branches over which has ultimate control of government program and fiscal spending policies."). The law provides for enforcement by the Comptroller General (an official in the Legislative Branch), not for private enforcement. Thus, that statute is generally not enforceable through an APA suit. *See Gen. Land Off. v. Biden*, 722 F. Supp. 3d 710, 734-35 (S.D. Tex. 2024); *Pub. Citizen v. Stockman*, 528 F. Supp. 824, 830 n.1 (D.D.C. 1981); *cf. Trump v. Sierra Club*, 140 S. Ct. 1 (2019).

More fundamentally, the Impoundment Control Act has nothing to say about the present circumstances—*i.e.*, temporary pauses in funding to review whether programs are consistent with the Administration's priorities, to the extent grant programs allow for such pauses. As the D.C. Circuit has explained, temporary pauses in obligations or payments of appropriations are quite common. *See City of New Haven v. United States*, 809 F.2d 900, 901 (D.C. Cir. 1987) (explaining how Congress has previously "acknowledged that 'the executive branch necessarily withholds funds on hundreds of occasions during the course of a fiscal year' and such delays may result from the 'normal and orderly operation of the government'" (quoting H.R. Rep. No. 658, 93d Cong., 1st Sess. 41 (1971)). And the Government Accountability Office (GAO), itself an entity within the Legislative Branch, has approved of agencies "taking the steps it reasonably believes are necessary to implement a program

efficiently and equitably, even if the result is that funds temporarily go unobligated." *In re James R. Jones, House of Representatives*, B-203057 L/M, 1981 WL 23385 (Comp. Gen. Sept. 15, 1981); *see also* GAO, *Principles of Federal Appropriations Law*, § 2-50 (4th ed. 2016) ("The expiration of budget authority or delays in obligating it resulting from ineffective or unwise program administration are not regarded as impoundments unless accompanied by or derived from an intention to withhold the budget authority.").

Here, as noted, the OMB Memo and the Executive Orders do not necessarily result in funds going unobligated. Thus, temporary pauses to determine whether grant programs are consistent with agency priorities are permissible when the underlying statutes allow for such pauses and evaluation. The ICA "does not impose any specific requirements on the Executive Branch as to the rate at which budget authority must be obligated or expended." *In re Henry M. Jackson, United States Senate*, B-200685, 1980 WL 14499, at *2 (Comp. Gen. Dec. 23, 1980). Nor is there any legal requirement that funds be "fully obligated as soon as they first become available, regardless of any necessary programmatic or administrative considerations." *In re James R. Jones, House of Representatives*, B-203057 L/M, 1981 WL 23385, at *4 (Comp. Gen. Sept. 15, 1981).

Consistent with these principles, past Presidents have likewise directed temporary pauses in funding, including for policy concerns—and for longer periods of time than what the OMB Memo directed here. President Biden, for example, directed agencies to "pause immediately the obligation of funds related to construction of the

southern border wall, to the extent permitted by law," with no specific end date but requiring a plan within 60 days. Procl. No. 10,142, *Termination of Emergency With Respect to the Southern Border of the United States and Redirection of Funds Diverted to Border Wall Construction*, 86 Fed. Reg. 7225 (Jan. 20, 2021), § 1(a)(ii). Similarly, President Obama directed that, even "[w]here executive departments or agencies lack discretion under the Recovery Act to refuse funding" for particular projects, the department or agency "[w]here legally permissible" should nonetheless "delay funding of the project for 30 days[.]" *Ensuring Responsible Spending of Recovery Act Funds*, 74 Fed. Reg. 12531 (Mar. 20, 2009), § 2(d)(i). On Plaintiffs' theory, these past actions were likewise unconstitutional and unlawful.

Finally, even if Plaintiffs' Impoundment Control Act theory had merit, they still could not obtain the broad relief they seek here. At most, Plaintiffs would have established that the OMB Memo or the Executive Orders constituted a deferral of budget authority for which the requisite "special message" was not communicated to Congress. *See* 2 U.S.C. § 684. In that scenario, the remedy would be a directive to communicate the special message—not a broad injunction interfering with the Executive's lawful discretion to review and reevaluate existing funding. And of course, transmission of the special message to Congress pursuant to § 684(a) would not redress Plaintiffs' injuries in any way. Thus, their Impoundment Control Act theory fails both on the merits and for more fundamental reasons.

Ultimately, even if (as Plaintiffs contend) there are some formula grants that mandate payments to the Plaintiff States on particular timeframes without delay,

there can be no serious question that numerous grant programs allow the Executive the discretion to temporarily pause payments. Indeed, this Court essentially stated as much. *See* ECF No. 50 at 4 ("Are there some aspects of the pause that might be legal and appropriate constitutionally for the Executive to take? The Court imagines there are[.]"). Because Plaintiffs bring a facial challenge seeking to invalidate the OMB Memo in all its applications, however, their claim fails based on the plainly legitimate sweep of circumstances where a pause is lawful—*i.e.*, where the underlying grant program statutes, appropriations measures, and grant agreements allow for such a pause. Thus, their statutory claims fail.

## C. The Constitutional Challenges Are Largely Just Recycled Statutory Claims, But Also Fail On Their Own Terms

Plaintiffs' constitutional claims alleging violations of the Separation of Powers, the Spending Clause, and the Presentment, Appropriations, and Take Care Clauses are meritless. Compl. ¶¶ 117–36.

As a threshold matter, aside from their Spending Clause claim (which presents distinct issues), Plaintiffs' supposed constitutional claims are really just statutory claims dressed up in constitutional language—because as the Supreme Court has confirmed, "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." *Dalton v. Specter*, 511 U.S. 462, 473 (1994). In *Dalton*, the Supreme Court rejected the proposition that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Id.* at 471. Not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the

Constitution." *Id.* at 472. In reaching this conclusion, the Supreme Court carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* (collecting cases). The Constitution is implicated only if executive officers rely on it as "[t]he only basis of authority" or if the officers rely on an unconstitutional statute. *Id.* at 473 & n.5.

Neither of those situations applies here. Even if Plaintiffs' claims are broadened to their over-arching "Funding Freeze," their supposed constitutional claims are fundamentally still arguing that that the President and other Defendant agencies paused funding contrary to the individual agencies' underlying statutory authorities, *see, e.g.*, PI Mot. at 48-50. Thus, as in *Dalton*, the question here is simply whether Defendants have complied with the relevant statutes—not whether the President had constitutional authority to act in excess of those statutes (which was the question in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)), or whether any particular statute itself is unconstitutional. *Dalton*'s reasoning therefore fully applies here and refutes Plaintiffs' argument that they have independent constitutional claims under the Separation of Powers or Presentment, Appropriations, and Take Care Clauses. *See Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 51–54 (D.D.C. 2020) (dismissing constitutional claims challenging border wall construction based on *Dalton*).

Even under Plaintiffs' own theories, there is no constitutional violation if Defendants acted in accordance with their statutory authorities and obligations. *See* PI Mot. at 48 (reasoning that "Defendants have not identified a single statutory or

regulatory provision authorizing the Freeze"); *id.* at 43 (arguing that the Executive Branch "may not refuse to disperse federal funds *without congressional authorization*" (emphasis added) (citations omitted)).  Thus, the above statutory analysis equally defeats these supposed constitutional claims.  But in any event, the claims also fail on their own terms.

### 1.    Separation of Powers

In making a constitutional claim based on the separation of powers, Plaintiffs make the same argument the Supreme Court rejected in *Dalton*.  Plaintiffs assert that "[t]he OMB Directive violates the separation of powers because the executive branch has overridden the careful judgments of Congress."  Compl. ¶ 121.  However, that separation-of-powers claim hinges entirely on whether OMB acted in accordance with its statutory authority.  Under Plaintiffs' theory, every garden-variety action by a federal agency alleged to be in violation of a statutory provision would also, *ipso facto*, violate the constitutional separation of powers—a line of argument that the Supreme Court foreclosed in *Dalton*.

In the event that the Court determines that Plaintiffs do make an independent separation-of-powers claim, the Court should reject any such claim relating to the challenged OMB Memo or the President's Executive Orders (to the extent the Court construes Plaintiffs to have challenged them).  As discussed *supra* Part III.A, the President does not infringe on Congress's Article I power by issuing an order to guide Executive Branch officials in their implementation of existing law.  Such orders carry out the President's responsibilities under Article II, Section 1, which provides that

the "executive Power shall be vested in a President of the United States of America."
That power "necessarily encompasses 'general administrative control of those
executing the laws,' . . . throughout the Executive Branch of government." *Allbaugh*,
295 F.3d at 32 (quoting *Myers*, 272 U.S. at 164).  A plaintiff could potentially bring
suit challenging a particular agency's final agency action implementing a
Presidential order or the OMB Memo, arguing that the particular implementation is
contrary to law.  But there is no basis for the sweeping conclusion that the President
or OMB somehow violated the structural design of the Constitution by directing other
Executive Branch officials to take certain action "to the extent permissible under
applicable law."  OMB Memo at 2; *see Allbaugh*, 295 F.3d at 33 (rejecting separation-
of-powers challenge to Executive Order where the President is merely exercising his
"supervisory authority over the Executive Branch" when he "directs his subordinates"
to take certain action "but only '[t]o the extent permitted by law'").

## 2.    Appropriations Clause

Plaintiffs' Appropriations Clause claim fails for similar reasons.  *See* Compl.
¶¶ 130-36.  Plaintiffs do not allege a distinct violation of the Appropriations Clause.
The Appropriations Clause states that "[n]o Money shall be drawn from the Treasury,
but in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7.
"[I]n other words, [a] payment of money from the Treasury must be authorized by a
statute." *Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990).  Plaintiffs'
claim boils down to an assertion that "Congress has established a comprehensive
statutory regime that governs when and how the President and Agency Defendants

can decline to spend duly appropriated funds" and that Defendants violated that "statutory regime" and therefore violated the Appropriations Clause.  PI Mot. at 44-45.   However, statutory funding disputes turn solely on "the interpretation and application of congressional statutes under which the challenged expenditures either were or were not authorized," not on a "controversy about the reach or application of" the Appropriations Clause.  *Harrington v. Schlesinger*, 528 F.2d 455, 457-58 (4th Cir. 1975).   Again, Plaintiffs implicitly acknowledge that there is no constitutional violation if Defendants acted in accordance with their statutory obligations.  *See* PI Mot. at 48 (resting argument on the assertion that "Defendants have not identified a single statutory or regulatory provision authorizing the Freeze").  For that reason, the Appropriations Clause adds nothing to this case separate and apart from the statutory issues discussed above.  *See also Dalton*, 511 U.S. at 474.

### 3.    Take Care Clause

Similarly, Plaintiffs' Take Care Clause claim fails because it simply reasserts allegations of statutory violations in constitutional terms.  The Take Care Clause provides that the President "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.  Plaintiffs base their Take Care Clause claim entirely on assertions that Defendants have failed to "'faithfully execute' congressional commands,'" by "ignor[ing] statutory mandates" and "refus[ing] to spend funds that Congress has duly authorized and appropriated."   PI Mot. at 47-48 (citations omitted); *see also id.* at 50.   But *Dalton* bars Plaintiffs' attempt to transform allegations of statutory violations into separate constitutional violations of the Take

Care Clause. Plaintiffs do not argue that Defendants could be in compliance with the statutes they identify, yet somehow violate the Take Care Clause. Thus, the outcome of this claim would turn on the meaning of the relevant statutes—a purely statutory dispute with no constitutional dimension.

Additionally, there is no precedent for using the Take Care Clause as a mechanism to obtain affirmative relief against the President or Executive Branch agencies. As previously explained, Plaintiffs cannot seek relief against the President. *See supra* Part II.A; *Franklin*, 505 U.S. at 796. Furthermore, recognizing such a claim in this context would raise its own separation-of-powers problems, because the Take Care Clause furnishes no basis for affirmative relief in an Article III court. For the Judicial Branch to undertake such an inquiry would express a "lack of the respect due" to the Nation's highest elected official, *Baker v. Carr*, 369 U.S. 186, 217 (1962), by assuming judicial superintendence over the exercise of Executive power that the Clause commits to the President. Indeed, the Supreme Court has recognized that "the duty of the President in the exercise of the power to see that the laws are faithfully executed" "is purely executive and political," and not subject to judicial direction. *Mississippi*, 71 U.S. at 499. The Take Care Clause does not open the door to any plaintiff seeking to challenge the manner in which the President or his subordinates execute the law.

In any event, in issuing the challenged OMB Memo, OMB took care to faithfully execute the laws. As discussed above, the OMB Memo instructed Federal agencies to temporarily pause certain federal financial assistance "to the extent

permissible under applicable law." OMB Memo at 2. The President's Executive Orders contain similar language. Given that, there is plainly no basis to conclude that OMB (or the President) has directed Executive Branch agencies to violate any law. *See Allbaugh*, 295 F.3d at 33.

### 4. Presentment Clause

Plaintiffs' Presentment Clause claim fares no better. Neither OMB nor any other Defendant has modified or repealed any statute contrary to the Constitution's bicameralism and presentment requirements of Article I, § 7. This case bears no resemblance to the legislative or line-item veto authorities that the Supreme Court struck down in *I.N.S. v. Chadha*, 462 U.S. 919 (1983) and *Clinton v. City of N.Y.*, 524 U.S. 417 (1998). Rather, Plaintiffs merely assert that OMB instructed agencies to not expend federal financial assistance funds, in violation of statutory authority. That claim is purely statutory in nature and raises no issues of any constitutional dimension. *See Dalton*, 511 U.S. at 473-74.

### 5. Spending Clause

Finally, Plaintiffs' Spending Clause claim also fails, because, as a threshold matter, Plaintiffs have failed to identify any new conditions placed on their receipt of federal funds as a result of the OMB Memo.

The Spending Clause provides that Congress has the power to "lay and collect Taxes, Duties, Imports, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Pursuant to this power, "Congress may fix the terms on which it shall disburse federal

money to the States." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *S. Dakota v. Dole*, 483 U.S. 203, 206 (1987) ("Incident to this power, Congress may attach conditions on the receipt of federal funds"). "[L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst*, 451 U.S. at 17. While this power is "br[oad]" it is "not unlimited," and "if Congress desires to condition the States' receipt of federal funds, it must do so unambiguously," *Dole*, 483 U.S. at 207, and cannot "surpris[e] participating States with post acceptance or 'retroactive' conditions," *Pennhurst*, 451 U.S. at 25.

Plaintiffs fail to state a Spending Clause claim for the fundamental reason that they do not identify any relevant "condition" imposed upon them, by the challenged OMB Memo or otherwise. Tellingly, instead of identifying *any* explicit condition on their funding (as necessary to make a Spending Clause claim), Plaintiffs' motion talks purely in conjecture, arguing that "to the extent the Freeze attempts to change the conditions of grant funding already obligated to the States, that change would violate the Spending Clause." PI Mot. at 52. Similarly, Plaintiffs' Complaint provides no specifics, merely stating in conclusory fashion that "the OMB Directive imposes new conditions on federal funding, altering the terms upon which grants were obligated and disbursed contrary to Congressional authority." Compl. ¶ 127. This is not surprising, since the "plain language" of the challenged OMB Memo does not impose any "newly created legal duties" in order to receive Federal funding. *Pennhurst*, 451 U.S. at 23. In the absence of "conditional language" setting forth "explicit conditions"

that "impos[e] . . . binding obligations on the States," there can be no Spending Clause violation. *Id.* at 23, 27; *see also City of Los Angeles v. Barr*, 929 F.3d 1163, 1176 (9th Cir. 2019) (finding no Spending Clause violation where the federal government "d[id] not propose to withdraw significant federal funds from a state or local jurisdiction unless they comply with specified federal requirements" or "retroactively impose costly new responsibilities on a recipient").

To the extent Plaintiffs assert that the relevant "condition" imposed upon them is that the OMB Memo instructs Federal agencies to "suspend or terminate payment," PI Mot. at 52, that is a question of *payment*, not the scope of authorized activities under a grant. Plaintiffs are not taking issue with "newly created legal duties," and therefore fail to state a Spending Clause violation. *Pennhurst*, 451 U.S. at 23. Furthermore, contrary to Plaintiffs' argument, the Spending Clause does not require that the Federal government "must keep the funds flowing" to the States, even if doing so is inconsistent with the Federal government's policy priorities, statutory authorities, and grant terms. *Madison v. Virginia*, 474 F.3d 118, 128 (4th Cir. 2006). And even if a withdrawal of funds could in some cases implicate the Spending Clause, here the OMB Memo directed only a short-term, temporary pause, and Plaintiffs fail to cite any case law suggesting an alteration in the timing of payment constitutes a new condition implicating the Spending Clause. On that logic, every time a payment took longer than expected the States would have suffered a constitutional violation.

That is not type of "fair notice" that the Spending Clause cases require.[5]

### D.    A Temporary Pause in Funding Is Not Arbitrary and Capricious

The scope of review under the "arbitrary and capricious" standard, 5 U.S.C. § 706(2)(A), is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). This standard "deems the agency action presumptively valid provided the action meets a minimum rationality standard." *Sierra Club v. EPA*, 353 F.3d 976, 978 (D.C. Cir. 2004) (citation omitted).

As a threshold matter, even if Plaintiffs' speculation is correct that some version of the OMB Memo might be reinstated in the future, their arbitrary-and-capricious challenge to the reasoning in this particular OMB Memo is moot. Any new memorandum would be premised on new considerations and would not present the same legal issue as the one presented here, so a decision by this Court about the propriety of OMB's past analysis would be a pure advisory opinion. *Cf. Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1908 (2020) (when an agency chooses to "'deal with the problem afresh' by taking *new* agency action," the agency "is not limited to its prior reasons").

Regardless, there is nothing irrational about a temporary pause in funding, to

---

[5] The Supreme Court has suggested that "in some circumstances the financial inducement offered by Congress might be so coercive" as to violate the Spending Clause. *Dole*, 483 U.S. at 211. Plaintiffs allege in conclusory terms that "the OMB Directive imposes funding conditions that are coercive," Compl. ¶ 127, but they do not elaborate on this in their preliminary injunction motion. This is not surprising, since absent any actual conditions being imposed on Plaintiffs it is entirely unclear what Plaintiffs are allegedly being coerced into doing, highlighting Plaintiffs' failure to state a valid Spending Clause claim.

the extent permissible by law, pending a review to ensure compliance with the President's priorities. That is precisely what OMB and other subordinate agencies are legally required to do pursuant to the President's Executive Orders. *See supra* Part III.A; *Sherley*, 689 F.3d at 784 ("[A]s an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law."). It cannot be irrational for them to comply with the law in such a manner. Indeed, requiring a federal agency to articulate a rationale for its action— beyond simple compliance with the President's directives—would, in essence, subject the President's directive to arbitrary and capricious review, contrary to the principle that the President is not an agency under the APA. *Franklin*, 505 U.S. at 800-01; *cf. Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*, 801 F. Supp. 2d 383, 403 (D. Md. 2011) ("the State Department and Assistant Secretary were acting on behalf of the President, and therefore their actions are not reviewable under the APA"), *aff'd*, 698 F.3d 171 (4th Cir. 2012).

Regardless, the OMB Memo cogently explains that its objective is to effectuate the President's Executive Orders and "safeguard valuable taxpayer resources." OMB Memo at 1. Plaintiffs characterize the pause as "contraven[ing] numerous statutory provisions," Pls.' PI Mot. at 56, but the pause does precisely the opposite—it ensures spending aligns with statutory provisions and presidential priorities. The OMB Memo rationally connected the temporary pause with these objectives by explaining that it is necessary to "provide the Administration time to review agency programs and determine the best uses of the funding for those programs consistent with the

law and the President's priorities." OMB Memo at 2. Additionally, the Memo explicitly directs agencies six times to act "consistent with the law," i.e., *not* to contravene their statutory authorities. *Id.*

Contrary to Plaintiffs' assertion that Defendants failed to consider important aspects of the problem or practical consequences, *see* PI Mot. at 8, the OMB Memo emphasized the significant amount of money that is expended every year on federal financial assistance—"$3 trillion [in] Federal financial Assistance, such as grants and loans," OMB Memo at 1—and then directed agencies to assess which specific assistance "may be implicated by any of the President's executive orders." *Id.* at 2. An agency's direction to assess and quantify a problem can hardly be impugned as irrational for failing to attempt to consider important aspects of the problem.

Additionally, not only did the OMB Memo consider practical consequences, but it also took steps to mitigate them. First, recognizing potential consequences for individuals, the OMB Memo exempted "assistance provided directly to individuals," specifically mentioning "Medicare or social security benefits." OMB Memo at 1 nn.1-2; *see also* OMB Guidance at 1-2. Second, the OMB Memo recognized that, despite the need for a pause and review of certain assistance, there may be some particular circumstances warranting a different approach, and thus provided for a safety valve: "OMB may grant exceptions allowing Federal agencies to issue new awards or take other actions on a case-by-case basis." OMB Memo at 2. Third, the OMB Memo was explicit that it directed only a temporary pause and review, not anything more significant such as outright cancellation of any grants. And fourth, the OMB Memo

provided a delayed effective date, with OMB acting quickly even before that effective date to "approve[] many programs to continue even before the pause has gone into effect." OMB Guidance at 1. Those efforts do not reflect wholesale ignoring of real world consequences, but rather an attempt to balance those consequences with the stated objectives of "act[ing] as faithful stewards of taxpayer money" and ensuring that federal programs "are being executed in accordance with the law and the new President's policies." *Id.* at 2.

A temporary pause in funding, accompanied by multiple safeguards, is a rational step toward achieving compliance with statutory provisions and presidential priorities while saving taxpayer money, therefore the OMB Memo was not arbitrary and capricious. Thus, all of Plaintiffs' claims fail on the merits.

## IV. The Balance of the Equities Independently Forecloses Relief

### A. Plaintiffs Have Not Proven Irreparable Injury in the Absence of a Preliminary Injunction

"Preliminary injunctions are strong medicine" and "should not issue except to prevent a real threat of harm." *Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004). "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004); *see also Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6–7 (1st Cir. 1991) ("[S]peculative injury does not constitute a showing of irreparable harm." (quoting *Public Serv. Co. of N.H. v. Town of W. Newbury*, 835 F.2d 380, 383 (1st Cir. 1987))). "The burden of demonstrating that a denial of interim relief is likely

to cause irreparable harm rests squarely upon the movant." *Charlesbank Equity Fund II*, 370 F.3d at 162. Plaintiffs' motion can be denied solely on the basis that they have failed to demonstrate irreparable harm. *See id.* ("In most cases—and the case at hand is no outlier—irreparable harm constitutes a necessary threshold showing for an award of preliminary injunctive relief.").

As already discussed, Plaintiffs' claims are moot, and, in any event, Plaintiffs do not clearly articulate the specific denials in funding that satisfy the requirements of Article III standing. *See supra* Part I. It therefore follows that Plaintiffs have failed to show irreparable harm for similar reasons.

In arguing otherwise, Plaintiffs assert that "deprivation of funding" will "hobbl[e] programs meant to further Plaintiff States' sovereign interests" and that they are "already suffering irreparable injuries due to Defendants' actions to 'pause' obligated federal funding." PI Mot. at 58, 64. But these actions pertain to other alleged pauses in funding, such as under the Infrastructure Improvement and Jobs Act and the Inflation Reduction Act. *See id.* at 59–61. Even assuming *arguendo* that Plaintiffs identify a real threat of harm, Plaintiffs fail to show "that the alleged harm will directly result from the action which the movant seeks to enjoin," which here is OMB Memo M-25-13. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam); *see also California v. Trump*, 379 F. Supp. 3d 928, 959 n.21 (N.D. Cal. 2019) (in order to show irreparable harm "Plaintiffs must demonstrate some likely harm resulting *from the challenged action*" (emphasis added)).

Plaintiffs' fallback argument that they will suffer irreparable harm as a result

of "budgetary uncertainty"—which they allege "is forcing state agencies to take steps to mitigate the risk" of losing grant funding, and will "cause reputational harm to State agencies, PI Mot. at 61–63—fails for similar reasons.  Given that the OMB Memo has been rescinded, any such prospective budgetary uncertainty cannot be caused by the challenged OMB Memo, but rather would either be a result of unchallenged actions or caused by Plaintiffs' mere speculation—neither of which is adequate to establish irreparable harm here.  *See Matos*, 367 F.3d at 73 (preliminary injunctions "should not issue merely to calm the imaginings of the movant"); *Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1201–02 (9th Cir. 1980) (plaintiff's "apprehension" regarding what they perceived as "reasonably likely" to occur was inadequate to constitute irreparable harm, particularly since plaintiff had not determined whether the "perceived barrier" caused by the challenged provision "was shadow or substance").

Plaintiffs do not cite any case law in which irreparable harm was found arising from alleged budget uncertainty caused by challenged action that was no longer in place.  Plaintiffs rely heavily on *County of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017), but that case is inapposite, because it did not involve alleged budgetary uncertainty caused by rescinded action.  Since the challenged OMB Memo does not still exist, *County of Santa Clara* does not provide support for Plaintiffs' assertion of irreparable harm in these circumstances.  Similarly, Plaintiffs cite *Michigan v. Devos*, 481 F. Supp. 3d 984 (N.D. Cal. 2020), but the plaintiffs in that case challenged a Department of Education interim final rule that was still in place.

Moreover, in that case, the government "acknowledged . . . that plaintiffs would sustain measurable financial and budgetary hardships under the Rule," so the court simply treated irreparable harm as "largely conceded." *Id.* at 995.

Finally, Plaintiffs' argument that they will suffer irreparable harm as a result of "reputational harm to State agencies" which they allege will "make it more difficult for them to attract grant partners for future applications," PI Mot. at 63, fails for the additional reason that it is speculative. *Guilbert*, 934 F.2d at 6-7. Plaintiffs cite to various exhibits, but none provides anything more than conclusory statements in support of this purported harm, let alone explains how a preliminary injunction would meaningfully redress such harm. The kinds of speculative and conclusory allegations in Plaintiffs' cited declarations do not suffice to establish irreparable harm. *See, e.g.*, *Tennessee v. Becerra*, 117 F.4th 348, 369 (6th Cir. 2024) (rejecting argument that state would suffer reputational injury as "too speculative," because state "d[id] not provide the requisite facts and affidavits supporting its theory of reputational harm" (citation omitted)); *Brodie v. U.S. Dep't of Health & Human Servs.*, 715 F. Supp. 2d 74, 84 (D.D.C. 2010) ("Merely conclusory allegations of stigma do not suffice to establish imminent injury."); *Toxco Inc. v. Chu*, 724 F. Supp. 2d 16, 30–31 (D.D.C. 2010) (where plaintiff "d[id] not point to a single concrete manifestation of the reputational injury it is purportedly suffering . . . the court concludes that the plaintiff's claims of reputational harm are far too vague, speculative and uncorroborated to support a finding of irreparable harm."). While Plaintiffs cite to *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12 (1st Cir.

1996), that case is readily distinguishable because the court upheld the district court's findings regarding loss of goodwill, since they were "not unduly speculative" and were consistent "with the available evidence." *Id.* at 20.

Ultimately, even if Plaintiffs can claim some threat of harm, there is no reason why they cannot vindicate that threatened harm through individualized, specific lawsuits challenging particular funding denials. Their declarations do not establish the need for broad relief in a single lawsuit, rather than proceeding in the ordinary course of APA review over discrete, specific funding decisions.

## B.    The Public Interest Weighs Squarely Against Relief

Lastly, Plaintiffs cannot establish that the balance of equities and the public interest favor granting the extraordinary remedy of a preliminary injunction. These final two factors merge in cases where relief is sought from the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

In arguing that the public interest weighs in their favor, Plaintiffs primarily rely on the notion that they are likely to prevail on the merits and that there is no public interest in the perpetuation of unlawful agency action. *See* PI Mot. at 65–66, 68–69. But that is just a repackaged version of their merits arguments, and as previously discussed, the now-rescinded OMB Memo and the related Executive Orders are lawful. Plaintiffs also briefly recast their irreparable-harm arguments, *see id.* at 66–67, which likewise fail for reasons already discussed.

Meanwhile, contrary to Plaintiffs' assertions that Defendants will suffer no cognizable harm if a preliminary injunction is granted, an injunction here would effectively disable almost a dozen federal agencies, as well as the President himself,

from implementing the President's priorities consistent with their legal authorities. "Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (brackets omitted). Plaintiffs attempt to distinguish *Maryland v. King* on the grounds that this language only applies to injunctions against "state law[s] enacted by a state legislature." PI Mot. at 68–69. But the First Circuit has indicated that it does not cabin Chief Justice Roberts' language so narrowly, citing it in a decision granting a stay pending appeal of a preliminary injunction against a federal agency rulemaking. *See Dist. 4 Lodge of the Int'l Assoc. of Machinists & Aerospace Workers Local Lodge 207 v. Ctr. for Biological Diversity*, 18 F.4th 38, 47 (1st Cir. 2021).

Additionally, where the Government is legally entitled to make decisions about the disbursement or allocation of federal funds but is nonetheless ordered to release the funding, such funds may not be retrievable afterwards. Given the exceptionally broad relief that Plaintiffs seek with respect to "disbursement and transmission of appropriated federal funds to Plaintiff States and recipients therein under awarded grants, executed contracts, or other executed financial obligations," PI Mot. at 69, the harms to the Government would be tremendous.

Relatedly, a broad preliminary injunction would have a significant chilling effect on the President's and his advisors' ability to lawfully direct and guide agencies' spending decisions. Agencies may feel obligated to forgo pursuing legally permissible actions in furtherance of the President's operative Executive Orders or other policy

priorities for fear of risking contempt.  Indeed, as the Court itself acknowledged in its order granting a temporary restraining order, there are "aspects of the pause that might be legal and appropriate constitutionally for the Executive to take."  ECF No. 50 at 4.  A preliminary injunction would have a chilling effect on agencies taking those lawful actions, contrary to the will of the people as expressed through the President and his priorities.  Thus, the balance of equities weighs in favor of the Government and relief should be denied.

## V.    Any Injunctive Relief Should be Narrowly Tailored to Permit Lawful Agency Activity, and Should Be Stayed Pending Appeal

It is a bedrock principle of equity that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  Additionally, "'preliminary relief may never be granted that addresses matters 'which in no circumstances can be dealt with in any final injunction that may be entered.'"  *In re Microsoft Corp. Antitrust Litig*, 333 F.3d 517, 525 (4th Cir. 2003) (quoting *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945)).  Therefore, the scope of equitable relief available here should be constrained by what would be available to Plaintiffs at final judgment under the APA.  *See Pac. Radiation Oncology, Ltd. Liab. Co. v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015) (preliminary relief must be "of the same nature as that to be finally granted.").

Relief under the APA is limited; courts may either "compel agency action unlawfully withheld or unreasonably delayed" or "hold unlawful and set aside agency action."  5 U.S.C. § 706; *see also SUWA* 542 U.S. at 66-67 (explaining how the APA's

limits on relief are intended to "protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements"). Plaintiffs' constitutional claims do not alter the scope of relief that is available to them in this APA case. "When a party claims that a [constitutional] violation . . . has occurred . . . '[that party] must be able to invoke the existing jurisdiction of the courts for [the party's] protection.'" *Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 58 (1st Cir. 2007) (quoting *Davis v. Passman*, 442 U.S. 228, 242 (1979)). And although "some residuum of power remains with the district court to review agency action that is *ultra vires*" "even after the passage of the APA," *Rhode Island Dep't of Env't Mgmt. v. United States*, 304 F.3d 31, 42 (1st Cir. 2002), in order to qualify for *ultra vires* equitable relief, the APA must not already provide Plaintiffs the "means of vindicating [their] rights." *Commonwealth of Puerto Rico*, 490 F.3d at 59 (holding that Puerto Rico could not obtain *ultra vires* equitable relief on a constitutional claim when the "existence of the APA as a means for review[] . . . implie[d] that nonstatutory review [was] inappropriate."). Because relief (to the extent the Court concludes it is appropriate) would be available under the APA, any relief outside the scope of the APA is unwarranted.

In line with the above principles, to the extent the Court intends to grant Plaintiffs' request for preliminary relief, such relief should be narrowly tailored to apply only to Plaintiffs, the object of their challenge (the OMB Memo), and to leave intact the Executive Branch's discretion to engage in further consideration of the topic at hand and implement new policies consistent with law.

A. **Injunctive Relief Should Be Limited to the Present Plaintiffs and the Object of Their Challenge: The OMB Memo**

Any preliminary relief should be limited to address any established harms of the present Plaintiffs that stem from the OMB Memo.  There is no basis for extending relief to non-parties in this suit, or to funding streams that do not appear to have any effect on Plaintiffs.  Accordingly, any preliminary injunction should confirm that all obligations in the injunctive order apply only with respect to awards involving the Plaintiff States.  *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions *of the parties* until a trial on the merits can be held." (emphasis added)).

Furthermore, it is axiomatic that Plaintiffs are not entitled to emergency injunctive relief reaching beyond the scope of what they challenge in this case.  *See, e.g., Bird v. Barr*, No. 19-cv-1581, 2020 WL 4219784, at *2 (D.D.C. July 23, 2020) (a preliminary injunction "is not a generic means by which a plaintiff can obtain auxiliary forms of relief that may be helpful to them while they litigate unrelated claims").  Here, Plaintiffs' Complaint challenges only the now-rescinded OMB Memo, not any independent Executive Orders—which were issued prior to the OMB Memo and which Plaintiffs elected not to challenge.  The scope of Plaintiffs' challenge is clear from Plaintiffs' Prayer for Relief, which asks for various forms of relief relating only to the "OMB Directive," and not to any Executive Orders.  *See* Compl. at 35–36.  Any injunctive relief should therefore extend no further than the OMB Memo.

Enjoining agencies' implementation of the President's Executive Orders directly interferes with the President's Article II authority to direct subordinate

agencies' actions, even if those agencies retain residual authorities of their own. Thus, allowing agencies to act on the basis of their "authorizing statutes, regulations, and terms," ECF No. 50 at 12, does not eliminate the separation of powers harms associated with enjoining those agencies from implementing the President's priorities as expressed through Executive Orders. And in all events, any relief should not issue directly against the President. *See supra* Part II.A.

### B.    Relief Should Be Limited to Preserve the Executive Branch's Discretionary Authority

To the extent the Court considers entering Plaintiffs' proposed preliminary injunction, that order should be limited to mitigate (albeit not eliminate) the significant harms it would cause to Defendants' and the Executive Branch's abilities to exercise their lawful statutory authority and discretion. Specifically, the Court should refuse to grant an injunction prohibiting Defendants from reissuing, adopting, implementing, or otherwise giving effect to the OMB Directive under any other name or title or through any other Defendants. Foreclosing further executive action on the matter would be contrary to the limited relief available under the APA, which generally allows courts to invalidate only the specific portions of an agency policy that it finds unlawful. *Cf. Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019) ("The APA permits a court to sever a rule by setting aside only the offending parts of the rule."). And this particular aspect of relief has proved to be unadministrable, as even Plaintiffs have shifted their views on precisely what conduct is prohibited. *Compare* Pls.' Mot. to Enforce TRO (ECF No. 66) at 15 ("Defendants' assertion that 'the mere fact of a pause in funding does not inherently

violate the Court's Order,' . . . cannot be squared with the plain text of the Order"), *with* Pls.' Opp'n to Mot. to Stay (ECF No. 105) at 1 ("[T]he Court's orders do not block defendants from exercising their discretion to halt the disbursement of federal funds based on specific applicable statutes, regulations, and grant terms."). This vague provision fails to comply with Rule 65(d)'s requirements and should be struck.

Additionally, if the Court concludes it is likely that certain provisions of the OMB Memo were *substantively* contrary to law, 5 U.S.C. § 706(2), any injunction that flows from that determination must be specific as to the provisions OMB is enjoined from reissuing. *See City of N.Y. v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 145 (2d Cir. 2011) ("An injunction is overbroad when it seeks to restrain the defendants from engaging in legal conduct, or from engaging in illegal conduct that was not fairly the subject of litigation."). The injunction must "state its terms specifically," and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed R. Civ. P. 65(d)(1)(C). When granting equitable relief under the APA, "ordinarily the appropriate course is *simply to identify a legal error* and then remand to the agency" for further action consistent with that determination. *N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 861 (D.C. Cir. 2012) (emphasis added).

When there is a finding of arbitrary and capricious action, then "further consideration of the issue by the agency" is the required remedy. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 46 (1983). But an overbroad preliminary injunction like the one Plaintiffs request would prohibit the

agency from engaging in "further consideration." *Id.*; *cf. Pub. Emps. for Env't Resp. v. Nat'l Park Serv.*, 605 F. Supp. 3d 28, 49 (D.D.C. 2022) (declining to "preclude an agency from reaching a similar result on the same issue of substantive policy, as long as the second decision result[s] from a new procedural process distinct enough that it can fairly be considered a new 'action.'").

By requesting the exact opposite of the remedy that is typically available under the APA, Plaintiffs' proposed injunction also runs counter to the rule that "'preliminary relief may never be granted that addresses matters 'which in no circumstances can be dealt with in any final injunction that may be entered.'" *In re Microsoft Corp. Antitrust Litig*, 333 F.3d at 525 (quoting *De Beers Consol. Mines*, 325 U.S. at 220). To avoid this, any preliminary relief here should make clear that it does not prohibit agencies from implementing the President's Executive Orders within the bounds of the agency's underlying statutory authorities. Failure to include that clarification would highlight the extraordinarily intrusive nature of Plaintiffs' requested injunction, prohibiting almost a dozen federal agencies (and potentially the President himself) from effectuating the President's priorities consistent with their underlying authorities, as they are required to do. *Cf. Sherley*, 689 F.3d at 784 ("an agency under the direction of the executive branch . . . must implement the President's policy directives to the extent permitted by law").

Defendants respectfully request that any preliminary relief be narrowly tailored to preserve the Executive Branch's discretionary authority as a coordinate branch of government to give further consideration to the issues at hand and act upon

-70-

Case 1:25-cv-00039-JJM-PAS    Document 113    Filed 02/12/25    Page 74 of 75 PageID #: 7202

those considerations pursuant to proper procedures and the Court's identification of specific legal constraints. That is the normal remedy in APA litigation, and anything broader would constitute a significant intrusion on the separation of powers.

Particularly in light of the extraordinary breadth of Plaintiffs' requested relief, to the extent the Court issues any injunctive relief, the United States respectfully requests that such relief be stayed pending the disposition of any appeal that is authorized, or at a minimum that such relief be administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction should be denied.

Dated: February 12, 2025            Respectfully submitted,

                                    BRETT A. SHUMATE
                                    Acting Assistant Attorney General

                                    ALEXANDER K. HAAS
                                    Director

                                    /s/   Daniel Schwei
                                    DANIEL SCHWEI
                                    Special Counsel (N.Y. Bar)
                                    ANDREW F. FREIDAH
                                    EITAN R. SIRKOVICH
                                    Trial Attorneys
                                    United States Department of Justice
                                    Civil Division, Federal Programs Branch
                                    1100 L Street NW
                                    Washington, DC 20530
                                    Tel.:   (202) 305-8693
                                    Fax:   (202) 616-8460
                                    Email:   daniel.s.schwei@usdoj.gov

                                    *Counsel for Defendants*

<u>**CERTIFICATION OF SERVICE**</u>

I hereby certify that on February 12, 2025, I electronically filed the within Certification with the Clerk of the United States District Court for the District of Rhode Island using the CM/ECF System, thereby serving it on all registered users in accordance with Federal Rule of Civil Procedure 5(b)(2)(E) and Local Rule Gen 305.


<u>*/s/ Daniel Schwei*</u>
Daniel Schwei